Nos. 23-2033, 23-2034, 23-2035, 23-2036, 23-2037, 23-2038, 23-2039

## UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

---

RIDESHARE DISPLAYS, INC.,
*Appellant,*

v.

LYFT, INC.,
*Cross-Appellant.*

---

Appeals from the United States Patent and Trademark Office, Patent Trial and Appeal Board in Nos. IPR2021-01598, IPR2021-01599, IPR2021-01600, IPR2021-01601, IPR2021-01602

---

### CROSS-APPELLANT LYFT, INC.'S PRINCIPAL & RESPONSE BRIEF

---

DECEMBER 21, 2023

ELIOT D. WILLIAMS
BAKER BOTTS L.L.P.
700 K Street, N.W.
Washington, DC 20001-5692
eliot.williams@bakerbotts.com

JEREMY J. TAYLOR
BAKER BOTTS L.L.P.
101 California Street, Suite 3200
San Francisco, CA 94111
jeremy.taylor@bakerbotts.com

JENNIFER C. TEMPESTA
MARGARET M. WELSH
BAKER BOTTS L.L.P.
30 Rockefeller Plaza
New York, NY 10112
jennifer.tempesta@bakerbotts.com
margaret.welsh@bakerbotts.com

*Attorneys for Cross-Appellant Lyft, Inc.*

## REPRESENTATIVE PATENT CLAIMS AT ISSUE[1]

## U.S. PATENT NO. 9,892,637

**Original Claim 1.** A vehicle identification system, comprising:

at least one display associated with a vehicle, wherein the at least one display is located to be visible from an exterior of the vehicle;

a transceiver; and

a controller communicatively coupled to the transceiver, wherein the controller is adapted to generate a first signal to be transmitted by the transceiver to a mobile communication device associated with a driver of the vehicle when it is determined that the vehicle is within a predetermined distance of a specific location,

wherein the mobile communication device associated with the driver is adapted to generate a second signal to be transmitted to the at least one display, the second signal representing an indicator.

**Substitute Claim 29.** A method of identifying a vehicle being dispatched to a location of a user having requested a ride from a transportation service, comprising:

when it is determined that the vehicle is within a predetermined distance of the location of the user, generating a notification signal to a mobile communication device associated with the driver;

generating, by creating an indicator, an indicatory signal representing ~~an~~ the indicator in response to receiving the notification signal;

displaying, on a display associated with the vehicle, the indicator based on the notification and indicatory signals, the display being located to be visible on the exterior of the vehicle;

displaying the indicator on a mobile communication device associated with the user; and

identifying the vehicle based on appearance of a match, by visual observation of the user, between the indicator being displayed on the mobile communication

---

[1] Claim amendments made in connection with the IPRs, and which are subject to Lyft's cross-appeal, are shown in underline and strikethrough.

device associated with the user and the indicator being displayed on the display associated with the vehicle.

## U.S. PATENT NO. 10,559,199

**Original Claim 1.** A vehicle identification method implemented as an Application on mobile communication devices over a wireless communication network, comprising:

requesting a ride from a transportation service from a mobile communication device of a user;

determining that a vehicle is within a predetermined distance of the location of the user;

generating a notification signal to a mobile communication device associated with a driver of the vehicle;

generating an indicatory signal representing an indicator;

displaying the indicator based on the notification signal on a display associated with the vehicle, the mobile communication device associated with the driver, and the user's mobile communication device, wherein the display associated with the vehicle is located to be visible from the exterior of the vehicle; and

identifying the vehicle based on appearance of a match, by visual observation of the user, between the indicator being displayed on the user's mobile communication device and the indicator being displayed on the display associated with the vehicle.

**Substitute Claim 3.** A vehicle identification method implemented as an Application on mobile communication devices over a wireless communication network, comprising:

requesting a ride from a transportation service from a mobile communication device of a user;

determining that a vehicle is within a predetermined distance of the location of the user;

generating a notification signal to a mobile communication device associated with a driver of the vehicle;

generating, by creating an indicator that is specific to a user and driver match, an indicatory signal representing ~~an~~ the indicator;

displaying the indicator based on the notification signal on a display associated with the vehicle, the mobile communication device associated with the driver, and the user's mobile communication device,

wherein the display associated with the vehicle is located to be visible from the exterior of the vehicle; and

identifying the vehicle based on appearance of a match, by visual observation of the user, between the indicator being displayed on the user's mobile communication device and the indicator being displayed on the display associated with the vehicle.

## U.S. PATENT NO. 10,169,987

1.  A vehicle identification system, comprising:

a display associated with a vehicle, wherein the display is located to be visible from an exterior of the vehicle by a rider;

a controller communicatively coupled to a network and configured to, in response to receipt of a signal from a user, generate and transmit a first signal representing an indicator via the network to a mobile communication device associated with a driver of the vehicle; and

wherein, in response to receiving the first signal, the mobile communication device associated with the driver of the vehicle generates and transmits a second signal representing the indicator to the display, the indicator identifies the vehicle.

## U.S. PATENT NO. 10,395,525

1.  A vehicle identification system, comprising:

a display associated with a front windshield of a vehicle, wherein the display is movable so as to be visible from an exterior of the vehicle by a rider;

a controller communicatively coupled to mobile communication devices, wherein the controller generates a first signal representing an indicator which is transmitted to a mobile communication device associated with a driver of the vehicle and a second signal representing the indicator which is transmitted to a mobile communication device associated with the rider; and

wherein the mobile communication device associated with the driver of the vehicle generates a third signal representing the indicator, which is transmitted to the display, the third signal representing the indicator identifies the vehicle.

## U.S. PATENT NO. 10,748,417

**1.** A vehicle identification system for mobile communication device users, comprising:

a display associated with a vehicle, wherein the display is located to be visible from an exterior of the vehicle by mobile communication device users;

a controller communicatively coupled to a network and configured to, in response to receipt of a ride request signal from a mobile communication device of a user in a pickup area, generate and transmit a notification signal via the network to a mobile communication device associated with a driver of the vehicle, and in response to the mobile communication device associated with the driver of the vehicle receiving the notification signal an indicatory signal representing a visual indicator is generated and transmitted to the display and the mobile communication device of the user, wherein the visual indicator is not duplicated in the same pickup area.

FORM 9. Certificate of Interest

Form 9 (p. 1)
March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

### <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 23-2033 |
| **Short Case Caption** | Rideshare Displays, Inc. v. Lyft, Inc. |
| **Filing Party/Entity** | Lyft, Inc. |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 07/25/2023

Signature: /s/ Eliot D. Williams

Name: Eliot D. Williams

**FORM 9. Certificate of Interest**

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☑ None/Not Applicable |
| Lyft, Inc. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐   Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☑     None/Not Applicable             ☐     Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑  Yes (file separate notice; see below)     ☐  No     ☐  N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑     None/Not Applicable             ☐     Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

**Page**

STATEMENT OF RELATED CASES ............................................................... vii

JURISDICTIONAL STATEMENT ........................................................ 1

INTRODUCTION ........................................................................... 2

STATEMENT OF THE ISSUES........................................................... 3

   I.     RSDI's Appeal ...................................................................... 3

   II.    Lyft's Cross-Appeal (the '637 and '199 Patent Substitute Claims) ..... 4

STATEMENT OF THE CASE............................................................... 5

   I.     The Challenged Patents....................................................... 5

   II.    The Prior Art at Issue .......................................................... 7

       A.    Kalanick Discloses an On-Demand Ride Dispatch Service Which Utilizes Default or User Selected Indicators.................. 7

       B.    Kemler Discloses a Driverless Vehicle Centralized Dispatching System Which Automatically Selects Indicators to Avoid Duplication.................................................. 9

       C.    Lalancette Discloses a Taxi Dispatch System Utilizing Unique Icons for Vehicle Identification and Protecting the User's Privacy ........................................................ 11

       D.    Stanfield Discloses Creating an Indicator After Determining the Vehicle Is Within a Predetermined Distance of the User ... 12

   III.   The IPR Proceedings........................................................ 15

       A.    The Board Invalidated Each and Every Challenged Claim ...... 15

       B.    The Board Granted in Part the Motion to Amend for Substitute Claims 29 and 31-32 of the '637 Patent and Substitute Claims 3-4 of the '199 Patent ............................... 16

    SUMMARY OF ARGUMENT ............................................................ 17

    STANDARD OF REVIEW ................................................................ 22

    ARGUMENT ............................................................................ 24

   I.     The "Generate" Claim Terms Were Properly Construed and Correctly Determined to be Disclosed by the Prior Art.................... 24

       A.    The Board Correctly Construed the Claim Term "Generate" .. 24

B.    Substantial Evidence Supports the Board's Obviousness Determination That Lyft's Invalidity Grounds Disclose Generating the Indicatory Signal ..............................27

1.    Kalanick Discloses Generating an Indicatory Signal .....27

2.    The Kalanick and Kemler Combination Discloses Creating a New Indicator Each Time an Indicatory Signal Is Generated ...................................................................28

3.    Lalancette Discloses Generating an Indicator ................31

C.    Substantial Evidence Supports the Board's Determination That a POSA Would Have Been Motivated to Combine Either Kalanick or Lalancette with Kemler .............................33

1.    There Is Substantial Evidence That a POSA Would Have Been Motivated to Combine Kalanick with Kemler ......34

2.    There Is Substantial Evidence That a POSA Would Have Been Motivated to Combine Lalancette with Kemler....40

II.    Substantial Evidence Supports the Board's Determination That Lalancette Discloses a Communication Device Associated with a Driver..................................................................................42

A.    Lalancette Discloses a Communication Device Associated with a Driver .................................................................42

B.    RSDI Is Improperly Limiting the Definition of a Communication Device Associated with a Driver to Require the Device to be a Personal Communication Device Such as a Cell Phone .............................................................43

C.    The Board's Determination That Lalancette Discloses a Communication Device Associated with a Driver Is Supported by Substantial Evidence ..........................................44

III.    Substantial Evidence Supports the Board's Determination That Kalanick in Combination with Kemler Discloses Sending the First Signal/Notification Signal When the Vehicle is Within a Predetermined Distance........................................................46

A.    Kalanick in Combination with Kemler Discloses Sending the First Signal/Notification Signal When the Vehicle Is Within a Predetermined Distance ........................................46

IV.  Substantial Evidence Supports the Board's Determination that Kalanick Alone or in Combination with Kemler Renders Claims 1-8 of the '987 Patent Obvious .............................................................49

    A.  Kalanick Alone Discloses Generating and Transmitting a First Signal in Response to Receipt of a Ride Request From a User ................................................................................................49

    B.  Kalanick in Combination with Kemler Discloses Generating and Transmitting a Notification Signal in Response to Receipt of a Ride Request From a User ...................................52

CROSS-APPEAL ARGUMENT ................................................................53

I.  The Substitute Claims Are Directed to Patent-Ineligible Subject Matter ...............................................................................................53

    A.  The Substitute Claims Are Directed to an Abstract Idea..........53

    B.  The Substitute Claims Lack an Inventive Concept...................57

    C.  The Board Wrongly Characterized Lyft's Arguments in Response to the Preliminary Guidance .....................................60

II.  The Original Disclosures Do Not Support "Creating an Indicator" When or After the Vehicle Is Within a Predetermined Distance........61

    A.  Claim 29 ('637 Patent)............................................................61

    B.  Claim 3 ('199 Patent)..............................................................63

III.  The Board Erred in Finding Lyft Failed to Demonstrate the Proposed Substitute Claims Were Obvious Over the Prior Art..........64

    A.  Kemler Discloses Creating an Indicator After Determining the Vehicle Is Within a Predetermined Distance of the User ...65

    B.  Stanfield Discloses the Indicator Creation Limitations ............68

CONCLUSION .......................................................................................70

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Affinity Labs. of Tex., LLC v. DIRECTV, LLC*,
   838 F.3d 1253 (Fed. Cir. 2016) ..........................................................56

*Almirall, LLC v. Amneal Pharms. LLC*,
   28 F.4th 265 (Fed. Cir. 2022) ...............................................................22

*Am. Nat'l Mfg. Inc. v. Sleep Number Corp.*,
   52 F.4th 1371 (Fed. Cir. 2022) .............................................................24

*Baggage Airline Guest Servs., Inc. v. Roadie, Inc.*,
   351 F. Supp. 3d 753 (D. Del. 2019) ....................................................57

*Bausch & Lomb, Inc. v. BarnesHind/Hydrocurve, Inc.*,
   796 F.2d 443 (Fed. Cir. 1986) ..............................................................68

*Consol. Edison Co. v. NLRB*,
   305 U.S. 197 (1938) ..............................................................................23

*Consolo v. Fed. Maritime Comm'n*,
   383 U.S. 607 (1966) .........................................................................23, 45

*CRFD Research, Inc. v. Matal*,
   876 F.3d 1330 (Fed. Cir. 2017) ............................................................29

*Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*,
   424 F.3d 1293 (Fed. Cir. 2005) ............................................................70

*Customedia Techs. LLC v. Dish Network Corp.*,
   951 F.3d 1359 (Fed. Cir. 2020) ............................................................55

*cxLoyalty, Inc. v. Maritz Holdings Inc.*,
   986 F.3d 1367 (Fed. Cir. 2021) ............................................................24

*DDR Holdings LLC v. Hotels.com, L.P.*,
   773 F.3d 1245 (Fed. Cir. 2014) .............................................54, 60, 61

*Elec. Power Grp., LLC v. Alstom S.A.*,
   830 F.3d 1350 (Fed. Cir. 2016) ........................................................56

*Graham v. John Deere Co. of Kansas City*,
   383 U.S. 1 (1966) ........................................................................23

*In re Comiskey*,
   554 F.3d 967 (Fed. Cir. 2009) ..................................................28, 33

*In re Gartside*,
   203 F.3d 1305 (Fed. Cir. 2000) ................................................23, 45

*In re Google Tech. Holdings LLC*,
   980 F.3d 858 (Fed. Cir. 2020) ........................................................37

*In re Kahn*,
   441 F.3d 977 (Fed. Cir. 2006) ........................................................70

*In re NTP, Inc.*,
   654 F.3d 1279 (Fed. Cir. 2011) ................................................22, 45

*In re Wesslau*,
   353 F.2d 238 (CCPA 1965) ............................................................68

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
   381 F.3d 1111 (Fed. Cir. 2004) ......................................................63

*Intel Corp. v. PACT XPP Schweiz AG*,
   61 F.4th 1373 (Fed. Cir. 2023) ................................................34, 70

*KSR Int'l Co. v. Teleflex Inc.*,
   550 U.S. 398 (2007) ..........................................................23, 34, 70

*L.E.A. Dynatech, Inc. v. Allina*,
   49 F.3d 1527 (Fed. Cir. 1995) ........................................................37

*Medytox, Inc. v. Galderma S.A.*,
   71 F.4th 990 (Fed. Cir. 2023) ........................................................24

*Randall Mfg. v. Rea*,
   733 F.3d 1355 (Fed. Cir. 2013) ......................................................23

*Sanderling Mgmt. Ltd. v. Snap Inc.*,
  65 F.4th 698 (Fed. Cir. 2023) ...............................................................55

*St. Jude Med., LLC v. Snyders Heart Valve LLC*,
  977 F.3d 1232 (Fed. Cir. 2020) ...........................................................23

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
  574 U.S. 318 (2015)................................................................................23

*Visual Memory LLC v. NVIDIA Corp.*,
  867 F.3d 1253 (Fed. Cir. 2017) ..................................................54, 60

*Vitronics Corp. v. Conceptronic, Inc.*,
  90 F.3d 1576 (Fed. Cir. 1996) .............................................................26

**STATEMENT OF RELATED CASES**

Pursuant to Federal Rule 47.5(b), Cross-Appellant Lyft, Inc. ("Lyft") states that this Court's decision in these consolidated appeals may affect the following case, in which the same patents have been asserted: *Rideshare Displays, Inc. v. Lyft, Inc.*, Case No. 1:20-cv-01229 (D. Del.) (stayed pending this appeal).

## JURISDICTIONAL STATEMENT

Lyft filed petitions for *inter partes* review ("IPR") of U.S. Patent Nos. 9,892,637; 10,559,199; 10,169,987; 10,395,525; and 10,748,417. Appx346-434, Appx874-940, Appx941-1004, Appx1005-1062, Appx1063-1127. The Patent Trial and Appeal Board had jurisdiction over Lyft's IPRs under 35 U.S.C. §§ 6(b)(4), 311. The Board issued its final written decisions in connection with those IPRs on April 10, 2023. Appx1-239. Lyft timely filed its notice of cross-appeal on June 12, 2023. Appx2141-2150; 35 U.S.C. § 142; 37 C.F.R. § 90.3. This Court has jurisdiction over this appeal under 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. §§ 141(c), 319.

1

# INTRODUCTION

Lyft filed petitions for *inter partes* review ("IPR") seeking to invalidate five patents owned by Rideshare Displays, Inc. ("RSDI"), U.S. Patent Nos. 9,892,637; 10,559,199; 10,169,987; 10,395,525; and 10,748,417 (collectively, "the Challenged Patents"). The Challenged Patents all have the same specification.

The Patent Trial and Appeal Board ("Board") instituted review for all of Lyft's five IPRs, and subsequently invalidated all the challenged claims of the Challenged Patents. For these determinations, Lyft seeks this Court's affirmance.

The Board, however, also determined that a total of five proposed Substitute Claims (two independent, three dependent) should be found patentable in connection with two of the Challenged Patents (the '637 and '199 Patents). As to these determinations, Lyft seeks reversal.

# STATEMENT OF THE ISSUES

## I.    RSDI's Appeal

1.    For all five Challenged Patents, whether A) the Board, in light of the intrinsic record, correctly construed "generate" and rejected RSDI's proposal that the claim term "generate" modifies both the signal and the indicator/code such that a new indicator needs to be produced each time an indicatory ***signal*** is generated; B) substantial evidence supports the Board's determination that generating an indicatory signal is disclosed by Lyft's prior art combinations; and C) substantial evidence supports the Board's finding that a person of ordinary skill in the art ("POSA") would have been motivated to make the combinations.

2.    For all five Challenged Patents, whether substantial evidence supports the Board's determination that Lalancette discloses a "communication device associated with the driver of a vehicle" where Lalancette discloses a mobile computer which is operated by the driver of a taxi vehicle.

3.    Whether substantial evidence supports the Board's determination relating to the '637 and '199 patents that Kalanick in combination with Kemler discloses sending a first signal/notification signal when a vehicle is within a predetermined distance where the combination discloses having a central controller send notification signals to the driver's device when the vehicle is within a predetermined distance.

4.     Whether substantial evidence supports the Board's conclusion relating to the '987 patent that Kalanick alone or in combination with Kemler discloses sending the indicator to the driver's device "in response to receipt of a signal from a user" where Kalanick's on-demand service system initiates upon receiving a ride request from a user.

## II.     Lyft's Cross-Appeal (the '637 and '199 Patent Substitute Claims)

5.     Whether the Board erred in holding that the Substitute Claims are directed to patent-eligible subject matter under 35 U.S.C. § 101 where the claims are directed to a method of organizing human activity and lack an inventive concept.

6.     Whether the Board erred in allowing the Substitute Claims, which add "creating an indicator," where the original specification discloses only generation of an "indicatory signal."

7.     Whether the Board erred in determining that the Substitute Claims would not have been obvious over the prior art references that disclose "creating an indicator."

## STATEMENT OF THE CASE

### I.    The Challenged Patents

The Challenged Patents (U.S. Patent Nos. 9,892,637 (the "'637 patent"); 10,169,987 (the "'987 patent"); 10,395,525 (the "'525 patent"); 10,559,199 (the "'199 patent"); and 10,748,417 (the "'417 patent") are all related and share a common specification. Appellee and Cross-Appellant Lyft, Inc. ("Lyft") cites to the '637 Patent specification unless otherwise specified.

The Challenged Patents are directed to "a system and method for vehicle identification" and providing "an indicator on a mobile communication device of a user having requested a ride service to allow the user to identify a vehicle prior to boarding the vehicle." Appx245 at 1:20-25. The alleged invention concerns "provid[ing] a notification signal for activating a driver's mobile communication device to generate a signal representing an indicator, whereby the indicator is displayed on a display visible from the exterior of the vehicle." Appx246 at 3:10-14. The specification states the indicator may "be displayed on a display associated with an article of clothing (e.g., coat or hat) worn by the driver and/or displayed on a remote hand-held display device (e.g., tablet computer) held by the driver." Appx246 at 3:14-19. The indicator "may be displayable as a 'code' (e.g., a text string or alphanumeric string), an icon, or other identifier," that is displayed "to enable the

[passenger] to identify the vehicle that he/she has requested for a ride service." Appx246 at 4:5-10.

As shown in FIGs. 1A and 1B of the '637 patent shown below, vehicle identification system 10 includes a controller 110, a transceiver 120, and one or more displays associated with a vehicle 20. Appx246 at 3:52-61; Appx241-242 at Fig. 1, 2.



In the embodiment shown in FIG. 1A (left), controller 110 generates a first signal or a notification signal which is transmitted via the transceiver 120 to the mobile communication device 150 associated with the driver. Appx247 at 5:1-15. The notification signal may be generated, for example, when the vehicle approaches a predetermined location based on GPS. *Id*.

In another embodiment, shown in FIG. 1B (right), the vehicle identification system 11 generates a signal 14 to be transmitted to the mobile device 140 associated with a passenger and a notification signal 15 is transmitted to the mobile device 150

of the driver. Appx247 at 5:36-50. The '637 patent broadly describes "mobile communication device" as "any portable wireless device," which include but are not limited to "cellular (cell) and mobile telephones, smart mobile telephones, mobile e-mail devices, digital personal assistance, etc." Appx245-246 at 2:64-66, 3:1-4.

When dispatched vehicle 20 arrives at the pickup location and waits for the passenger who requested the ride service, the vehicle may be parked among other vehicles. When the passenger who requested the ride service approaches the pickup area, in order to locate his/her ride the passenger can visually observe a vehicle 20 with the display 130 displaying the indicator 111 that is a match to the indicator 111 (e.g., A22 shown in FIGS. 1A and 1B) being displayed on the user's mobile communication device 140. Appx247 at 5:55-60.

## II.    The Prior Art at Issue

### A.    Kalanick Discloses an On-Demand Ride Dispatch Service Which Utilizes Default or User Selected Indicators

U.S. Patent Publication No. 20150332425A1 ("Kalanick") discloses an on-demand service to be provided for a requesting user by a transport service provider. Appx287, at Abstract, Appx304, ¶ 2. Kalanick's "'controller' (i.e., its 'system 100') 'can communicate, over one or more networks via a network interface [i.e., transceiver] (e.g., wirelessly or using a wire), with the client devices 150 (e.g., mobile computing devices operated by clients or users/customers) and the driver devices 160 (e.g., mobile computing devices operated by drivers) using a client

device interface 120 and a driver device interface 130, respectively."' Appx306, ¶ 25.

Kalanick describes a dynamically configured and personalized display that is positioned on or fastened to a vehicle. The display (shown in FIG. 2H below) is easily visible to a user outside of the vehicle and informs the user which vehicle has been assigned to the user for the on-demand service. Appx287 at Abstract, Appx304, ¶ 10; Appx292 at Fig. 2H.



The display can output "color(s), a pattern(s), an illumination sequence(s), text, visual content, video, and/or audio." Appx304, ¶ 10. Through the use of a service application, the user may specify "one or more output configurations for an

indication device." Appx313, ¶ 76. If the user did not select a personalized indicator, the system selects a default indicator. Appx307, ¶ 31.

Kalanick discloses that "the on-demand service system can programmatically determine that the driver is arriving at the pickup location or has reached the pickup location by comparing the location data of the driver with the specified pickup location of the user (e.g., if the driver's position is within a predetermined distance of the user's current location or the pickup location)." Appx308, ¶ 35.

### B. Kemler Discloses a Driverless Vehicle Centralized Dispatching System Which Automatically Selects Indicators to Avoid Duplication

U.S. Patent No. 9,494,938 ("Kemler") discloses systems and methods to provide a user with a way to identify or verify a vehicle dispatched to pick up the user. Appx330 at 3:38-47. Kemler discloses a central controller that creates unique indicators to avoid duplication of indicators within the same pickup location. Appx332-333 at 8:54-9:2. Kemler also discloses sending notification signals when the vehicle is within a predetermined distance. In Kemler, "a notification is received by the one or more computing devices from the driverless vehicle that the driverless vehicle has reached a threshold distance or time from the location of the client computing device, and the signaling information is sent to the driverless vehicle only after the notification is received." Appx329 at 1:58-65.

Kemler describes the dispatched vehicle having an external electronic display mounted on the vehicle and an internal electronic display. Appx331 at 5:16-32. Kemler explains that as the dispatched vehicle approaches the user's client device, a unique signal may be displayed on the vehicle's external display and the user's client device so the user can identify the vehicle without compromising the user's privacy. Appx330 at 4:1-19.



FIG. 9 is an example diagram 900 of a client computing device and a computing device of a vehicle displaying a unique signal around the same time. Appx327.

### C. Lalancette Discloses a Taxi Dispatch System Utilizing Unique Icons for Vehicle Identification and Protecting the User's Privacy

U.S. Patent Publication No. 2012/0137256A1 ("Lalancette") discloses a cross-platform target identification system for identifying a target in a target-rich public environment. Appx337, Abstract; Appx342, ¶¶ 1-3. Lalancette discloses that in "response to receiving a user request for service, a service provider 108 obtains or generates a human-readable icon for the user, and dispatches [a] selected taxi car 118 to the location of user 102 and displays the user's icon on the taxi roof-top electronic display 122 and to the driver's dashboard display 124. The service provider 108 also transmits a copy of the icon to user device 104 for confirmation to the user." (Internal quotations omitted). Appx343, ¶¶ 29, 31-33, Appx338 at Fig. 1.

Lalancette describes an electronic display mounted to be visible from outside a taxi, a mobile computing device in the taxi which manages a dash-mounted driver display and the mounted electronic display, and a smart phone of a user. Appx342-343, ¶¶ 27-29.

11



FIG. 1

As shown in FIG. 1, Lalancette discloses that when a taxi requested by the user approaches the user's location, the mounted display, driver display, and the user's smart phone will each display a unique human-readable icon associated with the user in order to help the user identify the requested taxi and help the driver identify the requesting user while maintaining a level of anonymity for the user. Appx343-344, ¶¶ 33-43; Appx338 at Fig. 1.

### D. Stanfield Discloses Creating an Indicator After Determining the Vehicle Is Within a Predetermined Distance of the User

U.S. Patent No. 9,442,888 ("Stanfield") relates to methods of "renting and controlling occupancy in a rental vehicle" used for ridesharing. Appx1677 at 1:38-

41. Stanfield describes a vehicle "receiving a signal from a fleet manager . . . the signal specifying a current availability of the vehicle for rent" (Appx1668 at Abstract, Appx1677 at 2:13-15) and "updating a visual indicator arranged on the vehicle according to the signal." Appx1668 at Abstract, Appx1677-1678 at 2:15-16, 4:23-24. Stanfield discloses receiving a signal from a fleet manager in Block S110 where the signal specifies the current availability of the vehicle for rent, and based on that signal the visual indicator arranged on the vehicle is updated according to the signal in Block S120. Appx1678 at 3:26-45, 4:26-42. The visual indicator is visible from outside the vehicle. *Id*. Stanfield discloses that "Block S120 [i.e., a computing device] functions to control the visual indicator to signify driver and/or passenger availability of the vehicle to a person outside the vehicle. Therefore, Block S120 can enable visual access to passenger and/or driver availability of the vehicle, thereby enabling a person with visual access to the vehicle . . . to substantially immediately comprehend the rental status of the vehicle." Appx1678 at 4:26-34.

Stanfield discloses the system transmits vehicle availability information "to mobile computing devices (e.g., Smartphones, tablets) carried by potential users, [that are] within a threshold range of the vehicle." Appx1680 at 7:8-10. Also, user information may be downloaded and stored on a user's mobile device "when the distance between the mobile computing device and the vehicle is less than a threshold distance" utilizing GPS for location of the vehicle and user's device.

Appx1680 at 8:32-41.

Stanfield discloses a "visual indicator" which can "include one or more light sources" which change colors depending on the availability of the vehicle and are arranged within or outside the vehicle. Appx1678 at 4:43-53. Stanfield further discloses the visual indicator can display more complex signals. E.g., "[b]lock S120 can also control the visual indicator according to a charge level or fuel level" and the visual indicator is able to display information corresponding to the vehicle's battery level or range. Appx1679 at 5:6-12. The display is also capable of displaying information such as time remaining until the next scheduled booking, or "to indicate when and who has reserved the vehicle and for how long, for what purpose, and/or for what destination." Appx1679 at 5:12-22.

Stanfield also discloses the use of weight, optical or motion sensors to determine which seats of the vehicle are occupied by riders. Appx1681 at 10:42-52. The system can utilize this sensor information to "inform one or more persons outside the vehicle of the availability or unavailability of the vehicle or seats within the vehicle." Appx1683 at 14:48-51. For example, "in FIG. 8, Block S120 indicates seating occupancy by controlling illumination of a portion of a seat (e.g., the driver's seat) of the rental vehicle, wherein the seat is illuminated in a first color to indicate occupancy and a second color to indicate vacancy." Appx1679 at 5:38-42.

## III.    The IPR Proceedings

In its Final Written Decisions, the Board concluded:

| IPR | Bases for Unpatentability | References | Claims Shown Unpatentable | Substitute Claims Allowed |
|---|---|---|---|---|
| 2021-01598 ('637 patent)  Appx1-72 | 103 | Kalanick/Kemler | 1-9, 11-20 | 29, 31-32 |
|  | 103 | Lalancette/Kemler |  |  |
| 2021-01601 ('199 patent)  Appx148-211 | 103 | Kalanick/Kemler | 1 | 3-4 |
|  | 103 | Lalancette/Kemler | 1, 2 |  |
| 2021-1599 ('987 patent)  Appx73-119 | 103 | Kalanick/Kemler | 1, 2, 4, 6-8 | N/A |
|  | 102 | Lalancette | 1, 2, 4, 7, 8 |  |
|  | 103 | Lalancette/Kemler | 6 |  |
| 2021-01600 ('525 patent)  Appx120-147 | 103 | Lalancette | 1 | N/A |
| 2021-01602 ('417 patent)  Appx212-239 | 103 | Lalancette | 1-5 | N/A |

### A.    The Board Invalidated Each and Every Challenged Claim

In its final written decisions, the Board determined that every claim of the Challenged Patents were unpatentable as obvious or anticipated over the prior art references Kalanick, Lalancette, and Kemler. Prior to reaching its decisions, the Board determined the claim term "generate" required construction. *See, e.g.*,

Appx1385. The Board determined that "generate" was not explicitly defined in the specification and utilized a dictionary definition to determine the term's plain and ordinary meaning, which is "to originate or produce the signal." *See, e.g.*, Appx1387-1388. Notably, the Board indicated that the claims do not require that a "a new signal be actively formulated each time a ride is dispatched" as RSDI argued. *See, e.g.*, Appx1385-1386. (Internal quotations omitted).

On appeal, RSDI is challenging the Board's construction of "generate" in the claimed context of generating an indicatory signal such that a new indicator is created each time an indicatory is produced. RSDI's Opening Brief ("Br.") 26-27. RSDI also challenges the Board's determination that the claims of the Challenged Patents are invalid.

### B. The Board Granted in Part the Motion to Amend for Substitute Claims 29 and 31-32 of the '637 Patent and Substitute Claims 3-4 of the '199 Patent

For the IPR proceedings involving the '637 patent and the '199 patent, RSDI moved to amend the claims and add proposed Substitute Claims 21-32 for the '637 patent and proposed Substitute Claims 3-4 for the '199 patent. Although the Board allowed claims 29 and 31-32 of the '637 patent and claims 3-4 of the '199 patent, it denied all other proposed Substitute Claims, which RSDI does not challenge on appeal. Appx70, Appx210.

With respect to the Substitute Claims, Lyft raised three independent reasons why those claims should not be allowed, which the Board rejected. First, the Board found claim 29 of the '637 patent and claim 3 of the '199 patent—which add "creating an indicator"—did not introduce new matter. *See* Appx58-59, Appx197-200. Second, the Board determined that Lyft had not proven the Substitute Claims were obvious over: (1) Kalanick and Kemler; (2) Kalanick, Kemler, and Stanfield; (3) Lalancette and Kemler; or (4) Lalancette, Kemler, and Stanfield. Appx61-66, Appx200-204. Third, the Board determined that the claims are directed to patent-eligible subject matter. Appx65-66, Appx205-206.

## SUMMARY OF ARGUMENT

**RSDI's Appeal:**

The Court should affirm the Board's determination that every challenged claim is unpatentable based on Kalanick, Lalancette, and Kemler.

The "Generate" Claim Terms Were Properly Construed and Found to Be Met by the Prior Art: First, the Board's construction of "generate" in the context of generating an indicatory signal/signal representing an indicator was correct. RSDI argues that the claims require the origination or production of a new indicator itself, along with the origination of the indicatory signal. However, RSDI's position is incorrect and runs contrary to the claim language itself and the specification. The challenged claims make clear that what needs to be created is a ***signal*** which contains

the information to display the indicator. There is no such requirement that a new indicator itself needs to be created, and therefore the Board's construction of "generate" should be upheld.

Applying the correct construction of "generate," the Board's determination that Lyft's invalidity grounds disclosed "generating an indicatory signal" is supported by substantial evidence. Kalanick alone meets the limitation of generating a signal representing the indicator because Kalanick discloses storing user selected indicators and then transmitting those indicators via an indicatory signal. Appx94-95; Appx911-912; Appx304, ¶ 2, Appx315 at cl. 1.

In addition, the combination of Kalanick and Kemler also discloses creating an indicatory signal and thus satisfies the "generate" limitations. Kemler discloses that its central controller creates unique indicators to avoid duplication of indicators within the same pickup location, (Appx905; Appx332 at 8:54-9:2) and RSDI concedes this much. Br. 30 ("Regardless of whether the system controller generates the signal/indicator (as in Kemler) or the signal/indicator is retrieved from a memory source (as in Kalanick), at some point the system controller has the signal (either from creating it or retrieving it) and sends it to the driver device.").

The Board's determination that Lalancette also discloses the creation of an indicatory signal was supported by substantial evidence. The Board was correct in finding that Lalancette "teaches that the controller (i.e., taxi service provider 108)

generates a first signal representing an indicator (icon) which is transmitted to a mobile communication device (i.e., the mobile computer) in taxi car 118." Appx139; Appx993; Appx343-344, ¶¶ 29, 31-33, 39.

Substantial evidence also supports the Board's determination that a POSA would have been motivated to combine Kalanick or Lalancette with Kemler. The Board correctly determined that Kalanick and Kemler are directed to achieving similar goals. Both references "address similar problems related to vehicle identification," "teach similar solutions involving generating, transmitting, and displaying unique, easily distinguishable visual indicators on multiple displays such that users can visually match the unique indicators to identify their assigned vehicle," and "also utilize vehicle mounted displays which are visible from the outside of the vehicle." (Internal quotations omitted). Appx30; Appx372-373; Appx474, ¶ 113. Likewise, both Lalancette and Kemler "address similar problems related to vehicle identification and share the common objective of enabling riders to visually locate a requested vehicle while protecting the rider's privacy." (Internal quotations omitted). Appx35; Appx404; Appx499, ¶ 218.

Lalancette Discloses "a Communication Device Associated with a Driver of a Vehicle": Contrary to what RSDI argues, substantial evidence supports the Board's determination that Lalancette discloses a "communication device associated with a driver." RSDI is attempting to save its claims from invalidation by improperly

19

interpreting these claims narrowly, arguing that Lalancette's mobile computer (which among other things displays a copy of the rider's unique icon to the driver of the taxi) is somehow not a "communication device associated with a driver." As the Board correctly recognized, Lalancette's mobile computer is in the taxi, and is therefore associated with the driver of that taxi. Appx343, ¶¶ 32-33; Appx141.

The Prior Art Combinations Disclose the "First Signal/Notification Signal" Limitations of the '637 and '199 Patents: Substantial evidence supports the Board's determination that Kalanick combined with Kemler discloses sending the first signal/notification signal when the vehicle is within a predetermined distance. As the Board correctly noted, "the combination of Kalanick and Kemler would include having the controller generate and transmit the signal containing the unique display information when the vehicle is within a predetermined distance from the user's location." (Internal quotations omitted). Appx41; Appx385; Appx483, ¶ 143.

The '987 Patent Claims Are Obvious Over Kalanick/Kemler: Substantial evidence supports the Board's determination that Kalanick alone or combined with Kemler discloses sending the indicator to the driver's device "in response to receipt of a signal from user." Claim 1 of Kalanick discloses that once a transport request from a user is received, Kalanick's system "transmit[s], over one or more networks, the data to at least one of the driver device or the indicator device associated with the selected driver to configure how the indication device of the driver operates when

the driver is selected for the customer." Appx315 at cl. 1. In addition, RSDI ignores the fact the Kalanick-Kemler combination also discloses sending the first signal "in response to" receipt of a signal from a user. The Board correctly agreed that a POSA would have been motivated to combine "Kemler's 'controller generated signal/indicator' with Kalanick's vehicle identification system to have the controller send a signal representing the indicator to the driver's device" in response to receiving a ride request from user. Appx97.

**Lyft's Cross-Appeal:**

In addition to affirming the Board's determinations related to the original claims, the Court should reverse the Board's decision on RSDI's motions to amend. The Board erred in partially granting RSDI's motions to amend, allowing Substitute Claims 29 and 31-32 of the '637 patent and Substitute Claims 3-4 of the '199 patent, for three reasons.

The Substitute Claims Are Invalid Under 35 U.S.C. § 101: The claims are directed to a method of organizing human activity. The Board erred in determining the claims—which cite generic computer components and recite functions without explaining how those functions are achieved—provide a technological solution. Because the claims use only generic computer parts in a conventional manner, they also fail to provide an inventive concept.

The Substitute Claims Reciting "Creating an Indicator" Without Specification Support: Although the original disclosures describe when an "indicatory signal" is generated, they remain silent on when the "indicator" itself is generated. The Board improperly regarded the two as the same, despite the original disclosures' acknowledgement that they are distinct (*i.e.*, "an indicatory signal represent[s] an indicator"). The Board's finding of written description support for "creating an indicator," therefore, is not supported by substantial evidence.

The Substitute Claims Would Have Been Obvious:   Kemler and Stanfield each disclose "creating an indicator" after determining the vehicle is within a predetermined distance of the user. Contrary to its approach on written description, the Board found Kemler's disclosure of when an indicatory signal is created to not sufficiently disclose "creating an indicator." The Board also committed legal and factual error when it ignored Stanfield's teachings because Stanfield purportedly failed to address the same problem as RSDI's patents.

## STANDARD OF REVIEW

This Court reviews the Board's legal conclusions de novo and factual findings for substantial evidence. *Almirall, LLC v. Amneal Pharms. LLC*, 28 F.4th 265, 271-72 (Fed. Cir. 2022). "This court does not reweigh evidence on appeal, but rather determines whether substantial evidence supports the Board's fact findings." *In re NTP, Inc.*, 654 F.3d 1279, 1292 (Fed. Cir. 2011). Substantial evidence means "such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *In re Gartside*, 203 F.3d 1305, 1312 (Fed. Cir. 2000) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229-30 (1938)). "[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966).

"The Board's claim constructions . . . are determinations of law reviewed de novo where based on intrinsic evidence, with any Board findings about facts extrinsic to the patent record reviewed for substantial-evidence support." *St. Jude Med., LLC v. Snyders Heart Valve LLC*, 977 F.3d 1232, 1238 (Fed. Cir. 2020) (citing *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 325-27 (2015)).

"Whether a claimed invention is unpatentable as obvious under § 103 is a question of law based on underlying findings of fact." *In re Gartside*, 203 F.3d at 1316. These underlying factual issues include the "scope and content of the prior art, differences between the prior art and the claims at issue, the level of ordinary skill in the pertinent art, and any objective indicia of non-obviousness." *Randall Mfg. v. Rea*, 733 F.3d 1355, 1362 (Fed. Cir. 2013) (first citing *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007); and then citing *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17-18 (1966)).

This Court "review[s] the Board's decision to grant a motion to amend under the Administrative Procedure Act, and [ ] may set aside the Board's action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Am. Nat'l Mfg. Inc. v. Sleep Number Corp.*, 52 F.4th 1371, 1382-83 (Fed. Cir. 2022) (quoting 5 U.S.C. § 706(2)(A)). The Board's patent-eligibility determination is an issue of law that this Court reviews de novo. *cxLoyalty, Inc. v. Maritz Holdings Inc.*, 986 F.3d 1367, 1376 (Fed. Cir. 2021). "Whether a claim amendment satisfies the written description requirement or improperly adds new matter are both questions of fact reviewed for substantial evidence." *Medytox, Inc. v. Galderma S.A.*, 71 F.4th 990, 996 (Fed. Cir. 2023).

## ARGUMENT

## I.  The "Generate" Claim Terms Were Properly Construed and Correctly Determined to be Disclosed by the Prior Art

The Board's construction of "generate" in the context of generating an indicatory signal/signal representing an indicator such that only a *signal* is required to be created is correct. Furthermore, the Board's determination that Lyft's prior art combinations disclose generating an indicatory signal and that a POSA would have been motivated to combine the references is supported by substantial evidence.

### A.  The Board Correctly Construed the Claim Term "Generate"

The Board's construction of the term "generate" should be upheld because the claims do not require that a new indictor is created each time an indicatory signal is

produced. RSDI argues on appeal that the Board misconstrued "generate" when read in the context of "a signal representing an indicator" (or similar limitations).[2] RSDI's position is that "generate" should be construed to "apply not just to 'signal,' but to the entire claim phrase 'signal representing an indicator,' which includes generation (i.e., origination/production of the indicator data itself.)" Br. 28. Such a construction necessitates that every claim at issue recites the creation of a new indicator whenever an indicatory signal (signal representing an indicator) is generated. However, as the Board correctly concluded, RSDI's construction is not supported by the claim language or specification and therefore the Board's construction should be upheld.

The Board applied the ordinary and customary meaning of the term "generate" as confirmed by the specification, determining that the term meant: "to originate or produce ***the signal***." (Emphasis added).[3] *See* Appx18-19. RSDI does not dispute this construction. Rather, it argues that when "generate" is read in the context of the claims at issue, the claims require that a new indicator be originated or produced whenever an indicatory signal is generated. *See* Br. 27. However, as the Board pointed out, RSDI's interpretation is inconsistent with the intrinsic evidence.

---

[2] Every claim at issue recites the generation of some sort of signal which contains the information needed to display an indicator on a visual display.

[3] Emphasis added throughout unless otherwise specified.

To properly construe a claim term, the court first considers the intrinsic record, starting with the claim language. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). Here, the claim language itself refutes RSDI's argument, and confirms that the Board's construction was correct. As RSDI points out, "[e]very claim-at-issue recites a signal representing an indicator (or code) being generated." Br. 21. The claim language of every claim at issue makes clear what is being generated, ***a signal*** – not the indicator, as the Board correctly concluded. *E.g.*, Appx248 at cl. 9 and Appx276 at cl. 1 ("generating an indicatory signal representing an indicator); Appx257 at cls. 1, 8 ("generate and transmit a first signal representing an indicator"). Thus, the claims themselves reveal that a signal is generated, and that the content of that signal "represent[s]" the indicator. Nothing in that claim language requires, as RSDI now argues, that the word "generate" "modify both the 'signal' and the 'indicator[].'" *Cf.* Br. 21.

While the claim language on its own is conclusive and the discussion could end there, the specification also does not support RSDI's interpretation. In its brief, RSDI highlights a couple of passages from the specification that describe the driver's mobile device creating the indicatory signal. Br. 27 ("The patents-at-issue disclose that the '"mobile communication device associated with the driver is adapted to generate ***a second signal*** to be transmitted to the one or more displays. The second signal represents an indicator.'"); *id*. at 28 ("In response to receiving the notification

signal, an application on the mobile communication device 150 associated with the driver D generates *a second signal* 17 (also referred to herein as an 'indicatory signal') representing an indicator." (Internal quotations omitted). Consistent with the claim language, the specification reiterates that *a signal* is what is being generated, not the indicator itself.

As such, the Board's construction of "generate" to mean "to originate or produce *the signal*" should be upheld because the claim language and specification only provides support for the creation of a signal, not the indicator itself. Regardless, as explained below, the grounds of unpatentability that the Board adopted in its final written decision all entail generation of a signal representing an indicator, even under RSDI's improper view of "generate."

**B.    Substantial Evidence Supports the Board's Obviousness Determination That Lyft's Invalidity Grounds Disclose Generating the Indicatory Signal**

The Board carefully analyzed the arguments and evidence presented by both parties and concluded that the challenged claims were unpatentable in view of the grounds presented in the petition. RSDI presents no basis to disturb those findings, as explained below.

### 1.    Kalanick Discloses Generating an Indicatory Signal

When applying the proper construction of "generate," the Board correctly determined that Kalanick alone discloses creating an indicatory signal. The Board

27

agreed that "Kalanick discloses arranging a transport service for a user by receiving a transport request from a user device and, in response to determining that the user has specified an output configuration (i.e., an indicator) for an indication device, identifying data corresponding to the user-specified output configuration and transmitting the data over a network to the driver device to configure the vehicle's indication device." Appx95; Appx911-912; Appx304, ¶ 2, Appx315 at cl. 1. Kalanick meets the limitation of generating a signal representing the indicator because Kalanick discloses storing user selected indicators and then transmitting those indicators via an indicatory signal. Appx97; Appx307-308, ¶¶ 29-39.

**2.     The Kalanick and Kemler Combination Discloses Creating a New Indicator Each Time an Indicatory Signal Is Generated**

The Board's finding that the Kalanick and Kemler combination discloses creating a new indicator when an indicatory signal is generated is supported by substantial evidence. As a result, regardless of whether RSDI's improper construction of "generate" is applied or not, the Kalanick-Kemler combination satisfies the limitation. Therefore, even if RSDI's construction of "generate" is applied, this Court should affirm-on-other-grounds the Board's determination that all claims of the Challenged Patents are invalid. *See In re Comiskey*, 554 F.3d 967, 974 (Fed. Cir. 2009) ("[w]e may, however, where appropriate, affirm the [agency]

on grounds other than those relied upon in rendering its decision, when upholding the [agency's] decision does not depend upon making a determination of fact not previously made by the [agency].") (Internal quotations omitted); *see also*, *CRFD Research, Inc. v. Matal*, 876 F.3d 1330, 1344-49 (Fed. Cir. 2017) (reversing the Board's determination that Hulu did not show by preponderance of the evidence the obviousness of the challenged claims and deciding that the challenged claims were invalid).

The Board was correct in determining that the combination of Kalanick and Kemler also discloses creating an indicatory signal and thus satisfies this limitation even under RSDI's improper view of the claims, which require the creation of a new indicator when the indicatory signal is generated. In particular, in its analysis of this issue in the Final Written Decision, the Board noted that RSDI's argument failed to address the combination proposed by Petitioner. The Board correctly noted: "Moreover, Petitioner relies on the combination of Kalanick and Kemler for this limitation, ***including the indicator signal***" which combination entailed the central controller generating a combined "signal/indicator" Appx186-187, (citing Appx1041). Thus, Board was correct in finding that the combination of references entails the central generation of a combined "signal/indicator" that would meet even RSDI's incorrect interpretation of the claims.

By way of background, the combination proposed in the Petition, and adopted by the Board, involved Kemler's disclosure of a central controller creating unique indicators to avoid duplication of indicators within the same pickup location. Appx905; Appx332 at 8:54-9:2. RSDI does not dispute that Kemler generates indicators, and in fact, concedes this point. Br. 30 ("Regardless of whether the system controller generates the signal/indicator (as in Kemler) or the signal/indicator is retrieved from a memory source (as in Kalanick), at some point the system controller has the signal (either from creating it or retrieving it) and sends it to the driver device."). The Board correctly found that a POSA would have been motivated with an expectation of success in combining, Kemler and Kalanick such that "a centralized dispatching system may generate a signal" including "a unique, distinct" indicator. Appx176, Appx179. Similarly, the Board was correct in finding that a "POSA would be motivated to combine the controller generated signal/indicator of Kemler's driverless vehicle identification system with Kalanick's driver-oriented vehicle identification system to permit the driver's device to send the signal to the display on the vehicle after the driver's device receives the signal from the controller." Appx186; Appx1041; Appx1343, ¶ 137. The Board's findings were supported by substantial evidence because "POSA would have been motivated to implement Kemler's indicator selection system, which provides for automatic selection of the indicator, in Kalanick because it would eliminate instances where

riders within a similar area select the same or similar indicators, or are provided the same default indicator, making them less unique." Appx178; Appx1036; Appx1338, ¶ 120.

In its Opening Brief, RSDI argues that Kalanick fails to teach creating an indicator but merely "transmits a signal that was stored in the user's profile based on the user's predetermined configuration preferences." Br. 28. While RSDI's argument rests on its improper construction of "generates," RSDI ignores the fact that Lyft relies on the combination of Kalanick and Kemler to satisfy this requirement. Therefore, the Board's determination that the Kalanick-Kemler combination discloses generating an indicator is supported by substantial evidence.

### 3.    Lalancette Discloses Generating an Indicator

Under the proper construction of "generates," substantial evidence supports the Board's determination that Lalancette discloses creating an indicatory signal. The Board correctly found that Lalancette "teaches that the controller (i.e., taxi service provider 108) generates a first signal representing an indicator (icon) which is transmitted to a mobile communication device (i.e., the mobile computer) in taxi car 118." Appx139; Appx993; Appx343-344, ¶¶ 29, 31-33, 39. In some embodiments, "the server [i.e., controller] is a service provider [cite Lalancette ¶0039], and [in] response to receiving a user request for service, a service provider 108 obtains or generates a human-readable icon for the user, and dispatches [a]

31

selected taxi car 118 to the location of user 102 and displays the user's icon on the taxi roof-top electronic display 122 and to the driver's dashboard display 124. The service provider 108 also transmits a copy of the icon to user device 104 for confirmation to the user." (Internal quotations omitted). Appx993; Appx343, ¶¶ 29, 31-33, Appx338. Figure 1 of Lalancette illustrates that the service provider (controller) sends the signal containing the indicator to the vehicle:



FIG. 1

Appx338 at Fig. 1 (annotated).

As such, the Board's determination that Lalancette generates an indicatory signal is supported by substantial evidence.

Even applying RSDI's improper construction of "generates," Lalancette still discloses creating an indicator rather than an indicatory signal and provides this Court grounds to affirm the Board's decision that all claims of the Challenged patents are invalid. *See In re Comiskey*, 554 F.3d at 974. While in certain embodiments, the icons disclosed in Lalancette "could be selected from a preconfigured collection of unique human-readable icons stored in the icon database," (Appx344, ¶ 42), the icons can also be created with "an automated icon generator using a pseudo-random number generator using for example an IP address or phone number or user-provided string as a seed to generate a random number which can be used to generat[e] a simple geometric pattern." (Internal quotations omitted). Appx427; Appx344, ¶ 43. Thus, Lalancette discloses generation of signals and indicators, even under RSDI's improperly narrow construction.

## C.    Substantial Evidence Supports the Board's Determination That a POSA Would Have Been Motivated to Combine Either Kalanick or Lalancette with Kemler

Contrary to RSDI's arguments, the Board's decision that a POSA would have been motivated to combine Kemler with Kalanick or Lalancette is supported by substantial evidence. RSDI myopically focuses on certain disclosures in claiming that Lyft used "hindsight reasoning" to combine the references. Br. 29, 32. First, Lyft provided detailed motivations to combine the references which contain numerous motivations beyond the select few that RSDI notes. *See, e.g.*, Appx372-

378, Appx404-407; Appx1032-1036, Appx1046-1049. Second, it is in fact RSDI who is using hindsight and conclusory statements to ignore the disclosures in these references. *See* Br. 32.

### 1.     There Is Substantial Evidence That a POSA Would Have Been Motivated to Combine Kalanick with Kemler

"The motivation-to-combine analysis is a flexible one. Any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." *Intel Corp. v. PACT XPP Schweiz AG*, 61 F.4th 1373, 1379 (Fed. Cir. 2023) ("*Intel Corp.*") (citing *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 420 (2007)) (alterations and internal quotation marks omitted). The Board's determination that a POSA would have been motivated to combine Kalanick with Kemler is supported by substantial evidence.

### i.     The Board's Finding that a POSA Would Have Been Motivated to Combine Kalanick with Kemler Is Supported by Substantial Evidence

The Board correctly determined that Kalanick and Kemler seek to achieve similar goals. Both references "address similar problems related to vehicle identification," "teach similar solutions involving generating, transmitting, and displaying unique, easily distinguishable visual indicators on multiple displays such that users can visually match the unique indicators to identify their assigned vehicle," and "also utilize vehicle mounted displays which are visible from the

34

outside of the vehicle." (Internal quotations omitted). Appx30; Appx372-373; Appx 474, ¶ 113.

While both Kalanick and Kemler are directed to vehicle identification, the references disclose slightly different techniques for use in such systems. For example, Kalanick discloses an "on-demand service system can also use location information from the driver's device and/or transport information . . . to automatically determine the driver's state or state of the transport service." (Internal quotations omitted). Appx30-31; Appx373; Appx307-308, ¶¶ 29, 35. Kalanick's system utilizes user selected indication preferences or a default indicator if the user does not provide indicator preferences. *See* Appx307, ¶ 30; Appx373. As the Board was correct in recognizing, "[w]hen a service application on the driver's device determines that the transport service is arriving now, based on a determination that the driver is within a predetermined distance, the service application can trigger the indication device to output the user's specific color." Appx31; Appx374; Appx308, ¶ 37. On the other hand, Kemler "describes a central dispatching system in which one or more server computing devices of the centralized dispatching system may select a vehicle to be dispatched based upon the location of the client computing device." Appx31; Appx333 at 10:3-33. As the Board correctly noted, "Kemler approaches indicator selection through a 'centralized dispatching system,' while

Kalanick allows the user to specify the 'output configuration' of the identification information. Appx32; Appx476, ¶ 121.

The Board correctly agreed that "a POSA would find it obvious to modify Kalanick's vehicle identification system to have the controller generate and transmit the signal based on a predetermined distance from the user's location, as disclosed in Kemler." (Internal quotations omitted). Appx32; Appx475, ¶ 118. Kemler discloses "rules to 'require that the signal actually be unique' such as generating the indicators such that 'the same unique signal may not be used for uses in the same state unless there is at least 1 month between uses.'" Appx376-377. A POSA would have been motivated to implement Kemler's centralized controller which generates the indicator in Kalanick "because it would eliminate instances where riders within a similar area select the same or similar indicators, or are provided the same default indicator, making them less unique." Appx376. A POSA would have had a reasonable expectation of success in combining Kalanick and Kemler in this manner because "this would require nothing more than modifying the software of Kalanick's system to permit the central controller to create and assign unique indicators, using the technique taught in Kemler." (Internal quotations omitted). Appx25; Appx377; Appx477, ¶ 122.

ii.    **RSDI's Arguments as to Why a POSA Would Not Have Been Motivated to Combine Kalanick with Kemler Are Unpersuasive**

36

As an initial matter, RSDI improperly raises new arguments for the first time on appeal.  RSDI lists handful of arguments as to why a POSA would not be motivated to combine the teachings of Kalanick with Kemler. *See* Br. 29-32. All of RSDI's arguments in this section of its brief were not presented to the Board. As such, these arguments are forfeited. *See In re Google Tech. Holdings LLC*, 980 F.3d 858, 862-63 (Fed. Cir. 2020) ("Google's failure to raise its lexicography arguments [before the Board], inadvertent or not, compels a finding of forfeiture."). RSDI's forfeited argument is not an issue that involves a pure question of law and refusal to consider it would not result in a miscarriage of justice; resolution in RSDI's favor is not beyond any doubt; RSDI had the opportunity to raise its arguments before the Board; the issue does not present a significant question of general impact or of great public concern; and no interest of substantial justice is at stake. *L.E.A. Dynatech, Inc. v. Allina*, 49 F.3d 1527, 1531 (Fed. Cir. 1995). Therefore, the Court may "decline to address the merits" of RSDI's argument. *In re Google*, 980 F.3d at 864.

Regardless, RSDI's arguments are unpersuasive on the merits, and the Board correctly determined that a POSA would have been motivated to combine Kalanick with Kemler. RSDI argues that there would be no motivation to combine Kalanick with Kemler because "[r]egardless of whether the system controller generates the signal/indicator (as in Kemler) or the signal/indicator is retrieved from a memory source (as in Kalanick), at some point the system controller has the signal (either

from creating it or retrieving it) and sends it to the driver device" and there would be "no effect on the Kalanick system always having been able to send the signal." Br. 30. Similarly, RSDI states that there was no "problem needing to be solved with the fact that Kalanick discloses an identifier that is retrieved by the controller, rather than created by the controller." Br. 32. RSDI's arguments completely ignore one of the main motivations to combine Kalanick with Kemler, which is to prevent the same indicator from being duplicated in the same pickup area. Utilizing the central controller in Kemler to generate the indicator ensures non-duplication. *See* Appx377. Without utilizing a central controller in charge of managing the generation of indicators, it would be difficult or impossible for the system in Kalanick to ensure that users did not select or were not provided with the same indicator. Contrary to what RSDI implies, the solution would not be to simply apply the "rules for creating an identifier that are disclosed in Kemler" Br. 32, to Kalanick's system because Kalanick does not disclose a central controller that selects indicators.

Also, RSDI's argument that there is a low probability of users in a similar pickup area selecting the same indicator is also meritless. *See* Br. 31. First, the Board acknowledged that duplication of indicators in a similar pickup area would be a legitimate problem for vehicle identification. *See* Appx33. Second, Kalanick also discloses utilizing default indicators if a user did not provide indicator preferences. *See* Appx307, ¶ 30; Appx373. Since the system in Kalanick does not prevent

duplication of indicators, this further necessitates the need to combine the teachings of Kemler's centralized controller to manage indicator generation.

Lastly, RSDI's conclusory argument that combining Kemler's central controller with Kalanick's system "needlessly obliterates a primary purpose of Kalanick: letting the user configure its own identifier." Br. 32. As Lyft explained above, the combination is far from "needless," as utilizing Kemler's central controller is essential to preventing duplication of indicators. Next, RSDI provides no support for its notion that a "primary purpose" of Kalanick is to have the user select his or her indicator. While the parties did not contemplate what is Kalanick's "primary purpose," Lyft argued, and the Board agreed that "Kalanick discloses a system for arranging an on-demand service to be provided by a transport service provider to a requesting user." Appx20; Appx365; Appx287 at Abstract, Appx304, ¶ 2. If anything, the "primary purpose" of Kalanick is to ensure riders successfully identify the dispatched vehicle displaying an indicator, and having a user select his or her own indicator is just of many ways of handling indicator selection. Furthermore, having the user select an indicator cannot be the "primary purpose" of Kalanick because Kalanick also discloses default indicators in anticipation that some users may not make indicator selection preferences. *See* Appx307, ¶ 30; Appx373.

For at least the reasons described above, the Board's determination that a POSA would be motivated to combine Kalanick with Kemler is supported by substantial evidence.

### 2. There Is Substantial Evidence That a POSA Would Have Been Motivated to Combine Lalancette with Kemler

The Board correctly determined that a POSA would have been motivated to combine the teachings of Lalancette and Kemler with a reasonable expectation of success. Appx35. Both references "address similar problems related to vehicle identification and share the common objective of enabling riders to visually locate a requested vehicle while protecting the rider's privacy." (Internal quotations omitted). Appx35; Appx404; Appx499, ¶ 218. The Board was correct in finding that "'Lalancette discloses a system, which includes a vehicle dispatch controller to generate and transmit unique, personalized, privacy-protected indicators, to provide more efficient and effective identification of dispatched vehicles.'" Appx35; Appx405; Appx499, ¶ 218. To the extent Lalancette does not disclose generating and transmitting the indicator only once the vehicle is within a predetermined distance of the rider, Kemler discloses that "[o]nce the vehicle is within a certain distance of the user's client device, the vehicle's computing device may display the signal on an external display of the vehicle such that the signal should be visible to the user as the vehicle approaches the user's client device." Appx330 at 4:1-4; Appx35-36; Appx405. A POSA would have been motivated to combine Kemler's

disclosure of displaying the indicator only once the vehicle is within a threshold distance rider to improve "accuracy, efficiency, and privacy of the user of the taxi identification system." Appx27; Appx42; Appx416-417; Appx509, ¶ 242.

RSDI's argument that a POSA would not have been motivated to "change the icon retrieval system of Lalancette with the controller-generated signal system of Kemler" because "Lalancette already provides a system that allows users to select icons that do not allow an association with the user in order to protect user privacy" misses the mark. *See* Br. 32. First, RSDI mischaracterizes Lyft's application of the Lalancette and Kemler combination. In the combination, it is Lalancette's controller which generates and transmits the unique icon to the vehicle. *See* Appx35; Appx405; Appx499, ¶ 218. Second, as Lyft previously explained, the motivation to apply Kemler's teachings of generating and displaying the indicatory signal only once the vehicle is within a predetermined distance of the rider would be to improve accuracy, efficiency, and privacy of the user. Appx36; Appx416-417; Appx509, ¶ 242. As the Board explained, "The fact that Lalancette is allegedly 'complete' does not prevent a person of ordinary skill from being motivated to improve upon it. Appx37.

For the reasons described above, the Board's determination that a POSA would be motivated to combine Lalancette with Kemler is supported by substantial evidence.

**II.    Substantial Evidence Supports the Board's Determination That Lalancette Discloses a Communication Device Associated with a Driver**

The Board was correct in finding that the mobile computer disclosed in Lalancette meets this limitation of a communication device associated with a driver. RSDI is improperly trying to limit the definition of the claim term "communication device associated with a driver" in a way that is not supported by the specification. Substantial evidence supports the Board's finding that Lalancette discloses "a communication device associated with a driver."

**A.    Lalancette Discloses a Communication Device Associated with a Driver**

The Board was correct in finding that Lalancette discloses a "mobile computer" in the taxi which receives dispatch information along with the signal containing the rider's unique icon from the service provider (controller) and manages the roof-top and driver's dashboard display." Appx993; Appx343, ¶¶ 29, 31-33, Appx338 at Fig. 1. Lalancette also discloses that each taxi has a driver, and when the taxi arrives at the pickup location, "the user 102 can show the driver the copy of the icon on the user device 104 which the driver can compare to the copy of the icon displayed on the driver's dashboard display 124." Appx343, ¶ 33. As the Board correctly pointed out, Lyft's expert testified that the term "mobile computer" has a variety of form factors which includes a smart phone, and Lalancette does not

describe a specific form factor regarding the mobile computer. Appx724 at 125:17-22, Appx728 at 129:20-25, Appx731 at 132:5-8; Appx142.

**B.    RSDI Is Improperly Limiting the Definition of a Communication Device Associated with a Driver to Require the Device to be a Personal Communication Device Such as a Cell Phone**

RSDI goes through great lengths in its attempt to narrow the definition of a "communication device associated with a driver." *See* Br. 33-38. As an initial matter, RSDI is trying to create a special definition for these claim terms, one that is narrower than its plain and ordinary meaning. A "communication device associated with a driver" is exactly what it purports to be, *any* communication device that a driver interacts with. If RSDI believed these claim terms deserved a special, narrower definition, RSDI should have (but did not) identify these terms for claim construction (*see, e.g.,* Appx128-133), and only raised this issue for the first time in its Sur-Reply before the Board. *See* Appx2172. In any event, the limitations RSDI seeks to place on these claim terms is inconsistent with the disclosure in the specification.

RSDI claims that the "communication device associated with a driver" should be limited to a personal portable wireless device such as a cell phone. *See* Br. 34-38. However, there is no specification support for RSDI's overly narrow definition. First, the specification unequivocally states that a "'mobile communication device' generally refers to *any* portable wireless device." Appx245 at 2:64-66. While RSDI

points to several sections of the specification which disclose what the "communication device" *could* be (i.e., a cell phone), there is nothing in the specification which **requires** the "communication device" to be so limited. *See* Br. 34-38. Again, the specification broadly describes a "communication device" as ***any*** portable wireless device. Appx245 at 2:64-66. Under the proper definition of "communication device," Lalancette's mobile computer which controls the driver's display is certainly a mobile communication device.

Also, the specification states that "[e]xamples of mobile communication devices include, without limitation, cellular (cell) and mobile telephones, smart mobile telephones, mobile e-mail devices, digital personal assistants, etc." Appx246 at 3:1-4. RSDI fails to show why Lalancette's mobile computer that operates the driver's display would not be considered to be a mobile communication device in accordance with this broad usage in the specification. As such, when "mobile communication device" is properly defined based on the specification, Lalancette's mobile computer meets this limitation.

### C. The Board's Determination That Lalancette Discloses a Communication Device Associated with a Driver Is Supported by Substantial Evidence

The Board was correct in finding that Lalancette's mobile computer meets the limitation of a communication device associated with a driver. To reach the determination of whether there is substantial evidence to support the Board's

determination, this Court does not reweigh evidence. *In re NTP, Inc.*, 654 F.3d at 1292. This Court need only find that there was enough relevant evidence so that "a reasonable mind might accept as adequate support a conclusion." *In re Gartside*, 203 F.3d at 1312. The fact that there is possibility of a reasonable mind "drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo*, 383 U.S. at 620.

As previously mentioned, when the "communication device associated with a driver" is properly construed as any portable wireless device, there is no doubt the Board's determination that Lalancette's mobile computer satisfies this requirement is supported by substantial evidence. However, even applying RSDI's improperly narrow definition which requires, the communication device to be uniquely personal to the driver, the determination that Lalancette's mobile computer satisfies this limitation is still supported by substantial evidence.

As the Board correctly recognized, Lalancette's mobile computer is in the taxi car, and there is a driver in the taxi. Appx343, ¶¶ 32, 33; Appx141. The mobile computer controls the driver's display so that the user's unique icon is displayed so that the driver may use it to identify the correct user. Appx343 ¶ 33; Appx141. Based on Lalancette's disclosure, the driver within the taxi is the only one who may observe and utilize the display, making the display personal or unique to that particular

driver. Therefore, the disclosure in Lalancette satisfies the requirement of a "communication device associated with a driver" even when the communication device needs to be uniquely personal to the driver and thus the Board's determination is supported by substantial evidence.

## III. Substantial Evidence Supports the Board's Determination That Kalanick in Combination with Kemler Discloses Sending the First Signal/Notification Signal When the Vehicle is Within a Predetermined Distance

The Board correctly determined that Kalanick in combination with Kemler discloses sending a notification signal when the vehicle is within a predetermined distance. *See*, *e.g.*, Appx40-43. RSDI's arguments that the Kalanick-Kemler combination fails to disclose sending a "first signal/notification signal" when the vehicle is within a predetermined distance mischaracterizes Lyft's application of the Kalanick-Kemler combination. *See* Br. 52-61. Thus, RSDI's arguments are flawed. For the reasons articulated below, Kalanick in combination with Kemler discloses sending the first signal/notification signal when the vehicle is within a predetermined distance.

### A. Kalanick in Combination with Kemler Discloses Sending the First Signal/Notification Signal When the Vehicle Is Within a Predetermined Distance

The specification of the Challenged Patents note that the "first signal [is] also referred to herein as a 'notification signal.'" Appx247 at 5:1-2. Kalanick's "'controller' (i.e., its 'system 100') 'can communicate . . . with the client devices . . .

and the driver devices 160 (e.g., mobile computing devices operated by drivers) . . .'" Appx306, ¶ 25; Appx383; Appx40. Kalanick also discloses that the system can determine "if the driver's position is within a predetermined distance of the user's current location or the pickup location." Appx308, ¶ 35; Appx384. A POSA would understand that the communications sent from Kalanick's controller ("system 100") to the driver's mobile communication device was a notification signal and satisfies this limitation. Appx384; Appx482, ¶ 141; Appx1659, ¶ 19.

The Board was correct in finding that Kemler's "system determines when the vehicle reaches a particular location that is a threshold distance from the vehicle's location and when the vehicle reaches the particular location, sends a notification to one or more server computing devices." Appx40; Appx384. Kemler's vehicle computing device "may continuously estimate its distance from the user in order to determine when the vehicle has reached a threshold distance to the user." Appx334 at 11:65-12:13; Appx384. Kemler also discloses that "the centralized dispatching system may send the signal when the vehicle is dispatched or when the vehicle is within the certain distance or time relative to the user." Appx330 at 4:13-16. As the Board correctly noted, "the combination of Kalanick and Kemler would include having the controller generate and transmit the signal containing the unique display information when the vehicle is within a predetermined distance from the user's location." (Internal quotations omitted). Appx41; Appx385; Appx483, ¶ 143.

RSDI argues that Kalanick does not actually disclose sending the first signal/notification signal when the vehicle is within a predetermined distance. *See* Br. 54-56. However, RSDI's argument fails to properly interpret the teachings of the Kalanick-Kemler combination. As mentioned above, it is Kemler that teaches having the central controller sending signals when the vehicle is "within the certain distance or time relative to the user." Appx330 at 4:13-16.

Also, RSDI's argument that Kemler does not teach "send[ing] a notification signal from a server to a 'mobile communication device associated with the driver'" is simply wrong. Br. 56. RSDI ignores the disclosure in Kemler that "the centralized dispatching system may send the signal when the vehicle is dispatched or when the vehicle is within the certain distance or time relative to the user." Appx330 at 13-16. At the very least, Kemler discloses the central controller sending signals when the vehicle is within a predetermined distance of the user. In addition, and as previously mentioned, Kalanick discloses its central controller communicates with a driver's mobile device and its system can determine if the driver is within a predetermined distance of the user's current location or the pickup location. Appx306-307, ¶¶ 25, 35-36. Therefore, the Board correctly determined that the Kalanick-Kemler combination "would include having the controller generate and transmit the signal containing the unique display information when the vehicle is within a

predetermined distance from the user's location." (Internal quotations omitted). Appx41.

For the reasons articulated above, the Kalanick-Kemler combination discloses sending the first signal/notification signal and satisfies these claim limitations for every challenged patent.

## IV.    Substantial Evidence Supports the Board's Determination that Kalanick Alone or in Combination with Kemler Renders Claims 1-8 of the '987 Patent Obvious

The Board's determination that the Kalanick-Kemler combination discloses transmitting a notification signal in response to receiving a user's request is supported by substantial evidence. *See* Appx94-98. RSDI's argument that Kalanick does not disclose sending the indicator to the driver's device "in response to receipt of a signal from user" ignores Kalanick's teachings. Br. 61-64. In addition, RSDI fails to address that Lyft also argued that Kalanick in combination with Kemler discloses this claim limitation.

### A.    Kalanick Alone Discloses Generating and Transmitting a First Signal in Response to Receipt of a Ride Request From a User

The Board correctly determined that Kalanick discloses sending the first signal "in response to" receipt of a signal from a user. The relevant portions of claim 1 of Kalanick disclose "arranging a transport service for a user by (i) receiving a transport request from a user device operated by the user . . . [and] in response to determining that the user has specified the output configuration, identifying, from a

memory resource accessible by the computing system, data corresponding to the output configuration specified by the user" and "transmitting, over one or more networks, the data to at least one of the driver device or the indicator device associated with the selected driver to configure how the indication device of the driver operates when the driver is selected for the customer." Appx315 at cl. 1. Kalanick describes an "on-demand service system can arrange for an on-demand service to be provided for a requesting user by a service provider." Appx304, ¶ 2, Appx306, ¶ 26. "[T]he personalization management 110 can receive the transport information 111 in response to the transport service being initially arranged by the dispatch system . . ." Appx306-307, ¶ 28. Further, "the system can transmit the data corresponding to the output configuration to the driver device during the progress of the transport service, but before the driver arrives at the pickup location specified by the user in the user's request for the transport service." Appx305, ¶13. The overall process described in the above disclosure of Kalanick are also illustrated in Figure 3:



FIG. 3

Appx298 at Fig. 3. The disclosure in Kalanick makes clear that the service system ultimately sends the indicator information to the driver's device because and only after the user requests a ride.

RSDI's argument that "Kalanick fails to teach that the first signal representing an indicator is generated and transmitted 'in response to receipt of a signal from a user'" but rather sends the first signal "in response to determining whether the user has specified configuration data" ignores the disclosures in Kalanick. Br. 63-64. As mentioned above, Kalanick's disclosures (including claim 1 which RSDI highlights

51

in its Brief), overwhelmingly show that the service system initiates the process of sending the indicator to the driver's device "in response to" the user requesting a ride. As such, the Board's determination that Kalanick discloses sending the first signal "in response to" receipt of a signal from a user is supported by substantial evidence.

### B. Kalanick in Combination with Kemler Discloses Generating and Transmitting a Notification Signal in Response to Receipt of a Ride Request From a User

The Board correctly found that the Kalanick-Kemler combination discloses sending a notification signal in response to receiving a user's request. RSDI ignores the fact that Lyft also argued that the Kalanick-Kemler combination also discloses sending the first signal "in response to" receipt of a signal from a user. The Board correctly acknowledged that Figure 9 of Kemler "illustrates a client computing device and a computing device of a vehicle displaying a unique signal at the same, or nearly the same time." (Internal quotations omitted). Appx97; Appx912; Appx Appx334 at 45-53, Appx327 at Fig. 9. Therefore, a POSA would have been motivated to combine "Kemler's 'controller generated signal/indicator' with Kalanick's vehicle identification system to have the controller send a signal representing the indicator to the driver's device" in response to receiving a ride request from user. Appx97; Appx913; Appx482, ¶ 141.

# CROSS-APPEAL ARGUMENT

The Board improperly granted RSDI's motions to amend with respect to claims 29 and 31-32 of the '637 patent and claims 3-4 of the '199 patent for several independent reasons. First, the Substitute Claims are unpatentable because they are directed to patent-ineligible subject matter under 35 U.S.C. § 101. Second, the claims add limitations that are unsupported by the original disclosures. Third, if, as the Board concluded, the added claim limitations are supported by the original disclosures, then the claims are unpatentable because substantially similar disclosure in the prior art renders those claims obvious. Any one of these reasons is sufficient to reverse the Board's partial grant of the motions to amend.

## I.   The Substitute Claims Are Directed to Patent-Ineligible Subject Matter

The Board's § 101 determination is legally erroneous. Claims 29 and 31-32 of the '637 patent and claims 3-4 of the '199 patent are all directed to patent-ineligible subject matter.

### A.   The Substitute Claims Are Directed to an Abstract Idea

Under step one of the *Alice* framework, independent claim 29 of the '637 patent and claim 3 of the '199 patent are directed to a longstanding method of organizing human activity. The Board correctly agreed that the Substitute Claims are directed an abstract idea. *See* Appx64-65 ('637 patent final written decision); Appx2019 ('637 patent preliminary guidance) (noting that the proposed Substitute Claims "recite elements of a method of organizing human activity (e.g., enabling a

53

user to identify a dispatched cab)"); Appx204 ('199 patent final written decision); Appx2042 ('199 patent preliminary guidance).

The Board, however, erred in finding the claims provide a technological solution rooted in computer and network technologies. Appx64-65; Appx204-205. The Board relied on *DDR Holdings* to distinguish RSDI's claims from well-known low-tech visual identifiers (such as drivers at airport pickup locations routinely holding signs displaying passengers' names to distinguish vehicles in a crowded area) because RSDI's claims purportedly "recite technological features that enable communication and coordination between multiple devices that are not co-located and are moving with respect to each other." Appx65 (citing *DDR Holdings LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257-58 (Fed. Cir. 2014); *Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253, 1259-60 (Fed. Cir. 2017)); Appx204. But the non-abstract technological solution claimed in *DDR Holdings* was "rooted in computer technology *in order to overcome a problem specifically arising in the realm of computer networks*." *DDR Holdings*, 773 F.3d at 1257. Likewise, the *Visual Memory* claims were directed to a technological improvement because they improved computer functionality (*i.e.*, improved computer memory system). *Visual Memory*, 867 F.3d at 1258-60.

RSDI's claims fail to make any similar improvement to computer functionality. Even the Board's characterization of the claims—"communication

and coordination between multiple devices that are not co-located and are moving with respect to each other"—is itself an abstract idea not rooted in computer technology. Appx65; Appx204. Simply "recit[ing] technological features" to enable this abstract idea does not make the abstract idea patent eligible. Appx65; Appx205; *Sanderling Mgmt. Ltd. v. Snap Inc.*, 65 F.4th 698, 703 (Fed. Cir. 2023) ("The claims of the asserted patents are not directed to a specific improvement in computer functionality but, instead, to the use of computers as a tool[.]").

RSDI's claims accomplish nothing more than a method of organizing human activity on a computer.[4] For example, the claims cite generic computer components, including a "display" and a "mobile communication device." But performing an abstract idea on a computer does not transform the abstract idea into patent-eligible subject matter. *See Customedia Techs. LLC v. Dish Network Corp.*, 951 F.3d 1359, 1364 (Fed. Cir. 2020) ("We have held that it is not enough, however, to merely improve a fundamental practice of abstract process by invoking a computer merely

---

[4] That the claims are directed to an abstract idea is supported by Judge Andrews's conclusions in the related district court litigation. The district court reviewed claims similar to the Substitute Claims at issue here and indicated it was inclined to agree that the claims are directed to an abstract idea. *See* Appx2046 n.1 ("The Magistrate Judge described the abstract idea issue as being a 'close question.' I am not so sure I agree with her on this one. I might conclude that the claims are directed to a long-standing method of 'organizing human activity.' *See* Seinfeld, "The Limo" (television episode from 1992)."). Although the district court resolved the § 101 issue based on representativeness of the claims and did not reach the Magistrate Judge's recommendations on steps 1 and 2 of the *Alice* analysis, it provided guidance on those recommendations. Appx2046.

as a tool."); *see also Affinity Labs. of Tex., LLC v. DIRECTV, LLC*, 838 F.3d 1253 (Fed. Cir. 2016) (using cell phones "as tools in the aid of a process focused on an abstract idea" is not a patent-eligible improvement to computer functionality).

Nor does the functional claim language provide a practical application. The focus of the Substitute Claims is to "provide an indicator on a mobile communication device of a user having requested a ride service to allow the user to identify a vehicle prior to boarding the vehicle." Appx245 at 1:22-3:25; Appx273 at 1:30-35. The claims, however, describe each element of the claimed method only in terms of the end result, *i.e.*, to allow the user to identify a vehicle prior to boarding the vehicle, rather than the process by which that result is achieved. *See Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1354 (Fed. Cir. 2016). For instance, the claims do not explain how the "indicator" is created and displayed on the "display."

Similarly, nothing in the specification describes any new computing technique or other novel solution to the purported problem of "communication and coordination between multiple devices that are not co-located and are moving with respect to each other" the Board identified. Instead, as explained below, only conventional servers, conventional communications techniques, and conventional signal transmissions are described in the specification.

Moreover, none of the dependent claims—claims 31-32 of the '637 patent and claim 4 of the '199 patent—add patent-eligible subject matter. Claim 31 adds

another generic computer component, "a controller," to receive the indicatory signal, and claim 32 specifies the indicator is an "alphanumeric string." Claim 4 of the '199 patent adds a non-technical limitation, which identifies the user "based on appearance of a match, by visual observation of the driver," between the indicators being displayed on the driver's mobile communication device and the user's mobile communication device.

### B.    The Substitute Claims Lack an Inventive Concept

The claims use only generic computer parts (*e.g.*, a display, a mobile communication device, and a controller) in a conventional manner. Such conventionality does not transform an abstract idea into patentable subject matter. *See Baggage Airline Guest Servs., Inc. v. Roadie, Inc.*, 351 F. Supp. 3d 753, 760-61 (D. Del. 2019) ("Reciting generic computer functions and the use of generic computer elements to achieve a more efficient way of 'coordinating and monitoring baggage delivery' [ ] does not make the claims patent-eligible."), *aff'd*, 783 F. App'x 1022 (Fed. Cir. 2019).

The patents describe the generic computer components broadly and as encompassing a wide swath of existing devices, with no inventive improvement. *See, e.g.*, Appx245-246 at 2:60-3:4 ("As used herein, the term 'controller' may include any type of computing device, computational circuit, or any type of processor or processing circuit capable of executing a series of instructions that are

stored in a memory associated with the controller. As it is used herein, 'mobile communication device' generally refers to any portable wireless device. In one instance, the mobile communication device has one or more processors and memory capability. Examples of mobile communication devices include, without limitation, cellular (cell) and mobile telephones, smart mobile telephones, mobile e-mail devices, digital personal assistants, etc.").

Similarly, the patents depict these components functionally and without inventive detail. *See, e.g.*, Appx241-242, Figs. 1A-1B; Appx246 at 3:52-4:3. ("FIG. 1A shows a vehicle identification system 10 in accordance with an embodiment of the present disclosure. The vehicle identification system 10 includes a controller 110, a transceiver 120, and one or more displays associated with a motor vehicle 20 . . . . In some embodiments, the controller 110 may be a computer network controller or a server. In some embodiments, the controller 110 is communicatively coupled to the transceiver 120. The transceiver 120 may consist of one or more cell phone towers of a tower network. It is to be understood that the transceiver 120 may be any device capable of wireless communication with a mobile communication device 150 associated with the driver D and/or a mobile communication device 140 associated with the user P. For example, the transceiver 120 may consist of satellites instead of land-based cell towers.").



**FIG. 1A**



**FIG. 1B**

Rather than providing an inventive concept, the claims merely recite "generalized steps to be performed on a computer using conventional computer activity." *Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253, 1260 (Fed. Cir. 2017). In *Visual Memory*, this Court noted that the claims were "directed to an improved computer memory system, not to the abstract idea of categorical data storage" and specifically addressed "the need to design a separate memory system for each type of processor, which proved to be costly and inefficient, and, at the same time, avoid the performance problems of prior art memory systems." 867 F.3d at 1259. Similarly, this Court determined the *DDR Holdings* claims to be patent eligible because they claimed a solution to "a problem specifically arising in the realm of computer networks." 773 F.3d at 1257. No such improvement to computer systems or computer networks is claimed here.

Therefore, the claims are directed to patent-ineligible subject matter.

## C.    The Board Wrongly Characterized Lyft's Arguments in Response to the Preliminary Guidance

Finally, the Board improperly discounted Lyft's arguments in response to the Board's preliminary guidance for purportedly failing to "address the rationale of our preliminary decision" and "only express[ing] disagreement with the outcome." Appx66; Appx206. In the preliminary guidance, the Board initially stated that the claims "recite technological features that enable communication and coordination

between multiple devices that are not co-located and are moving with respect to each other." Appx2020; Appx2043.

Lyft timely addressed the Board's conclusion in its responses and explained why the claims do not provide a technical improvement in computer function. *See* Appx2059-2062; Appx2076-2079. For example, Lyft explained that the claims' limitations "are merely computer implementations of the abstract idea" and "do not result in an improvement in the functioning of a computer or other technical improvement." Appx2060; *see also* Appx2076-2077. Lyft further explained why the "substitute claims are easily distinguishable from the claims at issue in the cases cited in the Board's Preliminary Guidance." Appx2060-2061; Appx2077-2078.

Therefore, the Board erred in its conclusion that Lyft did "not persuasively address [the Board's] conclusion," which is unsupported by the record. Appx66; Appx206.

## II. The Original Disclosures Do Not Support "Creating an Indicator" When or After the Vehicle Is Within a Predetermined Distance

Substantial evidence does not support the Board's conclusion that the original disclosures provide written description support for "creating an indicator" when or after the vehicle is within a predetermined distance. *See* Appx58-59, Appx198-200.

### A. Claim 29 ('637 Patent)

Claim 29 of the '637 patent adds "creating an indicator" to the step of "generating . . . an indicatory signal representing the indicator" in response to

receiving "the notification signal"—which itself is generated "when it is determined that the vehicle is within a predetermined distance of the location of the user." Therefore, claim 29 requires "creating the indicator when, or after it is determined that the vehicle is within a predetermined distance of a particular location." Appx61 (quoting Appx2009).

The Board found written description support relying on paragraphs 12, 21, 27, 30, and 34-35 of the '049 application. Appx59. Nothing in these paragraphs, however, support that the indicator is created *after* it is determined that the vehicle is within a predetermined distance. Paragraph 30 simply states that "the vehicle identification system 10 may generate another notification signal" if there is a need for the driver to pick up another person. Appx1809, ¶ 30. Although paragraph 34 states a "notification signal 15 is generated" when the vehicle is within a predetermined distance of the location of the user, *it does not describe when the notification signal is generated* relative to the indicator. *See* Appx1810, ¶ 34. Moreover, the Board's conclusion as to paragraphs 12, 21, 27, and 35 is patently wrong. These paragraphs do not disclose "that the indicator is generated *after* the notification signal is generated, as the notification signal *activates* the driver's mobile communication device to generate the indicator, and the indicator is created *in response* to receiving the notification signal." Appx59 (quoting Appx2006). Rather, these paragraphs describe "generating *an indicatory signal representing an*

*indicator* in response to receiving the notification signal" (Appx1803-1804, ¶ 12)—

**not generating an indicator** in response to the notification signal. *See* Appx1803-1804, ¶ 12; Appx1805-1806, ¶ 21; Appx1808, ¶ 27; Appx1810, ¶ 35.

To find written description support, the Board improperly equated an "indicator" and an "indicatory signal." But the patents describe the two as distinct: the indicatory signal represents the indicator. *See* Appx247 at 5:16-19. ("[A]n application on the mobile communication device 150 associated with the driver D generated a second signal 17 (also referred to herein as an 'indicatory signal') representing an indicator."); *see also Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1119 (Fed. Cir. 2004) ("[W]hen an applicant uses different terms in a claim it is permissible to infer that he intended his choice of different terms to reflect a differentiation in the meaning of those terms."). As even RSDI admits, the indicator and indicatory signal are not identical. Br. at 26-27 ("The use of the phrase 'representing an indicator' is used because it is not technically proper to say that the signal is the indicator . . .").

Because the '049 application is silent on when the *indicator* is generated, it does not provide written description support for claim 29.

## B.    Claim 3 ('199 Patent)

Like claim 29 of the '637 patent, claim 3 of the '199 patent adds "creating an indicator" to the step of "generating . . . an indicatory signal representing the

63

indicator" and requires the indicator be created after it is determined that the vehicle is within a predetermined distance of a particular location. Appx197.

The Board repeated the errors described above in finding written description support for claim 3 of the '199 patent. For this claim, the Board concluded that paragraph 30 of the '492 application provides support because it discloses generating a new notification signal for a new rider, and paragraph 34 discloses that the notification signal is generated "when it is determined that the vehicle 20 is within a predetermined distance of the location of the user P." Appx1899-1900, ¶ 34. Neither of these paragraphs disclose when the *indicator* itself is generated relative to the notification signal. To the extent the Board relies on paragraphs 12, 21, 27, and 35 as disclosures of the indicator being generated after the notification signal is generated, this conclusion would require improperly conflating an "indicator" and an "indicatory signal" for the reasons discussed above. *See* Appx1893-1894, ¶ 12; Appx1895-1896, ¶ 21; Appx1898, ¶ 27; Appx1900, ¶ 35.

Because the '492 application is silent on when the *indicator* is generated, it does not provide written description support for claim 29.

## III. The Board Erred in Finding Lyft Failed to Demonstrate the Proposed Substitute Claims Were Obvious Over the Prior Art

The proposed Substitute Claims would have been obvious over (1) Kalanick and Kemler; (2) Kalanick, Kemler, and Stanfield; (3) Lalancette and Kemler; or

(4) Lalancette, Kemler, and Stanfield. Appx61-66, Appx200-204. The Board's findings otherwise are not supported by substantial evidence.

### A. Kemler Discloses Creating an Indicator After Determining the Vehicle Is Within a Predetermined Distance of the User

Each of Lyft's four grounds relies on Kemler. The Board determined the claims would not have been obvious over the prior art after concluding that Kemler does not disclose creating an indicator after determining the vehicle is within a predetermined distance of the user. Appx61-62; Appx200-202. But substantial evidence does not support the Board's conclusions because the Board improperly discounted one of Kemler's embodiments. Kemler discloses a unique signal may be generated after the user requests a vehicle, which, as depicted in Figures 7-8, occurs after the vehicle is within a predetermined "threshold distance" of the rider." *See* Appx334 at 12:9-13 ("threshold distance"), 12:23-30 ("Alternatively, to further protect the privacy of the user, once the vehicle reaches the threshold distance or time, the vehicle's computing device may request the unique signal from the one or more server computing devices."). That is, only after sending a request to the central server does the vehicle "receive a unique signal in response." Appx334 at 12:35-44.



**700**

FIGURE 7



**800**

FIGURE 8

Appx325-326 at Figs. 7-8.

The Board erred when it discounted these Kemler disclosures depicted in Figures 7-8 because they differed from other disclosures in Kemler. Kemler clearly describes the Figures 7-8 embodiment as an "example" and "alternative." Appx334 at 11:52-53, 12:23-30, 12:35-44. The Board relied on Kemler's Figure 10 and its disclosure at 3:52-59 as contradicting the Figures 7-8 embodiment. But like Figures 7-8, Kemler describes Figure 10 as "an example of some of the aspects described" in the specification and only "one implementation of the features described." Appx334 at 12:54-60. The Board's cited disclosure to Kemler is also preceded by similar language that the description of the signal generation and dispatch is simply an example:

> "As noted above, the technology may be applicable in *various circumstances. In one instance*, a user may use a client device. Such as a mobile phone or wearable computing device or system (e.g., head-mounted, wrist, clip-on, etc.), to request a vehicle. The request may be sent to a centralized dispatching system which selects or assigns a vehicle to the requesting user. At the same time, the centralized dispatching system may generate a signal to identify the vehicle to the user. *In another instance*, the centralized dispatching system may assign a vehicle to a particular user in order to make a delivery. Again, the centralized system may generate a signal to identify the vehicle to the user."

Appx330 at 3:48-59. Because prior art references are prior art for everything they teach, not just a single embodiment, the Board legally erred in ignoring Kemler's disclosures. *See In re Wesslau*, 353 F.2d 238, 241 (CCPA 1965) ("It is impermissible within the framework of section 103 to pick and choose from any one reference only

so much of it as will support a given position, to the exclusion of other parts necessary to the full appreciation of what such reference fairly suggests to one of ordinary skill in the art."); *see also Bausch & Lomb, Inc. v. BarnesHind/Hydrocurve, Inc.*, 796 F.2d 443, 449 (Fed. Cir. 1986) (holding that the district court, by failing to consider a prior art reference in its entirety, ignored portions of the reference that led away from obviousness).

Additionally, the Board's obviousness analysis of Kemler is inconsistent with its analysis of whether there is written description support for creating an indicator *after* determining the vehicle is within a predetermined distance to the user. Kemler says at least as much as the '049 and '492 specifications regarding when the indicator is created. Kemler discloses that a *signal* is created after the vehicle is within a predetermined distance, which the Board found to be a sufficient disclosure for written description support. *See* Appx59, Appx201.  Therefore, to the extent there is § 112 support in the original disclosure, Kemler also discloses creating an indicator.

### B.    Stanfield Discloses the Indicator Creation Limitations

Even if Kemler does not disclose creating an indicator after determining the vehicle is within a predetermined distance of the user, a POSA would have found it obvious to do so considering Stanfield's disclosures relating to configuring data to display real-time information, such as time remaining until the next ride and whether certain seats are occupied by riders. *See, e.g.*, Appx1677 at 2:18-21; Appx1679 at

6:40-53. Lyft's expert also gave unrebutted testimony that a POSA would understand Stanfield to disclose creating an indicator and would have considered creating the indicator when a vehicle reaches a certain distance to be obvious. Appx2101-2102, ¶¶ 53-54; Appx2130-2131, ¶¶ 38-39. The Board did not address this testimony in its final written decisions.

The Board improperly ignored Stanfield's disclosures and Lyft's expert testimony because it concluded Stanfield does not address the same problem as the challenged patents. Appx63-64; Appx203-204. According to the Board, Stanfield addresses an "information retrieving problem," whereas RSDI's patents address and provide a solution to a security problem. Appx64; Appx204. Ignoring a reference's disclosures because it is not directed to an identical problem is legal error. Prior art need not be directed to the same problems to render a purported invention obvious. *See, e.g.*, *In re Kahn*, 441 F.3d 977, 987 (Fed. Cir. 2006) ("In considering motivation in the obviousness analysis, the problem examined is not the specific problem solved by the invention but the general problem that confronted the inventor before the invention was made."); *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1323 (Fed. Cir. 2005) ("One of ordinary skill in the art need not see the identical problem addressed in a prior art reference to be motivated to apply its teachings."); *see also Intel Corp. v. PACT XPP Schweiz AG,* 61 F.4th 1373, 1379 (Fed. Cir. 2023) (citing *KSR Int'l' Co. v. Teleflex*, 550 U.S. 398, 420 (2007) ("The

motivation-to-combine analysis is a flexible one. *Any* need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed.").

Stanfield is analogous art and would have been considered by the inventor of RSDI's patents to solve potential problems with security in transportation services. The '637 and '199 patents' solution to this security problem is to provide a vehicle identification system that allows riders to confirm the identity of the driver at pickup. Stanfield is reasonably pertinent to this problem because it provides a similar user positioning and identification method that can be used to confirm that the correct rider is approaching the vehicle. *See* Appx1680 at 8:32-41.

Aside from legal error, the Board also committed a factual error when it found Stanfield is not directed to a security problem. Stanfield expressly addresses security. Appx1677 at 2:18-21 ("enabling access to the vehicle for the user in response to verification of the user" improves security); *see also* Appx2109-2112, ¶¶ 71, 74-76; Appx2136-2138, ¶¶ 51, 54-55. Because the Board legally erred in discounting Stanfield's disclosures, its findings are not supported by substantial evidence.

## CONCLUSION

Accordingly, the Board's determinations that all challenged claims of the '637 patent, the '987 patent, the '525 patent, the '199 patent, and the '417 patent are

unpatentable over the prior art are supported by substantial evidence and should be affirmed; and the Board's partial grant of RSDI's motions to amend the '637 and '199 patents should be reversed.

Date:  December 21, 2023

*/s/ Eliot D. Williams*

Eliot D. Williams
eliot.williams@bakerbotts.com
Baker Botts L.L.P.
700 K Street, N.W.
Washington, DC 20001-5692
(202) 639-7700

Jeremy J. Taylor
jeremy.taylor@bakerbotts.com
Baker Botts L.L.P.
101 California Street, Suite 3200
San Francisco, CA 94111

Jennifer C. Tempesta
jennifer.tempesta@bakerbotts.com
Margaret M. Welsh
margaret.welsh@bakerbotts.com
Baker Botts L.L.P.
30 Rockefeller Plaza
New York, NY 10112

*Attorneys for Cross-Appellant Lyft, Inc.*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1. This filing complies with the type-volume limitation of Federal Circuit Rule 32(a) or Federal Circuit Rule 28.1.

X    The filing contains <u>15,517</u> words, excluding the parts of the filing exempted by Federal Rule of Appellate Procedure 32(f) or

__ The filing uses a monospaced typeface and contains_____ lines of text, excluding the parts of the filing exempted by Federal Rule of Appellate Procedure 32(f)

2. This filing complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Circuit Rule 28.1 and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6)

X  The filing has been prepared in a proportionally spaced typeface using Microsoft Office Word 365 in a 14 point Times New Roman font, or

___ The filing has been prepared in a monospaced typeface using in a ___ characters per inch_____ font.

Dated: December 21, 2023          */s/ Eliot D. Williams*
                                   Eliot D. Williams

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on this <u>21st</u> day of December, 2023, I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Federal Circuit through the Court's CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

*/s/ Eliot D. Williams*
Eliot D. Williams
