**23-2033, 23-2034, 23-2035, 23-2036, 23-2037, 23-2038, 23-2039**

# United States Court of Appeals for the Federal Circuit

RIDESHARE DISPLAYS, INC.,

*Appellant,*

v.

LYFT, INC.,

*Cross-Appellant.*

*Appeals from the Patent Trial & Appeal Board at the United States Patent and Trademark Office in IPR2021-01598, IPR2021-01599, IPR2021-01600, IPR2021-01601, IPR2021-01602*

## APPELLANT'S RESPONSE AND REPLY BRIEF

Michelle E. Dawson
Devan V. Padmanabhan
PADMANABHAN & DAWSON, PLLC
9800 Shelard Parkway, Suite 120
Minneapolis, MN 55441
(612) 444-3601
michelle@paddalawgroup.com
devan@paddalawgroup.com

*Counsel for Appellant*

January 30, 2024

## REPRESENTATIVE SUBSTITUTE PATENT CLAIMS AT ISSUE

### U.S. Patent No. 9,892,637

**Substitute Claim 29**.  A method of identifying a vehicle being dispatched to a location of the user having requested a ride from a transportation service, comprising:

when it is determined that the vehicle is within a predetermined distance of the location of the user, generating a notification signal to a mobile communication device associated with the driver;

generating, by creating an indicator, an indicatory signal representing ~~an~~ the indicator in response to receiving the notification signal;

displaying, on a display associated with the vehicle, the indicator based on the notification and indicatory signals, the display being located to be visible on the exterior of the vehicle;

displaying the indicator on a mobile communication device associated with the user; and

identifying the vehicle based on appearance of a match, by visual observation of the user, between the indicator being displayed on the mobile communication device associated with the user and the indicator being displayed on the display associated with the vehicle.

## U.S. Patent No. 10,559,199

**Substitute Claim 3**.  A vehicle identification method implemented as an Application on mobile communication devices over a wireless communication network, comprising:

requesting a ride form a transportation service from a mobile communication device of a user;

determining that a vehicle is within a predetermined distance of the location of the user;

generating a notification signal to a mobile communication device associated with a driver of the vehicle;

generating, by creating an indicator that is specific to a user and driver match, an indicatory signal representing ~~an~~ the indicator;

displaying the indicator based on the notification signal on a display associated with the vehicle, the mobile communication device associated with the driver, and the user's mobile communication device,

wherein the display associated with the vehicle is located to be visible form the exterior of the vehicle; and

identifying the vehicle based on appearance of a match, by visual observation of the user, between the indicator being displayed on the user's mobile communication device and the indicator being displayed on the display associated with the vehicle.

**March 2023**

# UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT
### <u>CERTIFICATE OF INTEREST</u>

**Case Number** <u>23-2033</u>

**Short Case Caption** <u>Rideshare Displays, Inc. v. Lyft, Inc.</u>

**Filing Party/Entity** <u>Rideshare Displays, Inc.</u>

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: <u>01/30/2024</u>

Signature: <u>/Devan V. Padmanabhan/</u>

Name: <u>Devan V. Padmanabhan</u>

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☑ None/Not Applicable |
| Rideshare Displays, Inc. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

FORM 9. Certificate of Interest      Form 9 (p. 3)

March 2023

---

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐   None/Not Applicable           ☐   Additional pages attached

| Peter A. Sullivan | Jeffrey Lewis | |
| --- | --- | --- |
| | | |
| | | |

---

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)? ☐

☒ Yes (file separate notice; see below)          ☐ None      ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

---

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☒   None/Not Applicable           ☐   Additional pages attached

| | | |
| --- | --- | --- |
| | | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT OF RELATED CASES ................................................. v

STATEMENT OF THE ISSUES ......................................................... 1

STATEMENT OF THE CASE ............................................................. 3

SUMMARY OF THE ARGUMENT ................................................... 5

ARGUMENT ...................................................................................... 6

RSDI's Reply on its Appeal of the Original Claims of the Patents-at-Issue ............. 6

I.   The Board Committed Legal Error in Failing to Construe the Claimed "Indicator" as Being "Generated." ................................................... 7

   A. The Term "Generate" Modifies Both the "Indicatory Signal" and the "Indicator." .................................................................. 8

   B. The Provisional Application Specifically Discloses that the Vehicle Identification System "Generates the Code Once the Vehicle Approaches the Pickup Location." ................................................. 11

   C. None of Kalanick, Kemler, Lalancette, or any Combination Thereof Disclose "Generating" the "Indicator" at the time the signal is generated. ........................................................................... 13

      1. Kalanick Does Not Disclose "Generating" an "Indicator." ................ 13

      2. Kalanick in view of Kemler Fails to Disclose "Generating" an "Indicator" at least because a Person of Ordinary Skill Would Not Combine the References in the Manner Asserted by the Board. ........ 14

      3. Lalancette Alone Fails to Disclose "Generating" an "Indicator" ....... 22

      4. Lalancette in view of Kemler Fails to Disclose "Generating" an "Indicator" at the time the signal is created at least because a Person of Ordinary Skill Would Not Combine the References in the Manner Asserted by the Board ...................................................... 23

II.  Substantial Evidence Does Not Support the Board's Finding that Lalancette Discloses a "Mobile Communication Device Associated with a Driver of a Vehicle." .................................................................... 24

i

III. Substantial Evidence Does Not Support the Board's Finding that Kalanick/Kemler Disclose the "First Signal/Notification Signal" Claimed in Claims 1-9, and 11-20 of the '637 Patent and Claim 1 of the '199 Patent. ..29

IV. Substantial Evidence Does Not Support the Board's Finding of Obviousness Based on Kalanick/Kemler of Claims 1-8 of the '987 Patent. ......................31

RSDI's Response to Lyft's Cross-Appeal on the Substitute Claims......................32

I. Standard Of Review........................................................................................32

II. The Board Correctly Held That the Substitute Claims Are Directed to Patent-Eligible Subject Matter........................................................................33

   A. The Board Correctly Held that the Substitute Claims Recite an Inventive Concept..................................................................................................34

   B. The Substitute Claims Are Also Not Drawn to an Abstract Idea, the Board Legally Erred in Holding Otherwise .............................................37

III. The Board Correctly Held That No New Subject Matter Was Added to the Substitute Claims..........................................................................................42

   A. Substitute Claim 29 of the '637 Patent Is Supported By the Specification .................................................................................................................43

   B. Substitute Claim 3 of the '199 Patent Is Supported by the Specification 45

   C. The Provisional Application Provides Support for Generating the Indicator Itself............................................................................................47

IV. The Board Correctly Held That Lyft Did Not Demonstrate That the Substitute Claims Were Obvious Over the Prior Art .....................................48

   A. The Board Correctly Held that Kemler Does Not Disclose Creating an Indicator After the Vehicle Has Reached a Predetermined Distance from the User.....................................................................................................49

   B. The Board Correctly Held that Stanfield Does Not Disclose Generating an Indicator After the Vehicle Has Reached a Predetermined Distance from the User ............................................................................................52

CONCLUSION AND RELIEF SOUGHT .............................................................56

# TABLE OF AUTHORITIES

**Case**                                                                          **Page(s)**

*Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC,*
   827 F.3d 1341 (Fed. Cir. 2016) ...........................................................35

*Consolo v. Fed. Maritime Comm'n,*
   383 U.S. 607 (1966)...........................................................................42

*Corephotonics, Ltd. v. Apple Inc.,*
   84 F.4th 990 (Fed. Cir. 2023) ...........................................................32

*CxLoyalty, Inc. v. Maritz Holdings Inc.,*
   986 F.3d 1367 (Fed. Cir. 2021) ..........................................................32

*DDR Holdings, LLC v. Hotels.com, L.P.,*
   773 F.3d 1245 (Fed. Cir. 2014) ............................................... 34, 35, 36

*Edison Co. v. NLRB,*
   305 U.S. 197, 229-30 (1938) ..............................................................42

*Enfish, LLC v. Microsoft Corp.,*
   822 F.3d 1327 (Fed Cir. 2016) ................................................. 1, 37, 38

*In re Gartside,*
   203 F.3d 1305 (Fed. Cir. 2000) ................................................... 32, 42

*Internet Patents Corp. v. Active Network, Inc.,*
   709 F.3d 1343 (Fed. Cir. 2015) ..........................................................37

*MCM Portfolio LLC v. Hewlett-Packard Co.,*
   812 F.3d 1284 (Fed. Cir. 2015) ..........................................................33

*Medytox, Inc. v. Galderma S.A.,*
   71 F.4th 990 (Fed. Cir. 2023) .................................................... 32, 42

*In re NTP, Inc.,*
   654 F.3d 1279 (Fed. Cir. 2011) ..........................................................42

*Pfizer, Inc. v. Aotex, Inc.*,
    480 F.3d 1348 (Fed. Cir. 2007) ............................................................33

*Rapid Litig. Mgmt. Ltd. v. CellzDirect, Inc.*,
    827 F.3d 1042 (Fed. Cir. 2016) ............................................................38

*Retractable Techs., Inc. v. Becton, Dickinson & Co.*,
    653 F.3d 1296 (Fed. Cir. 2011) ............................................................25

*SAP Am. Inc. v. InvestPic, LLC*,
    898 F.3d 1161 (Fed. Cir. 2018) ............................................................37

*TecSec, Inc. v. Adobe Inc.*,
    978 F.3d 1278 (Fed. Cir. 2020) ............................................................41

**Statutes**

35 U.S.C. § 101 ............................................................................................32
35 U.S.C. § 103 ............................................................................................33
5 U.S.C. § 706 ..............................................................................................32

## <u>STATEMENT OF RELATED CASES</u>

Pursuant to Federal Rule 47.5(b), Appellant Rideshare Displays, Inc. ("RSDI") states that this Court's decision in these consolidated appeals may affect the following case, in which the same patents have been asserted: *Rideshare Displays, Inc. v. Lyft, Inc.*, Case No. 1:20-cv-01229 (D. Del.) (stayed pending this appeal).

## STATEMENT OF THE ISSUES

**Lyft's Cross-Appeal on Substitute Claims of the '637 and '199 Patents**

1.  Whether the Board's holding should be affirmed that the Substitute Claims are patent-eligible under 35 U.S.C. § 101 as reciting an inventive concept under step two of *Alice* because the Board properly acknowledged not only the individual elements of the Substitute Claims, but the limitations as an ordered whole to arrive at an inventive concept that arises with the use of the internet and computer networks.

2.  Whether the Board legally erred in failing to also find that the Substitute Claims are not directed to an abstract idea under step one of *Alice* where the Board characterized the Substitute Claims as being drawn to "enabling a user to identify a dispatched cab," contrary to the focus of the Substitute Claims, thereby violating this Court's rule set forth in *Enfish,* that "describing the claims at [too] high [a] level of abstraction and untethered from the language of the claims all but ensures that the exceptions to § 101 swallow the rule."  *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1337 (Fed. Cir. 2016)

3.  Whether the Board's determination that no new matter was introduced into the Substitute Claims should be affirmed because the Board's determination is supported by substantial evidence.

4.  Whether the Board's determination that the Substitute Claims are not rendered obvious should be affirmed because the Board's determination is supported by substantial evidence.

## STATEMENT OF THE CASE

**Lyft's Cross-Appeal on the Substitute Claims of the '637 and '199 Patents**

The Board granted RSDI's motion to amend certain claims of the '637 patent and claims of the '199 patent. Appx66; Appx206. Specifically, the Board granted substitute claims 29, 31-32 of the '637 patent, and claims 3-4 of the '199 patent (the "Substitute Claims"). *Id*. RSDI took part in the Board's pilot program concerning motion to amend practice and procedures. As such, RSDI requested that the Board provide preliminary guidance on its motion to amend. The Board did provide preliminary guidance, in which the Board stated that RSDI had shown a reasonable likelihood that it had satisfied the requirements of patentability for the Substitute Claims. Appx1999-2022; Appx2023-2045. In the Board's Final Written Decisions for the '637 and '199 patents, the Board determined that the Substitute Claims were patentable, incorporating its preliminary guidance into its determination. Appx66; Appx206.

In its Final Written Decisions, the Board rejected Lyft's three arguments asserting that the Substitute Claims are not patentable. <u>First</u>, the Board rejected Lyft's argument that the Substitute Claims were not patent eligible under 35 U.S.C. § 101 because the Board determined that the Substitute Claims were directed to an inventive concept under step two of *Alice*. Appx64-66; Appx204-206. <u>Second</u>, the Board rejected Lyft's argument that new matter was introduced into the Substitute

Claims.  The Board found that the specification of the '637 and '199 patents fully supported the indicator itself being generated at the time the signal was generated and therefore no new matter was added.  Appx58-61; Appx198-200.  <u>Finally</u>, the Board rejected Lyft's argument that the Substitute Claims were rendered obvious by:    Kalanick/Kemler;  Kalanick/Kemler/Stanfield;  Lalancette/Kemler;  and/or Lalancette/Kemler/Stanfield.  Appx61-64; Appx200-204.  As such, the Board held the Substitute Claims patentable.

## SUMMARY OF THE ARGUMENT

### Lyft's Cross-Appeal on the Substitute Claims of the '637 and '199 Patents

The Court should affirm the Board's determination that Substitute Claims 29, 31-32 of the '637 patent and claims 3-4 of the '199 patent are patentable. The Board's determination was legally correct and supported by substantial evidence. The Board's holding that the Substitute Claims recite patent eligible subject matter under 35 U.S.C. § 101 should be upheld. The Board's holding that the claims recite an inventive concept under step two of *Alice* is legally correct and should be upheld, at least because, as the Board held, the Substitute Claims recite a technological solution rooted in computer and network technologies. Appx64-66; Appx204-206.

The Board's determination that no new matter is introduced into the Substitute Claims should also be upheld because the Board's finding is supported by substantial evidence. The Board found ample support in the specification of the '637 and the '199 patents to support the limitation found in each of the Substitute Claims that the indicator itself be generated at the time the indicatory signal is generated. The Board also properly determined that Lyft's arguments to the contrary were largely premised on a misreading of paragraph 30 of the applications giving rise to the '637 and '199 patents. Appx58-61; Appx198-200. Because the Board's determination is supported by substantial evidence, the Board's finding should be affirmed.

Finally, the Board's determination that the Substitute Claims are patentable because they are not rendered obvious by any combination that relies on either Kemler or Stanfield to disclose the generation of an indicator at the same time that the indicatory signal is generated should be upheld. The Board specifically determined that neither Kemler nor Stanfield disclose generating an indicator at the same time the indicatory signal is generated. Appx61-64; Appx200-204. This finding by the Board is supported by substantial evidence firmly rooted in the specifications themselves and should be affirmed.

## ARGUMENT

### RSDI's Reply on its Appeal of the Original Claims of the Patents-at-Issue

The Board's determination that claims 1-9, 11-20 of U.S. Pat. No. 9,892,637; claims 1, 2, 4, 6-8 of U.S. Pat. No. 10,169,987; claim 1 of U.S. Pat. No. 10,395,525; claims 1-2 of U.S. Pat. No. 10,599,199; and claims 1-5 of U.S. Pat. No. 10,748,417 (the original "claims-at-issue") are unpatentable should be reversed. As an initial matter, the Board committed legal error in construing the claim phrase "generating an indicatory signal representing an indicator" such that "generating" applies only to the indicatory signal and not the indicator itself. In so holding, the Board failed to read the claims themselves according to how a person of skill would understand them. The Board also failed to read the claims in light of the specification. The

Board compounded its error by determining that Kalanick/Kemler and/or Lalancette/Kemler would render obvious the claims even under a proper claim construction, i.e. the claim construction urged by RSDI. The Board's findings are not supported by substantial evidence, requiring the Board's holding of unpatentability to be reversed.

The Board also failed to support its findings that the claims are rendered obvious with substantial evidence even using its incorrect claim construction (as addressed under Sections II, III and IV of this section, in which the Board applies its own – erroneous - claim construction). Even under the Board's construction, the Board's analysis fails to give proper weight to the claim language read in light of the specification. Further, the Board's analysis is divorced from the disclosures of the prior art references and is impermissibly infected with hindsight reasoning so as to arrive at the claimed invention using the claims as a roadmap. Because substantial evidence does not support the Board's determination that the claims are obvious, even under the Board's improper claim construction, the Board's finding of unpatentability should be reversed.

## I.    The Board Committed Legal Error in Failing to Construe the Claimed "Indicator" as Being "Generated."

The claims-at-issue themselves make clear that the indicator itself is generated at the time the indicatory signal is generated. A person of skill in the art reading the claims, and certainly when reading the claims in light of the specification would

understand that what is being claimed is an indicator that is itself generated when the signal is generated. Further, under this proper construction of the claim phrase "generating an indicatory signal representing an indicator," none of the asserted references render the claims-at-issue obvious. The Board's holding that the claims-at-issue are unpatentable should be reversed.

### A. The Term "Generate" Modifies Both the "Indicatory Signal" and the "Indicator."

The Board legally erred when it improperly construed the claim phrase "generating an indicatory signal representing an indicator" (and its correlates), such that "generating" only modifies "an indicatory signal" and not the "indicator" itself also. Lyft argues that RSDI's construction "is inconsistent with the intrinsic evidence." Cross-Appellant Lyft, Inc.'s, Principal & Response Brief ("Lyft Br.") at 25. In support, Lyft argues that the <u>claim phrase itself</u> makes clear that only the signal is generated and not the indicator. Pointing only to the claim phrase itself, Lyft asserts that "the claims themselves reveal that a signal is generated, and that the content of the signal 'represent[s]' the indicator." *Id*. at 26.

Lyft fails to address RSDI's argument. Nobody disputes that the signal is generated, nor is there a dispute that the indicatory signal "represents an indicator." The issue is the Board's failure to appreciate that the claim phrase "generating an indicatory signal representing an indicator" would be read in the context of these

8

patents by a person of skill in the art to mean that when the signal is generated, so is its content – the indicator itself.

As the Board has noted, the signal itself cannot be stored. Appx815. Thus, any signal is always necessarily "generated." Accordingly, signals are typically claimed and described as being transmitted, sent, or received, as opposed to being "generated." A person of skill in the art would understand that when the claim term "generating" is used with the phrase "an indicatory signal representing an indicator" that the thing being generated is the signal **with the content of the signal**, which is the indicator itself. Beyond simply reciting the claim language, Lyft fails to respond to RSDI's argument that a person of skill would understand this claim phrase as requiring the content of the signal (the indicator) to be generated when the signal is generated. Corrected Opening Brief for Appellant ("Br.") at 26-27.

Lyft further states that the specification does not support RSDI's construction requiring that the term "generating" applies to both the signal and its content, i.e., the indicator itself. However, Lyft provides no support for this argument other than to simply assert it and to say that the Board agrees. Lyft Br. at 26-27. In fact, the specification provides strong support for RSDI's construction that what is generated is the signal that contains the indicator, i.e., the indicator itself is generated when the signal is generated.

First, the problem addressed by the present invention supports RSDI's proposed construction. The specification explicitly addresses the need for improved safety for the rider and the driver using ridesharing services. Generating the indicator at the time the signal is created, and not before, addresses the problem of rider and driver safety. The specification explains that "[r]ider safety is fundamental to the continued success of transportation services, but driver safety has also become an issue." Appx245 at 1:53-55. The patent further explains that a "continuing need exists for systems and methods adapted for use by transportation services to ensure rider and driver security." *Id*. at 1:56-58. The Patents-at-Issue address this concern by claiming inventions that recite the indicator being generated at the time the signal is generated, because "it enhances privacy/security and reduces risk of hacking." Appx2192 at ¶¶ 25-26, *see also* Appx2189-2192 at ¶¶ 21-24.

Second, the specification explicitly uses the phrase "generating one or more signals representing an indicator" to include generating the indicator itself. The Patents-at-Issue disclose that "[t]he vehicle identification system 10 may be adapted to generate one or more signals representing an indicator." Appx246 at 4:4-5. The Patents-at-Issue go on to provide descriptions of what a signal is: the signal includes the content that is displayed on the vehicle display, which is "a code (e.g., text string, or alphanumeric string), an icon or other identifier." *Id*. at 4:6-8. A claim construction that requires generating the indicator at the time the signal is generated

most closely aligns with the disclosure of the Patents-at-Issue as it would be read by a person of skill, as well as the claims themselves. The correct claim construction requires that the indicator itself be generated at the time the signal is generated. The Board should be reversed.

### B. The Provisional Application Specifically Discloses that the Vehicle Identification System "Generates the <u>Code</u> Once the Vehicle Approaches the Pickup Location."

In its Request to Take Judicial Notice (Dkt. 29), RSDI has asked the Court to consider U.S. Provisional Application No. 62/004,753, entitled "Vehicle Identification System," to which each of the Patents-at-Issue claims priority and **<u>incorporates by reference in its entirety</u>**[1]. Appx283 at 1:6-10; Appx245 at 1:6-10; Appx273 at 1:16-19; Appx264 at 1:6-10; and Appx254 at 1:6-10. Accordingly, the disclosure of the '753 provisional application constitutes part of the disclosure of each of the Patents-at-Issue, and hence is part of the intrinsic record for each of the Patents-at-Issue to be considered during claim construction, which this Court reviews de novo.

---

[1] Lyft has indicated it will oppose RSDI's Request to Take Judicial Notice, at least because the provisional application was not before the Board. It is true that the provisional was not discussed before the Board, but RSDI is not making any new arguments based on the provisional. Rather, RSDI is only using the provisional application to corroborate what RSDI has argued throughout the proceedings before the Board.

The provisional application explains that the inventive Vehicle Identification System (VIS) "is **<u>a code generating system</u>** that allows a person to identify a vehicle in which he/she is [sic] requested for a ride service."  Dkt. 29, Ex. 1 at 16, ¶ 1 (emphasis added).  The '753 application further explains that "VIS **<u>generates the code</u>** once the vehicle approaches the pickup location. . . . The code would be like i.e A22, B11, C44 and so on. the [sic] codes would not be duplicated in the same pick up location."  *Id.* at ¶ 3 (emphasis added).

As may be apparent, the '753 application discloses that **at its core** the invention is directed to a "VIS **<u>code generating system</u>** that allows a person to identify a vehicle," i.e. the vehicle identification system is directed to the "generation" of the code or indicator itself.  *Id.* at ¶ 1 (emphasis added).  The '753 application does not discuss "signals" at all, instead the application discloses "send[ing] the code to the display penal [sic] . . . ."  *Id.* at ¶ 3.

Thus, the disclosure of the '753 application corroborates what RSDI has argued throughout the IPR proceedings, namely that a person of ordinary skill in the art would understand that "generating an indicatory signal representing an indicator" means that what is generated is the **indicator itself** when the signal is generated.  As is routine, in converting the '753 provisional application into the applications that would become the Patents-at-Issue, a more fulsome description of the invention was provided.  In order to more accurately describe how the system works, the patentee

more precisely explained that there are one or more "signals" that convey specific content/information between various components of the internet-based system. Accordingly, the patentee described the invention as "generating an indicatory signal representing an indicator," consistent with the '753 application (i.e., the code or indicator itself is generated) but that generated indicator or code is sent via a signal.

Further, the patentee recites that the indicator is generated when the signal is generated. Thus, the '753 application provides further evidence that under a proper claim construction, the claim term "generating" applies to the **indicator itself** and not just the signal. The Board erred in holding otherwise.

### C. None of Kalanick, Kemler, Lalancette, or any Combination Thereof Disclose "Generating" the "Indicator" at the time the signal is generated.

None of Kalanick, Kemler, and/or Lalancette, alone or in combination disclose "generating an indicatory signal representing an indicator" when the claim phrase is properly construed to recite that the indicator itself is generated at the time the indicatory signal is generated. The Board's finding to the contrary is not supported by substantial evidence and should be reversed.

### 1. Kalanick Does Not Disclose "Generating" an "Indicator."

Kalanick does not disclose "generating" an indicator, as required under a proper claim construction. Lyft does not argue otherwise. Instead, Lyft argues that Kalanick discloses generating an "indicatory signal," and cites to the Board's

determination that Kalanick discloses that "in response to determining that the user has specified an output configuration (i.e., an indicator) for an indication device, identifying data corresponding to the user-specified output configuration and transmitting the data over a network to the driver device to configure the vehicle indication device." Lyft Br. at 27-28, quoting, Appx95; Appx911-912; Appx304, ¶ 2, Appx315 at cl. 1. This passage clarifies that Kalanick has a pre-stored output configuration associated with a user that is identified and then transmitted. The output configuration is not "generated" at the time the signal is generated/sent. Thus, the Board has not determined, nor does Lyft argue that Kalanick teaches generating an indicator when the signal is generated, which is required under a proper claim construction.

**2.      Kalanick in view of Kemler Fails to Disclose "Generating" an "Indicator" at least because a Person of Ordinary Skill Would Not Combine the References in the Manner Asserted by the Board.**

The Board's finding that a person of skill would modify the system of Kalanick with Kemler's driverless system's controller-generated signal is not supported by substantial evidence. Lyft's arguments to the contrary are not grounded in the disclosures of either Kalanick or Kemler, but rather appear to be the product of prohibited hindsight reasoning in order to arrive at the claimed invention[2].

---

[2] Lyft states that "[w]hile RSDI's argument rests on its improper construction of 'generates,' RSDI ignores the fact that Lyft relies on the combination of Kalanick

14

As RSDI explained in its Opening Brief, the Board determined that a person of skill would modify the system of Kalanick with the controller-generated indicator of Kemler in order to:

> (1) ". . . permit the driver's device to send the signal to the display on the vehicle after the driver's device receives the signal from the controller; (Br. at 30) and

> (2) "eliminate instances where riders within a similar area select the same or similar indicators, or are provided the same default indicator, making them less unique." *Id*.

RSDI argues in its opening brief that the Board's first argument for why a person of skill would look to combine Kemler with Kalanick is not supported by substantial evidence because it does not state or solve a problem with Kalanick that Kemler solves.  Br. at *Id*.  Both Kalanick and Kemler send the indicator <u>from the controller</u> <u>to the driver</u>.  Because Kalanick already does this, there is no reason to modify Kalanick in view of Kemler to achieve the same result.  The Board's rationale for combining the references is not supported by substantial evidence because the Kalanick reference already discloses permitting "the driver's device to

---

and Kemler to satisfy this requirement." Lyft Br. at 31.  To clarify Lyft's repeated errors in characterizing RSDI's arguments, <u>first</u>, RSDI has not disagreed with the Board's construction of "generates," but rather with the Board's failure to hold that both the signal **and the indicator** are generated.  <u>Second</u>, RSDI's Opening Brief expressly addresses the Kalanick/Kemler combination asserted by the Board, in which Kemler is used to provide the indicator being generated.  Br. at 29-32.

send the signal to the display on the vehicle after the driver's device receives the signal from the controller." Br. at 29-30.

Lyft provides **<u>no response</u>** to this argument and instead states that "RSDI's arguments completely ignore one of the main motivations to combine Kalanick with Kemler, which is to prevent the same indicator from being duplicated in the same pickup area." Lyft Br. at 38. Of course RSDI has not "ignored" the Board's second rationale for replacing the controller-generated indicator of Kemler with the user-selected system of Kalanick. However, the Board's <u>second</u> basis for combining Kalanick and Kemler does not provide support for the Board's <u>first</u> basis for combining Kalanick and Kemler. Lyft fails to address RSDI's arguments as to the Board's first basis.

Turning to the Board's second basis for combining Kalanick and Kemler, RSDI explained that the Board's rationale for combining Kemler with Kalanick, namely, to avoid duplication of indicators in the same pick-up area, was not supported by substantial evidence for at least the following reasons:

> (1) a person of skill would understand that the Board has conjured up a "problem" where one does not exist, as it would be extraordinarily unlikely that two (or more!) people would configure the same indicator using the Kalanick configuration system, and that those two or more people would find themselves at the same location at the exact same time waiting for their ride; and
>
> (2) even if this "problem" created a motivation to combine Kemler with Kalanick, the solution would be to use the rules provided in the indicator-creation system of Kemler and add them to the user-

16

configured system of Kalanick, thereby preserving a primary purpose of Kalanick that permits users to create their own indicator[3].

Br. at 30-32.

In response to RSDI's argument that the "problem" identified by the Board is only generated by hindsight reasoning because the likelihood of two people creating the same indicator and then finding themselves waiting at the same place, at the same time for a rideshare vehicle is improbable, Lyft provides no citation to the disclosure of Kalanick that demonstrates that the Board's asserted rationale for combining Kalanick and Kemler is supported by substantial evidence. Instead, Lyft simply states that (1) the Board said it was a legitimate problem (with nothing more), and (2) Kalanick also discloses using default indicators. Lyft Br. at 38-39. The alternative use of default indicators in Kalanick is never described as resulting in indicators that are any less unique than the user-generated indicators. Lyft has provided no support from Kalanick to the contrary.

Even if the Court accepts the Board's motivation to combine these references based on the "problem" of potential duplicates, substantial evidence does not support the Board's asserted motivation to modify Kalanick to include a "**controller-**

---

[3] Lyft argues that RSDI raises new arguments in addressing the Board's rationale to combine the Kemler indicator generation system with Kalanick. Lyft Br. at 37. Lyft is mistaken, RSDI has always argued that the Board erred in asserting that a person of skill would be motivated to modify Kalanick to include the controller-generated indicator of Kemler. Appx550-566.

generated" indicator from Kemler to solve the "problem" of potential duplication of indicators at the same pick-up location. Kemler's solution to the problem of non-duplication is the use of rules to ensure that duplication (among other things) does not occur. Kemler discloses that the rules are stored in a "storage system." Appx332 at 8:24-25 ("The storage system 250 may also store a set of rules for generating the unique signals."). Both an application that permits a <u>user</u> to generate an indicator, (as in Kalanick), and a <u>controller</u> that generates an icon (Kemler) could equally as easily implement the rules disclosed in Kemler.

Kalanick discloses that its user-generated icon system uses an application. Appx304 at ¶ 12 ("A user can access the user's account via a portal on the user's computing device, such as through use of a webpage or a designated client service application in communication with the on-demand service system and/or the transport personalization system, in order to configure the output configuration."). The Kalanick application could be modified to include the rules stored in the Kemler storage system to preserve the user-configured icon of Kalanick, but also include the rules of Kemler to prevent duplication of icons.

The use of the Kemler rules for indicator-creation in the user-generated system of Kalanick solves the Board's identified "problem" of potentially permitting duplicate indicators to be used at the same pick-up location. There is no reason beyond using the claims as a roadmap to arrive at obviousness to require that

Kalanick be modified to include the **controller** generating the indicator. The controller generating the indicator versus the user generating the indicator has no impact on the generation of non-duplicative indicators. The rules alone solve the problem and can be equally used in a system where the controller generates the indicator or where the user does.

In response, Lyft argues that "[u]tilizing the central controller in Kemler to generate the indicator ensures non-duplication. See Appx377. Without utilizing a central controller in charge of managing the generation of indicators, it would be difficult or impossible for the system in Kalanick to ensure that users did not select or were not provided with the same indicator." Lyft Br. at 38. Lyft's citation to Appx377 is its Petition for the '637 patent where it discusses generally and with no reference to either the Kalanick or the Kemler indicator-selecting system that a "POSA would have been motivated to combine the load balanced server farm disclosed in Kemler when implementing Kalanick's central system." Appx377. This has no bearing on the argument at hand. Lyft provides <u>no citation</u> for its assertion that the central controller is required to manage an indicator selection system that does not generate duplicates.

The disclosure of Kemler does not support Lyft's assertion. In fact, Kemler discloses that it is **not the central controller** that prevents duplication of indicators, but rather rules that are applied by the controller that prevent duplication of

indicators.  The rules are stored in a "storage system 250" that could be used as easily in a controller-generated indicator system as in a user-generated indicator system. Appx332 at 8:24-25.

Kemler goes on to describe what the rules are that prevent icon duplication and provide other security measures for the user, but Kemler **never discloses** that the controller itself does anything beyond applying the rules stored in the storage system.  *Id*. at 8:24-9:2.  Accordingly, substantial evidence does not support the Board's proffered motivation to combine Kalanick and Kemler, because the "problem" to be solved does not require that the controller generate the icon. The only basis for modifying Kalanick in that way is hindsight reasoning.  Further, using the controller-generated icon function of Kemler would eviscerate a primary purpose of Kalanick, which is to allow users to create their own icons so that they will easily recognize them.

Lyft argues that a user picking its own identifier is not a primary purpose of Kalanick.  Lyft Br. at 39.  Lyft speculates that "[i]f anything, the 'primary purpose' of Kalanick is to ensure riders successfully identify the dispatched vehicle displaying an indicator, and having a user select his or her own indicator is just of [sic] many ways of handling indicator selection.  Furthermore, having the user select an indicator cannot be the 'primary purpose' of Kalanick because Kalanick also

discloses default indicators in anticipation that some users may not make indicator selection preferences." *Id*.

Lyft fails to appreciate the clear disclosure of Kalanick that has as a primary purpose permitting a user to create its own icon. Kalanick explains that "[t]he system can use information specified or configured **by a user** of an on-demand service to cause the indication device to dynamically adjust the output for a predefined duration of time. Examples of features that can be configured by a user include a color(s), a pattern(s), an illumination sequence(s), text, visual content, video, and/or audio. **In this manner**, when the service provider approaches a user for purposes of providing the on-demand service, **the indication device can be dynamically configured** and **personalized in a manner specified and recognizable by the user**, thereby informing the user which vehicle has been assigned to the user to provide the on-demand service." Appx304 at ¶ [0010]; *see also* Appx308 at ¶ ¶ [0038], [0039] ("In this manner, by enabling the user to provide user-specified preferences for the indication device 170, the system 100 can provide the user with a personalized on-demand service experience"). The Board's combination of Kalanick with Kemler is not supported by substantial evidence and should be reversed.

21

### 3. Lalancette Alone Fails to Disclose "Generating" an "Indicator" When the Indicatory Signal Is Generated.

Substantial evidence does not support a finding that Lalancette alone discloses "generating" an "indicator" at the time the indicatory signal is generated. Lyft argues that Lalancette discloses generating the icon at the time the signal is created because Lalancette discloses that "an automated icon generator using a pseudo-random number generator using for example an IP address or phone number or user-provided string as a seed to generate a random number which can be used to generat[e] a simple geometric pattern." Lyft Br. at 33, citing Appx344 at ¶ [0043].

This argument misses the point. Whether the icon is generated by an automated icon generator or by the user, the icon is already created and stored by the time the indicatory signal is sent. Thus, the icon is **retrieved** not **generated** at the time the signal is sent. "Human-readable icons of the present invention could be selected form a pre-configured collection of unique human-readable icons **stored in the icon database** 114. These icons could be designed **in advance** and selected for uniqueness and to be easily distinguishable. Alternatively, the human-readable icons can be **user-defined in advance**." Appx344 at ¶ [0042] (emphasis added). Accordingly, substantial evidence does not support a finding that Lalancette discloses generating an indicator at the time the indicatory signal is generated.

4.     **Lalancette in view of Kemler Fails to Disclose "Generating" an "Indicator" at the time the signal is created at least because a Person of Ordinary Skill Would Not Combine the References in the Manner Asserted by the Board.**

Substantial evidence does not support the Board's combination of Lalancette in view of Kemler.  It is not even clear what the combination is that allegedly discloses generating an indicator when the indicatory signal is generated.  As Lyft acknowledges, in an attempt to make sense of Lyft's cobbled together combination, RSDI assumed that what was attempting to be done was to modify the icon retrieval system of Lalancette with the controller-generated indicator system of Kemler in an attempt to show obviousness of the claim limitation "generating an indicatory signal representing an indicator," where the indicator itself is generated at the time the signal is generated.  Br. at 32.

However, Lyft states that this is **<u>not</u>** the combination asserted; the combination asserted includes "**<u>Lalancette's</u>** controller which generates and transmits the unique icon to the vehicle."  Lyft Br. at 41.  Lyft goes on to explain that Kemler is then combined with Lalancette for Kemler's "teaching" "of generating and displaying the indicatory signal only once the vehicle is within a predetermined distance of the rider. . ." *Id.*  This combination does not even attempt to provide support for "generating" the **<u>indicator itself</u>** at the time the indicatory signal is created.  Instead, Lyft combines the pre-stored indicator being sent to the vehicle as disclosed in Lalancette, but includes from Kemler that the indicator is sent

when the vehicle is within a predetermined distance of the rider.  This combination fails to provide **<u>any support</u>** for, much less substantial evidence to support that these references combined in this way disclose "generating" an indicator at the time the signal is generated.

For all of the reasons provided above, the Boad's claim construction should be reversed because its holding that "generating" in the claim phrase "generating an indicatory signal representing an indicator" (and its correlates) only modifies "indicatory signal," and not the indicator itself is legally erroneous.  Further, the Board's finding that Kalanick/Kemler and/or Lalancette/Kemler would render the claims obvious even under RSDI's claim construction is not supported by substantial evidence.  In fact, neither combination of references discloses the claims of the Patents-at-Issue when the claims are construed properly.  Accordingly, the Board's holding that the claims-at-issue are unpatentable should be reversed.

## II.    Substantial Evidence Does Not Support the Board's Finding that Lalancette Discloses a "Mobile Communication Device Associated with a Driver of a Vehicle."

In this Section, and the remaining sections of RSDI's Reply (including Sections III. And IV. below), the underlying analysis by the Board is conducted under its claim construction, wherein the claim phrase "generating an indicatory signal representing an indicator," is construed such that "generating" only modifies "an indicatory signal" and not the "indicator" itself.  Even under this erroneous claim

construction standard, the Board has failed to provide substantial evidence to support its finding of unpatentability and it should be reversed.

The Board's finding that Lalancette discloses the claimed "mobile communication device associated with a driver of a vehicle" is divorced from both a fair reading of the claims-at-issue and the disclosure of Lalancette itself. The Board's finding is a classic case of hindsight reasoning that is not supported by substantial evidence.

The claims-at-issue recite components that are "associated with the vehicle," such as the display, and components that are "associated with the driver of the vehicle," such as the mobile communication device. These claimed differences must be given weight and effect. The Board has failed to do that.

Lyft argues that "the limitations RSDI seeks to place on these claim terms is inconsistent with the disclosure in the specification." Lyft Br. at 43. It is axiomatic that patent claims are understood in light of the specification. *Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1305 (Fed. Cir. 2011). As RSDI explained at length in its Opening Brief, the Patents-at-Issue explain and describe what a mobile communication device associated with a driver of a vehicle can be, namely a personal, portable communication device. The specification describes the mobile communication device associated with the driver of a vehicle in this manner

because the Patents-at-Issue are directed to an internet-based rideshare system, where there is no central taxi service, or fleet of vehicles owned by a taxi service. Instead, the driver is a user of a ride-share service working independently. Accordingly, the mobile communication device "associated with the driver" is described as being a cell phone, etc.  *See*, Br. at 34-38.

RSDI is not arguing that "mobile communication device" requires some particular construction beyond what the specification discloses (Lyft Br. at 43), instead RSDI argues that the claim phrase **as a whole**, "mobile communication device associated with a driver of a vehicle," when read in light of the specification, makes clear that what is claimed is a mobile, portable, wireless device personal to the driver.  Br. at 34-38.

Lyft asserts that "even applying RSDI's improperly narrow definition which requires, the communication device to be uniquely personal to the driver, the determination that Lalancette's mobile computer satisfies this limitation is still supported by substantial evidence."  Lyft Br. at 45.  To be clear, it is not the claimed "mobile communication device" alone that requires the device to be uniquely personal to the driver, but the entire claim phrase "a mobile communication device associated with a driver of the vehicle" (which Lyft prefers to shorten to only a "communication device") that requires that the mobile communication device be unique to the driver.

Lyft repeats the Board's strained analysis that because the Lalancette mobile computer is in the taxi and the driver is in the taxi, the mobile computer is associated with the driver. Lyft Br. at 45-46. This analysis is nonsensical. According to this reasoning, the seats of the taxi are "associated with the driver," the floor of the taxi is "associated with the driver," and so on. That is clearly not what is intended by the claims-at-issue. Further, this analysis fails to appreciate that the claims-at-issue specifically recite components that are associated with the <u>vehicle</u>, such as the display, and components that are associated with the <u>driver of the vehicle</u>, such as the mobile communication device. Accordingly, the claims themselves require that for a component to be associated with the driver, something more is required than the component simply being located in the vehicle.

Lyft goes on to argue that because the driver views the <u>display</u> to see the user's icon, the "<u>mobile computer</u> in the taxi car" that manages the displays is associated with the driver. Lyft Br. at 446. Again, this analysis is nonsensical. <u>First</u>, according to this analysis, anything in the car that the driver looks at could be described as being "associated with the driver of the vehicle." The taxi's speedometer, gas gauge, clock, and radio would all be fairly described as being "associated with the driver of the vehicle," according to this analysis.

<u>Second</u>, and more importantly, Lalancette does not even disclose that the "mobile computer in the taxi car" itself displays the icon. Instead, Lalancette

27

discloses that the "mobile computer in the taxi car" receives the icon from the service provider "and the mobile computer manages the taxi roof-top electronic display 122 and the diver's dashboard display 124." Appx343 at ¶ 32.

This basic disclosure of Lalancette appears to be lost on both the Board (Appx825 at 80:13-22) and Lyft. Lyft states that the "mobile computer controls the driver's display so that the user's unique icon is displayed so that the driver may use it to identify the correct user." Lyft Br. at 45. So far so good, but then Lyft goes on to state that "[b]ased on Lalancette's disclosure, the driver within the taxi is the only one who may observe and utilize the <u>display</u>, making the display personal or unique to that particular driver." *Id*. at 45-46 (emphasis added).

Lyft conflates the "mobile computer in the taxi" with the <u>driver display</u> as disclosed in Lalancette. Lyft is apparently arguing that the <u>driver display</u> is associated with the driver, because the driver looks at the display. However, the driver display[4] of Lalancette is not the "mobile computer in the taxi," which has been alleged to meet the claim limitation at issue. Thus, Lyft's basis for arguing that the "mobile computer in the taxi" is associated with the driver falls (even apart from the

---

[4] RSDI explained in its Opening Brief in great detail how the driver display of Lalancette cannot be the claimed "mobile communication device associated the driver of a vehicle," at least because the claimed display is claimed as being associated with the vehicle, not the driver. Br. at 38-43.

absurdity of arguing that because the driver looks at something in the taxi it automatically becomes "associated with the driver").

Lalancette discloses that the "mobile computer in the taxi" operates without any input from the driver. Instead, it automatically manages receiving the signal with the icon from the system and sends it to one or more of the taxi displays. Appx343 at ¶ 32. The mobile computer disclosed in Lalancette is described as being "in the taxi," has no icon for the driver to view, and operates entirely independently of the driver. There is no credible reading of this disclosure that would support the Board's finding that a person of skill would understand "the mobile computer in the taxi car" of Lalancette to be the claimed "mobile computing device associated with a driver of the vehicle."

III.    **Substantial Evidence Does Not Support the Board's Finding that Kalanick/Kemler Disclose the "First Signal/Notification Signal" Claimed in Claims 1-9, and 11-20 of the '637 Patent and Claim 1 of the '199 Patent.**

As RSDI explains in its Opening Brief, the Board's attempt to disclose the first signal limitations of the relevant claims of the Patents-at-Issue is hopelessly mired in hindsight reasoning. The Board's analysis evidences both a misreading of the specifications of the prior art and a failure to address the limitations **as claimed** of the claims-at-issue. Br. at 51-56.

Lyft does nothing to uncloud the Board's flawed analysis. For example, Lyft simply argues that "the Board correctly determined that the Kalanick-Kemler combination 'would include having the controller generate and transmit the signal containing the unique display information when the vehicle is within a predetermined distance from the user's location." Lyft Br. at 48-49.

As RSDI explained at length in its Opening Brief, this finding of the Board fails to address the claims - **as-claimed**. Specifically, this finding demonstrates RSDI's position that the Board has not supported its assertion that Kalanick/Kemler disclose a "first signal," where the first signal is sent from the controller to the driver's mobile communication device when the vehicle is at a predetermined distance from the user. Instead, this finding demonstrates that the Board has impermissibly read out multiple limitations of the claim by asserting that the controller sending **the indicator information** (as opposed to the first notification signal) when the vehicle is at a predetermined location somehow discloses what is actually claimed.

The claims require that the controller generate a first/notification signal when the vehicle is within a predetermined distance of a user. The Board's finding does not address this. The Board only addresses the controller sending the indicator information (i.e., the claimed second signal). The claims further require that the controller send the first signal to the mobile communication device of the driver.

The Board's finding does not address this at all.  The claims require that in response to receiving the first/notification signal, the driver's mobile communication device generate the indicatory signal representing an indicator and send it to the display.  The Board's finding does not address this at all.  In short, the Board has failed to even attempt to address the limitations as-claimed, much less has the Board provided substantial evidence demonstrating that the Kalanick/Kemler combination disclose the limitations of the claims-at-issue.

## IV.    Substantial Evidence Does Not Support the Board's Finding of Obviousness Based on Kalanick/Kemler of Claims 1-8 of the '987 Patent.

As explained in RSDI's Opening Brief, the Board's determination that Kalanick claim 1 discloses generating and transmitting a notification signal "in response to" receipt of a ride request from a user is not supported by substantial evidence.  Br. at 61-64.  As may be clear from reading this section of RSDI's brief, the focus of RSDI's argument is the Board's failure to provide support for the "in response to" part of the cited limitation of claim 1-8 of the '987 patent.

In Lyft's response, it does not respond at all to RSDI's arguments related to this limitation.  Instead, Lyft states that "RSDI ignores the fact that Lyft also argued that the Kalanick-Kemler combination also discloses sending the first signal 'in response to' receipt of a signal from a user."  Lyft Br. at 52.  However, the citations by Lyft to the record for this statement (i.e., Appx97; Appx913; Appx482, ¶ 141)

are directed to an analysis by the Board to demonstrate disclosure by the Kalanick/Kemler combination for a "controller generated signal/indicator," which is not relevant to RSDI's present argument on appeal. Accordingly, Lyft fails to address RSDI's arguments showing that the Board's analysis to support Kalanick's disclosure for the "in response to" portion of the cited limitation is not supported by substantial evidence.

### RSDI's Response to Lyft's Cross-Appeal on the Substitute Claims

## I.    Standard Of Review

This Court reviews "Board decisions using the standards set forth in the Administrative Procedures Act." *Medytox, Inc. v. Galderma S.A.*, 71 F.4th 990 at 996 (Fed. Cir. 2023) (citing 5 U.S.C. § 706). In an appeal from an IPR, this Court reviews "the Board's legal determinations de novo and its factual findings for substantial evidence." *Corephotonics, Ltd. v. Apple Inc.*, 84 F.4th 990, 1001(Fed. Cir. 2023).

The Board's determination of patent-eligibility under 35 U.S.C. § 101 is an issue of law that this Court reviews de novo. *CxLoyalty, Inc. v. Maritz Holdings Inc.*, 986 F.3d 1367, 1376 (Fed. Cir. 2021).

"Whether a claim amendment satisfies the written description requirement or improperly adds new matter are both questions of fact reviewed for substantial

evidence." *Medytox*, 71 F.4th at 996 (Fed. Cir. 2023). Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citing and quoting *In re Gartside*, 203 F.3d 1305, 1312 (Fed. Cir. 2000).

Under 35 U.S.C. § 103, the obviousness inquiry asks whether "a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention." *Pfizer, Inc. v. Aotex, Inc.*, 480 F.3d 1348, 1361 (Fed. Cir. 2007). In reviewing the Board's determination on the question of obviousness, the Federal Circuit "review[s] the Board's legal conclusions de novo and its factual findings for substantial evidence." *MCM Portfolio LLC v. Hewlett-Packard Co.*, 812 F.3d 1284, 1293 (Fed. Cir. 2015).

## II.     The Board Correctly Held That the Substitute Claims Are Directed to Patent-Eligible Subject Matter

The Board's holding that claims 29 and 31-32 of the '637 patent and claims 3-4 of the '199 patent (the "Substitute Claims") recite patent-eligible subject matter is legally correct and should be affirmed. The Substitute Claims recite patent-eligible subject matter, not only as the Board held under step two of *Alice* for reciting an inventive concept (which alone is sufficient for this Court to affirm the Board's holding), but also because the Substitute claims are not drawn to an abstract idea under step one of *Alice*.

## A.    The Board Correctly Held that the Substitute Claims Recite an Inventive Concept.

The Board correctly held that the Substitute Claims are patent-eligible under step two of *Alice*.  The Board's holding of patent eligibility should be affirmed. Under step two of *Alice*, the Court determines if there is an "inventive concept" recited in the claims.  The Court considers "the elements of each claim – both individually and as an ordered combination – to determine whether the additional elements transform the nature of the claim into a patent-eligible application of that abstract idea."  *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245 (Fed. Cir. 2014).

The Boad correctly held that the Substitute Claims recite an inventive concept. Specifically, the Board held that the Substitute Claims "recite technological features that enable communication and coordination between multiple devices that are not co-located and are moving with respect to each other (i.e., a customer's/user's mobile communication device, a vehicle's display, and a driver's mobile communication device and a controller of a vehicle identification system) communicating therebetween and generating notifications and indicators based on the vehicle's location and the distance to the user."  Appx65; Appx205.  The Board's formulation properly acknowledges not only the individual elements of the Substitute Claims, but the limitations as an ordered whole to arrive at an inventive concept that renders the Substitute Claims patent-eligible.

As the Board noted, Lyft refused to address the Board's analysis, and instead only disagrees with the outcome.  Appx66; Appx206.  Lyft continues to fail to address the ordered combination of the limitations of each claim.  Instead, Lyft focuses on the well-known components recited in the claim.  For example, Lyft states that the claims only recite generic computer parts, such as a display, a mobile communication device, and a controller, in a conventional manner.  Lyft Br. at 55. Patent eligibility does not **require** that claims improve upon one or more recited **computer components**.  Rather, patent-eligibility derives from the ordered **<u>combination</u>** of limitations of the Substitute Claims that recite an inventive concept: "an inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces." *Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016).

Further, while Lyft alleges that the claimed computer components are only used to do what was previously done without computers, Lyft never explains how humans previously were able to have a non-rider/driver send both the rider and the driver the same indicator only when the driver and the rider are within a certain distance of one another so that both the driver and the rider are able to verify that they are the correct match.

Lyft cannot do so, because, as the Board correctly held, the Substitute Claims address and solve a problem that arises with the use of the internet and computer

35

networks. Like the claims at issue in *DDR Holdings*, apart from the fact that the Substitute Claims involve computer components and the internet, "these claims stand apart because they do not merely recite the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet. Instead, the claimed solution is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks." *DDR Holdings*, 773 F.3d at 1257. *See* Appx64-66.

The Substitute Claims provide a technical solution to a problem that exists in the internet-based rideshare industry, i.e., quick and safe matching of riders and drivers using rideshare technology. The claims do this by having a separate controller send the indicator to both the rider and driver, enabling a visual match.

Further, the Substitute Claims recite the use of an identifier that may only be accessed by the rider and driver's mobile communication device when the non-rider/driver system sends the driver's mobile communication device a notification signal. That notification signal is only sent from the system to the driver's mobile communication device when the user and the driver's vehicle are within a predetermined distance of one another. The system has to monitor both the driver and the rider in real time in order to accomplish this.

Just as in *DDR Holdings*, the Substitute Claims provide a technological solution to a technological problem. Accordingly, the Board's holding that the

Substitute Claims recite an inventive concept and are therefore are patent-eligible under step two of *Alice* should be affirmed.

**B.      The Substitute Claims Are Also Not Drawn to an Abstract Idea, the Board Legally Erred in Holding Otherwise.**

While the Board's finding of patent eligibility of the Substitute Claims can be affirmed based on its determination that the claims recite an inventive concept, the Substitute Claims also do not recite an abstract idea. The Board legally erred holding otherwise. The Board held that the Substitute Claims are directed to the abstract idea of organizing human activity, specifically enabling a user to identify a dispatched cab, under step one of *Alice*. See Appx64-65; Appx2019; Appx204; Appx2042. Under step one of *Alice*, the court has to "examine the focus" of the claim, i.e., its "character as a whole," in order to determine whether the claim is directed to an abstract idea. *SAP Am. Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1167 (Fed. Cir. 2018); *Internet Patents Corp. v. Active Network, Inc*., 709 F.3d 1343, 1346 (Fed. Cir. 2015).

Characterizing the Substitute Claims as being drawn to "enabling a user to identify a dispatched cab," as the Board has done, fails to examine the focus of the claims or the character of the claims as a whole, as required. Appx64-65; Appx2018-19; and Appx204; Appx2041-42. "[D]escribing the claims at [too] high [a] level of abstraction and untethered from the language of the claims all but ensures that the exceptions to § 101 swallow the rule." *Enfish,* 822 F.3d at 1337 (Fed Cir. 2016).

"At step one, therefore, it is not enough to merely identify a patent-ineligible concept underlying the claim, [the court] must determine whether that patent-ineligible concept is what the claim is 'directed to.'" *Rapid Litig. Mgmt. Ltd. v. CellzDirect, Inc.*, 827 F.3d 1042, 1050 (Fed. Cir. 2016).

In the related district court proceedings, Lyft moved to dismiss the complaint alleging that all of the claims were directed to ineligible subject matter. In that motion, Lyft characterized the claims as being directed to "identifying a particular vehicle using visual indicators." Appx2234. After carefully reviewing and considering the Parties' arguments (Appx2231), the Magistrate provided a Report and Recommendation, in which she analyzed the claims thoroughly under *Alice*[5]. She expressed concern that Lyft had done what this Court cautions may not be done, namely that Lyft's "description of the focus of the claims is at too high a level of abstraction and is 'untethered from the language of the claims.'" Appx2234 at 7, quoting *Enfish*, 822 F.3d at 1337.

---

[5] Lyft's assertion that Judge Andrew's Order on Lyft's motion to dismiss provides support for a holding that the Substitute Claims are patent-<u>ineligible</u> is without merit. Judge Andrew provided exactly zero analysis for the *dicta* he provided and that Lyft cited related to the patent eligibility of the claims. Lyft Brief at 55 FN 4, citing Appx2046. Instead, if anything, what is instructive is the Magistrate's Report and Recommendation, in which she considers specific limitations of the claims and the claims as a whole, and further compares the claims to precedential case law from this Court to determine that the claims-at-issue should not be held patent-ineligible.

The claims are not simply directed to "enabling a user to identify a dispatched cab," but rather to permitting both the user **and the driver** of the internet-based ride-share system to verify that they have a correct match in a manner that improves the safety and security of both riders and drivers. The '637 patent explains that a "continuing need exists for systems and methods adapted for use by transportation services to ensure rider and driver security." Appx245 at 1:56-58.

In its brief, even Lyft acknowledges that the "focus" of the claims is more narrow than the Board provided. "The focus of the Substitute Claims is to provide an indicator on a mobile communication device of a user having requested a ride service to allow the user to identify a vehicle prior to boarding the vehicle." Lyft Br. at 56, citing Appx245 at 1:22-3:25; Appx273 at 1:30-35. While Lyft's characterization of the focus of the claims in its cross-appeal is closer to the mark, it also leaves out that the claims are not only directed to allowing the user to identify the correct vehicle to board, but also to allowing **the driver** to identify the correct rider to permit to enter the driver's vehicle. Lyft's characterization also fails to include that the Substitute Claims are focused on permitting this two-way identification in a way that enhances the safety of both the rider and the driver.

Providing an indicator on a mobile communication device of both the user that has requested a ride service - and the driver of the vehicle - that allows both the rider and the driver to confirm they have a match prior to the user boarding the

39

vehicle in a manner that enhances both rider and driver safety is not "a longstanding, well-known method of organizing human behavior." *See Bascom Glob. Internet Servs.,* 827 F.3d at 1348 (Fed. Cir. 2016.    The claimed invention provides for enhanced security for both the rider and the driver.

Each of the Substitute claims requires that a separate controller that is neither the rider's nor the driver's cell phone generates a notification signal when the vehicle is within a predetermined distance of the user.  Only when this notification signal is received from a non-rider/driver controller can the indicator be generated and displayed on the vehicle display and the rider's mobile communication device. These claimed steps provide not just for a mechanism whereby a user can identify a dispatched cab, but rather the claimed invention ensures that there is a non-rider/driver controller that serves as a gatekeeper for when and how the indicator is generated and displayed to both the rider and the driver.

The indicator is only able to be generated once the mobile communication device of the driver receives the notification signal.  The notification signal comes from the gatekeeper controller that also tracks where the driver's vehicle is in relation to the user.  Only when the vehicle is within a pre-determined distance of the user may the indicator be generated and displayed on the vehicle display and the user's mobile communication device.  These steps provide security for both the

passenger **and the driver**, in accordance with the stated aim of the patents, i.e. "to ensure rider and driver security." Appx245 at 1:57-58.

As this Court has instructed, "the Step 1 'directed to' analysis called for by our cases depends on an accurate characterization of what the claims require and of what the patent asserts to be the claimed advance. The accuracy of those characterizations is crucial to the sound conduct of the inquiries into the problem being addressed and whether the line of specificity of solutions has been crossed." *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278 (Fed. Cir. 2020).

To read the Substitute Claims as being directed merely to enabling a user to identify a dispatched cab, is to fail to accurately characterize the claims. Thus, when properly characterized, it becomes apparent that the Substitute Claims are not drawn to a longstanding, well-known method of organizing human behavior that has been solved merely by adding generalized computer components. Because the Substitute Claims are not drawn to an abstract idea, they may also be held patent-eligible under step one of *Alice*.

Beyond pointing out that the Board held the claims to be directed to an abstract idea, Lyft provides no further argument on this point. Instead, under the heading "[t]he substitute claims are directed to an abstract idea," Lyft's arguments are largely directed to step two of *Alice*, which have been addressed above.

41

## III.  The Board Correctly Held That No New Subject Matter Was Added to the Substitute Claims

The Board's finding that the Substitute Claims do not introduce new matter is supported by substantial evidence and should be affirmed.  "Whether a claim amendment satisfies the written description requirement or improperly adds new matter are both questions of fact reviewed for substantial evidence." *Medytox, Inc., 71 F.4th at 996 (Fed. Cir. 2023). "This court does not reweigh evidence on appeal, but rather determines whether substantial evidence supports the Board's fact findings." *In re NTP, Inc.,* 654 F.3d 1279, 1292 (Fed. Cir. 2011).  Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *In re Gartside*, 203 F.3d 1305, 1312 (Fed. Cir. 2000) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229-30 (1938)).  "[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966).

Lyft argues that the Substitute Claims add new matter because the specification does not provide support for generating an indicator after the notification signal is sent.  Lyft Br. at 61-64.  The Board correctly found that these limitations are supported by the specification.

42

**A.    Substitute Claim 29 of the '637 Patent Is Supported by the Specification.**

Claim 29 amends original claim 9 to further recite "generating, by creating an indicator, an indicatory signal representing the indicator in response to receiving ~~an~~ ~~the~~ notification signal."  The Board disagreed with Lyft that new matter was added to Substitute Claim 29.  Mainly with reference to paragraph 30 of the '049 patent, the Board found that:

> the '049 application discloses that (i) a notification signal is generated for a new rider/user, (ii) the notification signal is generated when it is determined that the vehicle is within a predetermined distance of the user's location, and (iii) a new indicator is generated for the new user after the notification signal is generated (i.e., after it has been determined that the vehicle is within a predetermined distance of the user's location), we agree with the Patent Owner that the '049 application (and the '637 patent) provides written description support *for creating an **indicator** when it is determined that the vehicle is within a predetermined distance of the location of the user, as recited in proposed substitute claim 29."*

Appx58-59; Appx2003-2007.  (Emphasis in italics in original, emphasis in bold added).

Lyft does not appear to disagree that the '049 patent discloses that the indicatory signal representing an indicator is generated after the notification signal is generated, but rather that the Board erred in determining that the '049 application discloses generating an **indicator** (as opposed to the indicatory signal) after the notification signal is generated.  Lyft Br. at 62-63.  Lyft is wrong.

The Board specifically and correctly determined that the indicator itself is generated in response to the notification signal. Paragraph 30 specifically states - and the Board correctly found - that "another code (or other indicator) can be generated for the next rider." Appx58-59. The Board further found that the ability for the driver's mobile communication device to create the indicator is "in response to" receiving the notification signal that is generated when the vehicle is within a predetermined distance of the rider. Appx59.

The Board explained to Lyft in its Preliminary Guidance that Lyft's arguments were conclusory and ignored most of the disclosure of paragraph 30. Appx2005. The Board concluded that paragraph 30:

> . . . *explicitly discloses that a new indicator is generated (by the driver's mobile device in communication with the vehicle identification system" for a new rider, with previously-used indicators being deleted and not . . . duplicated. Id.* at 7-8 (alteration in original). Further, "paragraph 34 of the '049 application discloses that the notification signal is generated 'when it is determined that the vehicle 20 is *within a predetermined distance of the location of the user P.' Id.* at 8. Finally, "paragraphs 12, 21, 27, and 35 disclose that the indicator is generated *after* the notification signal is generated, as the notification signal *activates* the driver's mobile communication device to generate the indicator, and the indicator is created *in response to* receiving the notification signal."

Appx59 (emphasis in original) (citing Appx2006-2007).

The Board's factual findings are supported by substantial evidence and should be affirmed as to Substitute Claim 29 and claims 31 and 32 that depend therefrom.

**B.    Substitute Claim 3 of the '199 Patent Is Supported by the Specification.**

Substitute Claim 3 amends original claim 1 to further recite "generating, by creating an indicator that is specific to a user and driver match, an indicatory signal representing ~~an~~ the indicator."  For the same reasons the Board found support in the '049 specification for the amendments to claim 29 of the '637 patent, the Board found support for the amendments to Substitute Claim 3 of the '199 patent in the '492 application, which in all relevant respects is identical to the '049 specification. Accordingly, Lyft makes the same assertions that there is no support for claim 3 as it did for claim 29, namely that the Board equated an indicatory signal with an indicator and that the '492 application does not disclose when the indicator is generated relative to the notification signal.  Lyft Br. at 63-64.  For all of the reasons provided above with regard to claim 29 of the '637 patent, the Board's findings related to claim 3 of the '199 patent are supported by substantial evidence.

In its brief, Lyft simply repeats its arguments that it made in its reply to RSDI's motion to amend before the Board.  And as the Board found, those arguments were merely a rehash of the arguments Lyft made in response to the Board's Preliminary Guidance on RSDI's motion to amend.

> Petitioner asserts that '[t]he '492 Application simply does not disclose creating *an indicator* once the vehicle is determined to be within a predetermined distance of the user's location.' [Pet. MTA Reply 6] (citing Williams II Decl. ¶¶ 113-117).  Patent Owner responds that

Petitioner 'reargues its position' already addressed in the Preliminary
Guidance.  PO MTA Sur-reply 6.  We agree with Patent Owner.

Appx199 (emphasis in original).

As it did unsuccessfully before the Board, Lyft again argues here that neither
paragraphs 30 or 34 of the '492 application "disclose when the indicator itself is
generated relative to the notification signal."  Lyft Br. at 64.  Just as it did with claim
29 of the '637 patent, the Board explained to Lyft when it made this same argument
for the second time before it - that Lyft's analysis of paragraph 30 "ignores most of
the disclosure in this paragraph."  Appx199-200, citing Appx2028-29.  The Board
concluded that paragraph 30:

> . . . *explicitly discloses that a new indicator is generated (by the driver's
> mobile device in communication with the vehicle identification system"*
> for a new rider, with previously-used indicators being deleted and not
> . . . *duplicated. Id*. at 7 (alteration in original).  We also determined that
> 'Paragraph 30 also discloses that when a new rider is scheduled to be
> picked up and 'the driver D approaches the second location [of the new
> rider] (or third location, etc.), the vehicle identification system 10 may
> *generate another notification signal*.''  *Id*.    We concluded that
> '[f]urther, paragraph 34 of the '492 application discloses that the
> notification signal is generated 'when it is determined that the vehicle
> 20 is *within a predetermined distance of the location of the user P.*' *Id*.

Appx200 (emphasis in original) (citing Apx2029).

In sum the Board agreed with RSDI that Lyft's arguments before the Board
focusing on Paragraph 30 "are duplicative of and do not adequately address our
preliminary findings."  Appx200.  The Board's finding that the specification
discloses the amendments to claim 3 is supported by substantial evidence.  Lyft has

failed to demonstrate otherwise.  Because substantial evidence supports the Board's findings, the Board's finding that no new matter has been added to claim 3 of the '199 patent should be affirmed.

### C. The Provisional Application Provides Support for Generating the Indicator Itself.

In its Request to Take Judicial Notice (Dkt. 29), RSDI has asked the Court to consider U.S. Provisional Application No. 62/004,753, entitled "Vehicle Identification System," to which both the '637 and the '199 patents claim priority and incorporate by reference in its entirety[6]. Appx245 at 1:6-10; Appx273 at 1:16-19.  Accordingly, the disclosure of the '753 provisional application constitutes part of the disclosure of both the '637 and the '199 patents, and hence is part of the intrinsic record for each of the patents.

The provisional application explains that the inventive Vehicle Identification System (VIS) "is a **code generating system** that allows a person to identify a vehicle in which he/she is [sic] requested for a ride service."  Dkt. 29, Ex. 1 at 16 ¶ 1 (emphasis added).  The '753 application further explains that "VIS **generates the code once the vehicle approaches the pickup location**. . . . The code would be like

---

[6] Lyft has indicated it will oppose RSDI's Request to Take Judicial Notice, at least because the provisional application was not before the Board.  It is true that the provisional was not discussed before the Board, but RSDI is not making any new arguments based on the provisional.  Rather, RSDI is only using the provisional application to corroborate what RSDI has argued throughout the proceedings before the Board.

i.e A22, B11, C44 and so on. the [sic] codes would not be duplicated in the same pick up location." *Id*. at ¶ 3 (emphasis added).

As may be apparent, the '753 application discloses that at its core the invention is directed to a "VIS **code generating system** that allows a person to identify a vehicle," i.e. the vehicle identification system is directed to the "generation" of the code or indicator itself.  *Id*. at ¶ 1 (emphasis added).  Further, the VIS is directed to generating codes that would not be generated until the vehicle approaches the pickup location.

Thus, the disclosure of the '753 application corroborates what RSDI has argued throughout the IPR proceedings and above, namely that the '637 and '199 patents disclose generating the indicator itself when the signal is generated and when the vehicle is at a predetermined distance of the rider.

## IV.    The Board Correctly Held That Lyft Did Not Demonstrate That the Substitute Claims Were Obvious Over the Prior Art.

The Board correctly held that Lyft failed to demonstrate that either Kemler or Stanfield disclose creating an indicator after the vehicle has reached a predetermined distance from the user.  Each of the Substitute Claims recites that the indicator is created after the vehicle has reached a predetermined distance from the rider.  The Board's finding that neither Kemler nor Stanfield disclose this limitation of the Substitute Claims is supported by substantial evidence and should be affirmed.

48

RSDI notes that Lyft has not appealed – and hence has waived – its arguments before the Board that any other reference or combination of references disclose this limitation, including Kemler with Kalanick; Kalanick, Kemler and Stanfield; Lalancette alone; Lancette with Kemler; or any other combination of references.

### A.   The Board Correctly Held that Kemler Does Not Disclose Generating an Indicator After the Vehicle Has Reached a Predetermined Distance from the User.

Kemler does not disclose generating an indicator after the vehicle has reached a predetermined distance from the user.  As it did before the Board, Lyft argues that the Board "improperly discounted one of Kemler's embodiments," namely the disclosure of Figures 7 and 8 of Kemler.  Lyft Br. at 65.  Lyft argues that Figures 7 and 8 of Kemler disclose that "a unique signal may be **generated** after the user requests a vehicle, which, as depicted in Figures 7-8, occurs after the vehicle is within a predetermined 'threshold distance' of the rider."  Lyft Br. at 65 (emphasis added) (citing Appx334 at 12:9-13 and 12:23-30).  As the Board found and is discussed below, Kemler does not disclose "generating" a unique signal when the threshold distance or time is reached.

As an initial matter, Figures 7 and 8 are not disclosing complete embodiments, but rather only an embodiment of a "map 710."  Appx334 at 11:52. Kemler is directed to a dispatching service for driverless vehicles. Appx317, Abstract.  Figures 7 and 8 are used to explain how the driverless vehicle determines when a threshold

49

distance is reached, and also when the unique signal may be requested/provided and then displayed.  Appx334 at 11:52-12-48.

Kemler discloses with reference to Figure 7 that "[o]nce the vehicle's computing device determines that the vehicle has reached the threshold distance or time, the vehicle may display the unique signal."  Further, Kemler discloses that "once the vehicle reaches the threshold distance or time, the vehicle's computing device **may <u>request</u> the unique signal** from the one or more server computing devices.  **In response**, the one or more server computing devices **may <u>provide</u> the unique signal** to the vehicle, and the vehicle, in turn, may display the unique signal." Appx334 at 12:24-30 (emphasis added).

Thus, Figure 7 of Kemler only discloses an embodiment where - at a threshold distance - the vehicle device <u>requests</u> the unique signal, and the server computing device provides the unique signal.  There is no disclosure for actually **<u>generating the content of the signal</u>** once the threshold distance or time has been reached.

Lyft argues that the Board committed legal error in ignoring what is disclosed in Figures 7 and 8.  The Board did no such thing.  <u>First</u>, Figures 7 and 8 do not disclose **<u>generating</u>** the content of the unique signal at a threshold distance, but rather they describe the vehicle computing device <u>requesting</u> the unique signal and the server <u>providing</u> the unique signal when the threshold distance is reached.  The Board explained that while Kemler does not disclose <u>when</u> the unique signal is

generated with reference to Figures 7 and/or 8, Kemler does disclose when the unique signal is generated elsewhere: the unique signal is generated at the time that the user requests a vehicle, i.e. much earlier than when a threshold distance has been reached. "The request may be sent to a centralized dispatching system which selects or assigns a vehicle to the requesting user. **At the same time**, the centralized dispatching system may **generate** a signal to identify the vehicle to the user." Appx62 (citing Appx330 3:52-59). Unlike the disclosure describing Figures 7 and 8, this disclosure provides the timing for when the signal to identify the vehicle to the user is "**generated**," (not when it is "requested" or "provided").

Lyft next complains that the Board is inconsistent in its analysis of what the RSDI '049 and '492 applications disclose as compared to what Kemler discloses. Lyft's argument appears to be that if all that Kemler discloses is the creation of a signal at a predetermined distance, then that is also all that the '049 and the '492 applications disclose. This argument is unavailing. First, Figures 7 and 8 do not disclose that the "unique signal" is "created" or "generated" at a threshold distance or time, but rather only that the unique signal is "requested" and "provided" when a threshold distance/time is reached. Kemler specifically discloses that the "unique signal" is **generated** at the time that the vehicle is requested by the user. Thus, Kemler does not disclose the "unique signal" being "created" or "generated" at a threshold distance. Second, the Board specifically found that the '049 and '492

51

applications disclose generating the **indicator** itself when the vehicle reaches a predetermined distance from the rider.  *See* Section III. Supra.

The Board's finding that Kemler fails to disclose generating an indicator when the vehicle reaches a predetermined distance from a user is supported by substantial evidence and should be affirmed.

### B.    The Board Correctly Held that Stanfield Does Not Disclose Generating an Indicator After the Vehicle Has Reached a Predetermined Distance from the User.

The Board's finding that Stanfield fails to disclose generating an indicator when the vehicle has reached a predetermined distance from a user is supported by substantial evidence and should be affirmed.  Lyft alleges that the "Board improperly ignored Stanfield's disclosures and Lyft's expert testimony because it concluded Stanfield does not address the same problem as the challenged patents."  Lyft Br. at 69.  Lyft has inaccurately represented the Board's findings.  While the Board does indeed properly find that Stanfield does not address the same problem as the '637 and '199 patents, the Board **begins** its analysis by specifically finding that Stanfield does not disclose this limitation.

> In the Preliminary Guidance, we did not find supported Petitioner's contention that Stanfield 'discloses the indicator creation features in contingent claims 21 and 29.' Prelim. Guidance 14.  We concluded that 'Petitioner's contention does not establish that Stanfield creates the indicator when (or after) it is determined that the vehicle is within a predetermined distance of a particular location (as required by claims 21 and 29).' *Id*. at 15 (emphasis omitted).  We reasoned that '[i]n Stanfield, the signal's (indicator's) creation is not prompted by the

vehicle being within a predetermined distance of a particular location or user.' *Id*. at 15 (emphasis omitted).  We explained that "[b]ecause Stanfield's indicator is *created* when the vehicle's availability becomes known to the fleet manager (or is set by the fleet manager), and *not when* a potential customer approaches (or is within a certain distance of) a vehicle. . .

Appx63, Appx203 (emphasis in originals).

In its Preliminary Guidance, the Board provides citations to Stanfield to support the above analysis, including, Appx1677 at 2:61-65, 3:27-45; and 3:47-58; Appx1681 at 10:28-34; Appx1685 at 18:21-34; and Appx1686 at 19:37-48. Appx2012-2015; Appx2034-2037.  The Board further explains that the created indicator in Stanfield "is later used to light up a lamp on the vehicle (or activate a display) when potential customers approach the vehicle.  *See* Appx1677 at 3:27-45, Appx1678 at 4:23-42; Appx1679 at 5:2-24, and 5:38-42; Appx1680 at 7:4-10; and Appx1683 at 14:48-51."  Appx2013; Appx2035-36.  Accordingly, the Board's finding is supported by substantial evidence and is unrebutted by Lyft.

The Board in its Preliminary Guidance also specifically addressed the argument Lyft makes here that Standfield's disclosure "relating to configuring data to display real-time information such as time remaining until the next ride and whether certain seats are occupied by riders" would render the limitation-at-issue obvious.  Lyft Br. at 68.  The Board found that this disclosure of Stanfield does not

. . .

. . . establish that Stanfield *creates* the indicator the indicator *when (or after)* it is determined that the vehicle is *within a predetermined distance* of a particular location (as required by claims 21 and 29). Rather, Stanfield provides that (i) 'Block S120 can also control the visual indicator according to a charge level or fuel level of the vehicle,' (ii) 'Block S120 can additionally or alternatively control the visual indicator to display a time until a next or future booking,' and (iii) 'Block S120 can adjust the brightness of the visual output . . . according to seating availability in the vehicle (e.g. dims as additional seats are reserved).' See Ex. 1026, 5:5-37. All of these adjustments to the visual indicator done at Stanfield's 'Block S120,' however, are performed 'according to the signal' that is received from the fleet manager that 'specif[ies] a current availability of the vehicle for rent.' *See id*. at 2:12-19, 3:27-35 ('Block S110 of method S100 recites receiving a signal from a fleet manager, the signal specifying a current availability of the vehicle for rent,' whereby 'Block S110 functions to access data pertaining to the availability of the vehicle for rent, and Block S110 can therefor enable Block S120 to update the visual indicator to accurately display a current availability of the vehicle for rent.'), 4:23-25. In Stanfield, the signal's (indicator's) *creation is not prompted by the vehicle being within a predetermined distance of a particular location or user.*

Appx2013, Appx2035-36 (emphasis in originals).

As may be seen, far from the Board "ignor[ing] Stanfield's disclosures, and Lyft's expert testimony because it concluded that Stanfield does not address the same problem as the challenged patents," (Lyft Br. at 69) the Board provided **<u>extensive analysis</u>** citing to Stanfield's disclosure to determine that Stanfield failed to disclose the limitation-at-issue. Additionally, the Board specifically found that "Mr. Williams' testimony relied upon by Petitioner does not establish the obviousness of creating 'an indicator for the first time when a vehicle reaches a certain distance." Appx2014; Appx2036. The Board went on to explain that "Mr.

Williams' testimony relies on the text of Stanfield. . . . As discussed supra, Stanfield does not each *creating* an indicator *when (or after)* it is determined that the vehicle is *within a predetermined distance* of a particular location (or user)." Appx2014, Appx2036 (emphasis in originals).

Finally, Lyft argues that the Board's determination that Stanfield is not analogous art is not supported by substantial evidence because "the inventor of RSDI's patents" would look to Stanfield to "solve potential problems with security in transportation services." Lyft Br. at 70. The question at issue, however, is whether a person of skill in the art at the time would seek to combine Kalanick or Kemler with Stanfield to include the limitation-at-issue from Stanfield into a modified Kalanick and/or Kemler system. First, for the reasons provided above, a person of skill would not do so, because Stanfield does not disclose the limitation-at-issue.

But, second, as the Board explained, the '637 and '199 patents "address[] (and provide a solution to) a security problem." Appx2014, and Appx2036-37 (citing Appx245 at 1:21-25, 1:56-58). Stanfield, in contrast, addresses "an information retrieving problem, whereby a potential customer can easily be informed of the availability of vehicles for rent." Appx2014; Appx2036-37. The Board goes on to state that "Stanfield's visual indicator – which informs a customer of a vehicle's availability for rent, or of a rental vehicle's seat availability . . . does not provide a

security solution, since the customer is merely using the indicator to choose a rental vehicle, or to determine which of multiple vehicles rented by a party still have free seats." Appx2015-15; Appx2036-37. Substantial evidence supports the Board's determination that a person of skill would not look to Stanfield to modify Kalanick and/or Kemler to arrive at the Substitute Claims.

Because the Board's determination that neither Kemler nor Stanfield disclose the limitation-at-issue is supported by substantial evidence, the Board's finding should be affirmed.

## CONCLUSION AND RELIEF SOUGHT

For the reasons stated herein, RSDI respectfully requests this Court reverse the PTAB's Final Written Decisions finding all of the original claims-at-issue unpatentable. Further, for the reasons stated herein, RSDI respectfully requests that this Court affirm the PTAB's Final Written Decisions finding the Substitute Claims patentable.

Respectfully submitted,

/s/*Michelle E. Dawson*
Michelle E. Dawson
Devan V. Padmanabhan
PADMANABHAN & DAWSON, PLLC
9800 Shelard Parkway, Suite 120
Minneapolis, MN 55441
(612) 444-3601
devan@paddalawgroup.com
michelle@paddalawgroup.com

*Counsel for Appellant*

56

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS**

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) or Federal Rule of Appellate Procedure 28.1(e)

  X    The brief contains <u>13,198</u> words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii),or

        The brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6)

  X    The brief has been prepared in a proportionally spaced typeface using <u>MS Word 2018</u> in a <u>14</u> point <u>Times New Roman</u> font or

        The brief has been prepared in a monospaced typeface using _____ _____in a ___ characters per inch_____ font.

January 30, 2024

/s/ *Michelle E. Dawson*
Michelle E. Dawson
PADMANABHAN & DAWSON, PLLC
*Counsel for Appellant*

## <u>CERTIFICATE OF SERVICE</u>

I certify that pursuant to FRAP 31(b) on this 30 day of January 2024, the

Appellant's Response and Reply Brief was served on counsel listed below via ECF:

Eliot Williams
Margaret Welsh
Jeremy Taylor
Jennifer Tempesta

*/s/Michelle E. Dawson*
Michelle E. Dawson