Nos. 23-2033, 23-2034, 23-2035, 23-2036, 23-2037, 23-2038, 23-2039

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

RIDESHARE DISPLAYS, INC.,
*Appellant,*

KATHERINE K. VIDAL, UNDER SECRETARY OF COMMERCE FOR INTELLECTUAL PROPERTY AND DIRECTOR OF THE UNITED STATES PATENT AND TRADEMARK OFFICE,
*Intervenor,*

v.

LYFT, INC.,
*Cross-Appellant.*

---

Appeals from the United States Patent and Trademark Office, Patent Trial and Appeal Board in Nos. IPR2021-01598, IPR2021-01599, IPR2021-01600, IPR2021-01601, IPR2021-01602

---

## CROSS-APPELLANT LYFT, INC.'S REPLY BRIEF

---

APRIL 2, 2024

ELIOT D. WILLIAMS
BAKER BOTTS L.L.P.
700 K Street, N.W.
Washington, DC 20001-5692
eliot.williams@bakerbotts.com

JEREMY J. TAYLOR
BAKER BOTTS L.L.P.
101 California Street, Suite 3200
San Francisco, CA 94111
jeremy.taylor@bakerbotts.com

JENNIFER C. TEMPESTA
MARGARET M. WELSH
BAKER BOTTS L.L.P.
30 Rockefeller Plaza
New York, NY 10112
jennifer.tempesta@bakerbotts.com
margaret.welsh@bakerbotts.com

*Attorneys for Cross-Appellant
Lyft, Inc.*

FORM 9. Certificate of Interest

Form 9 (p. 1)
March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

| | |
|---|---|
| **Case Number** | 23-2033 |
| **Short Case Caption** | Rideshare Displays, Inc. v. Lyft, Inc. |
| **Filing Party/Entity** | Lyft, Inc. |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 07/25/2023

Signature: /s/ Eliot D. Williams

Name: Eliot D. Williams

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☑ None/Not Applicable |
| Lyft, Inc. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☑   None/Not Applicable          ☐   Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑   Yes (file separate notice; see below)     ☐   No     ☐   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑   None/Not Applicable          ☐   Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................1

CROSS-APPEAL ARGUMENT.................................................................2

I.      Contrary to the Board's Findings, the Substitute Claims are Directed to Patent-Ineligible Subject Matter........................................2

        A.    The Board's Reliance on PTO Guidance, Rather than Controlling Law, Led it to Incorrectly Analyze the Claims at *Alice* Step One...........................................................................2

        B.    Under the Correct Analysis the Claims Fail to Satisfy *Alice* Step One ...................................................................................7

        C.    The Substitute Claims Also Fail *Alice Step* Two......................16

II.     The Substitute Claims Contain New Matter and the Board's Decision is not Supported by Substantial Evidence............................20

        A.    The '753 Provisional Application Should Be Disregarded Along with RSDI's Arguments.................................................21

        B.    The '049 Application Does not Disclose the Creation of a New Indicator when the Vehicle is Within a Predetermined Distance..................................................................................23

III.    The Prior Art Discloses Creating an Indicator when the Vehicle is Within a Predetermined Distance and the Board's Decision Otherwise is not Supported by Substantial Evidence .........................25

        A.    The Board Inconsistently Interpreted Substantially Similar Disclosures of the Kemler Disclosure and those of the Challenged Patents.................................................................26

        B.    The Board Incorrectly Interprets Stanfield ..............................29

CONCLUSION .....................................................................................30

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Affinity Labs of Texas, LLC v. Direct TV, LLC*,
  838 F.3d 1253 (Fed. Cir. 2016) .................................................................10, 11

*Alice Corporation Pty, Ltd v. CLS Bank Int'l*,
  573 U.S. 208 (2014)................................................2, 5, 6, 7, 10, 16, 17

*American Standard Inc. v. Pfizer Inc.*,
  828 F.2d 734 (Fed. Cir. 1987) ............................................................22

*Baggage Airline Guest Services, Inc. v. Roadie, Inc.*,
  351 F. Supp. 3d 753 (D. Del.), *aff'd*, 783 F. App'x 1022 (2019)...........15, 16, 17

*Bascom Global Internet Services., Inc. v. AT&T Mobility LLC*,
  827 F.3d 1341 (Fed. Cir. 2016) ...........................................................20

*Bausch & Lomb, Inc. v. Barnes-Hind/Hydrocurve, Inc.*,
  796 F.2d 443 (Fed. Cir. 1986) ............................................................28

*Bilski v. Kappos*,
  561 U.S. 593 (2010).............................................................................7

*Cross Medical Products, Inc. v. Medtronic Sofamor Danek, Inc.*,
  424 F.3d 1293 (Fed. Cir. 2005) ...........................................................29

*Customedia Technologies, LLC v. Dish Network Corp.*,
  951 F.3d 1359 (Fed. Cir. 2020) .................................................7, 8, 10, 11, 17

*cxLoyalty, Inc., v. Maritz Holdings Inc.*,
  986 F.3d 1367 (Fed. Cir. 2021) ........................................................3, 4

*DDR Holdings, LLC v. Hotels.com, L.P.*,
  773 F.3d 1245 (Fed. Cir. 2014) .........................................................8, 9

*In re Wesslau*,
  353 F.2d 238 (CCPA 1965) ...............................................................28

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
  381 F.3d 1111 (Fed. Cir. 2004) ...........................................................24

*K/S Himpp v. Hear-Wear Techs., LLC*,
  751 F.3d 1362 (Fed. Cir. 2014) ...........................................................22

*Murakami v. U.S.*,
  398 F.3d 1342 (Fed. Cir. 2005) ...........................................................22

*SAP America, Inc. v. InvestPic, LLC*,
  898 F.3d 1161 (Fed. Cir. 2018) ...........................................................17

*Securities & Exchange Commission v. Chenery Corp.*,
  332 U.S. 194 (1947) ..............................................................................21

*SmartSky Networks LLC v. Gogo Bus. Aviation, LLC*,
  No. 23-1058, 2024 WL 358136 (Fed. Cir. Jan. 31, 2024)..................22

*Visual Memory LLC v. NVIDIA Corp.*,
  867 F.3d 1253 (Fed. Cir. 2017) ...........................................................18

**STATUTES**

35 U.S.C. § 101 .........................................................................................1

**OTHER AUTHORITIES**

84 Fed. Reg. 50 (Jan. 7, 2019) ................................................................3

84 Fed. Reg. at 51-52 & 57 n.42 ............................................................3

(84 Fed. Reg. at 53 at n.16).....................................................................5

# INTRODUCTION

Claims 29 and 31-32 of the '637 patent and claims 3-4 of the '199 patent (the "Substitute Claims") are unpatentable because they are directed to patent-ineligible subject matter under 35 U.S.C. § 101. The Substitute Claims are directed to the abstract idea of using conventional computing and communications components working in conventional ways to carry out the abstract idea.

The Board erred in its analysis at Step One of *Alice*. While the Board correctly found the Substitute Claims were directed to an abstract method of organizing human activity, the Board, relying on legally unsupported internal Patent and Trademark Office ("PTO") guidance, improperly determined that the claims satisfied *Alice* Step One because they recited technological features rooted in computer or network technologies that integrated the abstract claims into a practical application. The Director's Intervenor Brief, which in part seeks affirmance contingent on this Court reconsidering its current precedent, confirms that the Board's analysis was based on PTO guidance rather than controlling Supreme Court and Federal Circuit case law. Therefore, the Board's determination on patent eligibility under § 101 must be reversed.

Additionally, the Substitute Claims are invalid for lack of written description as the original disclosure does not provide support for creating an indicator when the vehicle is within a predetermined distance as the Substitute Claims require. Finally,

1

to the extent the Substitute Claims are not invalid under § 101 or § 112, they are obvious over Lyft's prior art combinations as Kemler and Stanfield disclose creating an indicator when the vehicle is within a predetermined distance.

## CROSS-APPEAL ARGUMENT

## I.    Contrary to the Board's Findings, the Substitute Claims are Directed to Patent-Ineligible Subject Matter

The Substitute Claims are not patent eligible. They are directed to an abstract method of organizing human activity without claiming any improvement to the functioning of a computer. The Board incorrectly analyzed the claims at Step One of *Alice Corporation Pty, Ltd v. CLS Bank Int'l*, 573 U.S. 208 (2014), and found that the claims satisfied "Prong Two of Step 2A" of the PTO Guidance—a standard which does not exist under Supreme Court or Federal Circuit caselaw. *See* Appx65. Under the proper test, the Substitute Claims are ineligible for reciting conventional computer and communication components performing their conventional functions in a predictable arrangement in furtherance of the abstract idea. Therefore, the Board's determination should be reversed.

### A.    The Board's Reliance on PTO Guidance, Rather than Controlling Law, Led it to Incorrectly Analyze the Claims at *Alice* Step One

The Board's conclusion is unsupported under existing law. As pointed out in Lyft's Principal & Response Brief ("Lyft Br."), under the two-step *Alice/Mayo* framework, the Substitute Claims are ineligible. Lyft Br. 53-61. The Board's erroneous conclusion was based on its attempt to apply the PTO's "2019 Revised

Patent Subject Matter Eligibility Guidance" and the "October 2019 Update" thereto (collectively "PTO Guidance"). *See* Appx64-65. Although there are several issues with the PTO's[1] Guidance, one problem is the PTO Guidance deems abstract claims to be patent eligible if they "integrate the judicial exception into a practical application." Appx2019. However, this is not the standard for patentability under *Alice* or this Court's precedent. Under the actual *Alice* test, the Substitute Claims fail Step One, because they are directed to an abstract idea. Whatever the merits of the PTO's attempt to bring "more clarity and predictability"[2] to patent examiners' application of the Supreme Court's flexible two-step test for determining subject matter eligibility, it is axiomatic that the Board's obligation is to apply the law as established by the Supreme Court and this Court. *See cxLoyalty, Inc., v. Maritz Holdings Inc.*, 986 F.3d 1367, 1375 n.1 (Fed. Cir. 2021) (PTO Guidance "is not, itself, the law of patent eligibility").

---

[1] For instance, the PTO Guidance restricts PTO personnel to analyzing claims against only a limited set of "enumerated groupings of abstract ideas" rather than applying a "case-comparison approach" when determining eligibility. October 2019 Update at 2; 84 Fed. Reg. at 51-52 & 57 n.42 ("Claims that do not recite matter that falls within these enumerated groupings of abstract ideas should not be treated as reciting abstract ideas" unless, in the case of a PTAB decision, the PTAB panel raises the matter "to the attention of the PTAB leadership by a written request for clearance"). This approach is inconsistent with the Supreme Court's holdings in *Alice* and *Bilski.*
[2] USPTO's 2019 Revised Patent Subject Matter Eligibility Guidance, 84 Fed. Reg. 50 (Jan. 7, 2019).

As shown below, the PTO Guidance bifurcates *Alice* Step One into a two-part inquiry consisting of two prongs:



October 2019 PEG Update at 11

<https://www.uspto.gov/sites/default/files/documents/peg_oct_2019_update.pdf>.

Prong Two of Step 2A of the PTO Guidance finds claims eligible, even if they recite an abstract idea, if the claim "recite[s] additional elements that integrate the judicial exception into a practical application." *See id.* This "Prong Two" is found

nowhere in Supreme Court or Federal Circuit precedent.[3] Notably, this "Prong Two" of Step 2A is an additional step performed before *Alice* Step Two, as the PTO Guidance includes "Step 2B", which corresponds to *Alice* Step Two:



October 2019 Update at 10.

Accordingly, the PTO Guidance improperly asks the Board to ***twice*** look for "additional elements" in the claim that may convert an otherwise ineligible abstract idea into eligible subject matter. This is inconsistent with the law, which recites only two inquiries: (1) are the claims "directed to" a patent ineligible concept, such as an abstract idea; and (2) are there "additional elements" of the claim that "transform" the claim into an "inventive concept." *Alice*, 573 U.S. at 217-18. Thus, the review

---

[3] The PTO Guidance purportedly cites *Alice* in support of this criteria (84 Fed. Reg. at 53 at n.16), but *Alice* uses the term "integrate" only to describe Step Two. *Alice*, 573 U.S. at 217 (describing as patentable those patents that "integrate the building blocks [of human ingenuity] into something more…thereby transforming them into a patent eligible invention") (cleaned up).

of "additional elements" should only occur in *Alice* Step Two, and only to determine

whether those elements transform the abstract idea into an inventive concept.

By directing the Board to look for "additional elements" in "Prong Two of

Step 2A" for some other purpose, the PTO Guidance led the Board to err. Notably,

in this case, the Board explicitly relied on this legally unsupported "Prong Two of

Step 2A" to find the claims eligible. Appx65. This is confirmed by the Director's

Brief, which admits that "the Board determined that some of the limitations of the

substitute claims recite a method of organizing human activity" but nevertheless

found the claims eligible because "the claims as a whole recite specific technological

steps…" Intervenor's Br. 19; *id*. at 23 n.5 ("[T]he Board determined that under *Alice*

step one, the substitute claims, as a whole, are directed to a practical application…").

The Director's Brief all but concedes this aspect of the PTO Guidance is not

supported under existing law, acknowledging that "*Lyft's* argument is not wholly

lacking in support." Intervenor's Br. 30. The Director suggests that this Court's

precedent has incorrectly "overread the *Alice/May[o]* limitations to preclude

patenting of claims that provide a technological solution rooted in computer or

network technology if limited to solving a human problem" and asks this Court to

"reconsider[]" this precedent. Intervenor's Br. 30-31. To the contrary, however,

*Alice* itself rejected the Director's argument, finding ineligible claims directed to

solving a human problem using a solution that required a computer. *Alice*, 573 U.S.

at 223 ("[M]ere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent eligible-invention"; not enough to "limit[] the use of an abstract idea 'to a particular technological environment'") (quoting *Bilski v. Kappos*, 561 U.S. 593, 610 (2010)).

To the extent the Board's analysis and/or the unsupported PTO Guidance is intended to address this Court's caselaw applying *Alice's* teaching that claims which "purport to improve the functioning of the computer itself" may be eligible, that caselaw is addressed next. *Alice*, 573 U.S. at 225.

### B. Under the Correct Analysis the Claims Fail to Satisfy *Alice* Step One

The Board's analysis under "Prong Two of Step 2A" was purportedly justified based on *DDR Holdings*, with the Board concluding that the Substitute Claims provided "technological solutions rooted in computer and network technologies." Appx65. However, the Board's conclusion is precluded by this Court's decision in *Customedia Technologies, LLC v. Dish Network Corp.*, 951 F.3d 1359, 1362 (Fed. Cir. 2020). There, this Court noted that patent owners frequently "latch on to" the language from *Alice* suggesting that claims which purport to "improve the functioning of the computer itself" may be subject matter eligible. *Id.* But, such attempts fail when the claims are nothing more than using generic pre-existing computers and communication systems to "improve a fundamental practice or abstract practice." *Id.* at 1364. There, as here, the claims "were focused not on

7

physical-realm improvement to computers as tools but rather an improvement in wholly abstract ideas." *Id.* Thus, as Lyft has explained (Lyft Br. 53-57; *supra* § I.A), the Board erred when it went beyond its (correct) conclusion that these recited abstract methods of "organizing human activity (e.g. enabling a user to identify a dispatched cab)" at Step One of *Alice*. Appx2019; Intervenor's Br. 23 n.5 ("[T]he Board found that certain limitations [of the Substitute Claims] recite abstract concepts."). Rather than going on to analyze "Prong Two of Step 2A", it should have moved to Step Two of *Alice*—consistent with Supreme Court and this Court's precedential caselaw.

The Substitute Claims are also distinguishable from those in *DDR Holdings*. The claims in *DDR Holdings* presented a solution to e-commerce which allowed users to shop for products online without navigating away from the host's website when selecting an advertised product. The claims disclosed a third-party outsource provider that provides a "hybrid web page that merges content associated with the products of the third-party merchant with the stored 'visually perceptible elements'" from the host's website. *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1256 (Fed. Cir. 2014). This Court reasoned that the claims "do not merely recite the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet. Instead, the claimed solution is necessarily rooted in computer technology to overcome a problem specifically

arising in the realm of computer networks." *Id*. at 1257. However, in the present case, there are no such improvements specific to computer functionality but only claims that recite "generating…an indicatory signal" and transmitting the signal to be displayed "on a display associated with a vehicle," which are generic computer and communications technologies meant to assist with human capable tasks. *See e.g.*, Appx1963; Appx 1997-1998.

As the Director seems to acknowledge, the Board found the Substitute Claims are directed to "enabling a user to identify a dispatched cab"—an abstract concept carried out by humans since the advent of for-hire personal transportation. Intervenor's Br. 23 n.5; Appx2019. While the claims may recite the use of certain generic technological features, they are in no way examples of technological inventions. The Substitute Claims recite allowing a rider to "identify[] a vehicle being dispatched" by "creating an indicator" when "the vehicle is within a predetermined distance of the location of the user…displaying, on a display associated with the vehicle…the indicator" and allowing the rider to "identify[] the vehicle based on…visual observation." *See e.g.*, Appx1963; Appx1997-1998. While computer functionality may aid in executing the claimed steps, there is nothing disclosed in the Substitute Claims that improves the functioning of computers or otherwise represents any kind of advancement in computer science. The claims do not recite technological improvements to computers or communication networks,

allowing them to work more efficiently or to achieve previously impossible results. *See Customedia*, 951 F.3d at 1362-65; *Affinity Labs of Texas, LLC v. Direct TV, LLC*, 838 F.3d 1253, 1258-65 (Fed. Cir. 2016).

The limitations of the Substitute Claims can be performed by a human without the aid of a computer. As an example, as the driver of the vehicle approaches the pickup location (e.g., within visual distance), the driver can write the rider's name on a piece of paper to display through the car's window, allowing the rider to identify the correct vehicle. Therefore, the Substitute Claims merely invoke the use of computers as a tool to perform the abstract process of displaying indicators.

The Director suggests that minimal human involvement in the Substitute Claims supports the Board's reasoning that the claims are patent eligible. Intervenor's Br. 22 ("The only human involvement occurs either before the claimed technological process (i.e., the rider requesting a ride) or after the claimed technological process (i.e., by the rider and driver identifying each other)."). However, this reasoning proves too much, as it would render patent-eligible any abstract idea when implemented on a computer to minimize the need for human involvement. It is now well-established that eligibility is not conferred by using computers as a tool in this way. *Alice*, 573 U.S. at 218-21; *Customedia*, 951 F.3d at 1362-65. The pertinent issue is not the minimal human involvement in the claims, but the fact the claims seek to patent an abstract idea that could be performed in a

low-tech fashion by a human. *See Customedia*, 951 F.3d at 1364 ("We have held that it is not enough, however, to merely improve a fundamental practice of abstract process by invoking a computer merely as a tool."). Also, contrary to what the Director suggests, the Substitute Claims affirmatively ***require*** human involvement in achieving the claimed objective of "identifying a vehicle being dispatched to…a user." The claims recite the user "identifying the vehicle…based on visual observation" of the indicator—thereby emphasizing that the Substitute Claims are directed to an abstract method of organizing human activity.

Similarly insufficient were the Board's findings regarding the purported "technological features that enable communication and coordination between multiple devices…moving with respect to each other…." Appx65; Intervenor's Br. 20-28. As Lyft previously explained, nothing in those specific features as recited in the Substitute Claims constitute a technological improvement, and instead the "Board's characterization…is itself an abstract idea not rooted in computer technology." Lyft Br. 54-61. Those claim recitations do not purport to improve the functioning of computers or communications networks, but merely recite entirely conventional computer-enabled communications functions that would be found when any two entities are communicating via mobile radios/cell phones (i.e., two communication devices moving with respect to each other). *See Affinity Labs of Tex., LLC*, 838 F.3d at 1258-65 (determining that using cell phones to carry out an

otherwise abstract idea to be not patent eligible). Again, as Lyft previously explained, the only alleged "improvement" provided by these recited features is to the abstract idea of enabling riders to identify their matched car, not to computers or communication networks. Lyft Br. 54-60.

Therefore, as the Director insinuates, had the Board applied the proper legal analysis, it would have concluded that the Substitute Claims were abstract and unpatentable. *See* Intervenor's Br. 30-31 ("[W]e acknowledge (as we have repeatedly told the Supreme Court) that the precedents in this area are not entirely consistent. Thus, *Lyft*'s argument is not wholly lacking in support…[S]ome caselaw suggests (contrary to our argument above) that a claim is 'directed to' an abstract idea even when the claim has technological limitations, provides an application of an ineligible concept, and/or does not preempt the ineligible concept.").

RSDI's argument that the Board's characterization of the Substitute Claims is from "too high a level of abstraction and untethered from the language of the claims" misses the mark. RSDI Resp. Br. 37. Substitute Claim 29 of the '637 patent recites a user "identifying the vehicle based on appearance of a match, by visual observation…the indicator being displayed on the mobile communication device associated with the user…and the indicator being displayed on the display associated with the vehicle." Substitute Claim 3 of the '199 patent recites similar language. The

Substitute Claims are not only directed to the abstract idea of identifying vehicles, they expressly ***recite*** that abstract idea.

Similar to the Board's flawed analysis, RSDI latches onto various claim limitations, such as providing indicators to both the rider and driver to "confirm they have a match prior to the user boarding the vehicle in a manner that enhances both rider and driver safety" (RSDI Resp. Br. 39-40), and having a controller "generate[] a notification signal when the vehicle is within a predetermined distance of the user" (*id*. at 40), and argues these limitations make the substitute directed to something other than an abstract idea.[4] However, RSDI's arguments are no better than the Director's. The claim limitations mentioned by RSDI are still simply methods of organizing human activity, which invoke computers as a mere tool (i.e., even under RSDI's view of the claims, they are still directed to the abstract idea of enabling a rider to identify a matched cab/driver).

RSDI also attempts to inject non-existent limitations into its characterization of the Substitute Claims to make them appear more rooted in computer technology. For example, citing the Board's characterization of the claims, RSDI states that the

---

[4] RSDI also injects claim limitations which are not recited in the Substitute Claims. For example, RSDI states that the claims recite having a "separate" or "gatekeeper" controller (RSDI Resp. Br. 40) provide indicators to both the rider and driver to "allow[] the driver to identify the correct rider to permit" entry. Resp. Br. 39. The Substitute Claims do not recite a "separate controller," a "gatekeeper controller," or allowing the driver to "permit" entry.

Substitute Claims "recite technological features that enable communication and coordination between multiple devices that are not co-located and are moving with respect to each other." RSDI Resp. Br. 34 (internal quotations omitted); Intervenor's Br. 22. Further, RSDI states that the claims disclose "monitor[ing] both the driver and the rider in real time. RSDI Resp. Br. 36. Also, RSDI repeatedly states the claims disclose a "separate controller" that sends signals to the rider. *Id*. at 36, 40. But in fact, the Substitute Claims do not recite ***technological features*** that allow multiple devices to communicate, monitor both the rider and driver in real time, and do not recite a controller at all. Nor does the specification describe any new technique to perform those conventional functions.

Additionally, RSDI's attempt to focus on Magistrate Judge Hall's recommendation and to minimize Judge Andrew's findings of abstractness in the parallel district court is flawed. Contrary to what RSDI insinuates, the Magistrate Judge did not make a final ruling based on *Alice* but provided a recommendation on Lyft's motion to dismiss which specifically allowed Lyft to re-raise its arguments at a later time. Appx2233 ("I conclude that Lyft's 101 motion should be denied without prejudice to Lyft's ability to re-raise invalidity under § 101 at the summary judgment stage."). Magistrate Judge Hall's recommendation denying Lyft's motion to dismiss was based on a purported lack of claim representativeness that is not at issue on this appeal. Appx2234 ("I agree with RSDI that it would be inappropriate at this stage of

the case to conclude, as a matter of law, that all of the claimed arrangements are generic and conventional. Accordingly, I cannot conclude at this stage of the case that claim 1 of the '987 patent is representative of all of the claims in the asserted patents.").

Furthermore, Judge Andrews provided his own analysis, disagreeing with the Magistrate Judge's characterization that the abstract idea analysis was a "close call," concluding that the claims were "directed to a "longstanding-standing method of 'organizing human activity.'"[5] Appx2046; *see also* RSDI Resp. Br. 38. Judge Andrews also found that the claims were analogous to those in *Baggage Airline Guest Services, Inc. v. Roadie, Inc.*, where this Court confirmed that the claims were directed to patent-ineligible subject matter. *See id.* ("When I was looking at the patents, I was reminded of an earlier case that I handled. *See Baggage Airline Guest Services, Inc. v. Roadie, Inc.*, 351 F. Supp. 3d 753 (D. Del.), *aff'd*, 783 F. App'x 1022 (2019)."). In *Baggage Airline Guest Servs.*, Judge Andrews summarized the ineligible claims as "(1) receiving baggage information, (2) assigning the baggage to a delivery person, (3) informing the passenger that the baggage is on its way and

---

[5] The claims at issue before the district court and contemplated by Judge Andrews contained limitations of the user identifying vehicles based on indicators, substantially similar to the limitations in the proposed Substitute Claims, which RSDI does not dispute. Contrary to what the Director argues, even if the exemplary claims considered by the district court did not "recite the same sequence of steps" as the Substitute Claims, it does not negate the fact that claims are abstract. Intervenor's Br. 26 n.7.

who is delivering it, (4) receiving a request to delay delivery, (5) informing the delivery person of the change, and (6) reordering the delivery person's delivery schedule" and determined they were directed to the abstract method of organizing baggage delivery. *Baggage Airline Guest Servs.*, 351 F. Supp 3d at 759. Similarly, the Substitute Claims are directed to an abstract method of organizing human activity.

### C.    The Substitute Claims Also Fail *Alice Step* Two

Lyft also showed, under the correct *Alice* Step Two analysis, that the remaining claim features did not "transform a patent-ineligible abstract idea into a patent-eligible invention." *Alice*, 573 U.S. at 223. For instance, Lyft showed that the claim elements and specification recite nothing more than "conventional servers, conventional communications techniques, and conventional signal transmissions." Lyft Br. 56-58; *see also* Appx2060-2062. In particular, the specification states that the claimed techniques are applicable to "any portable wireless device" such as "cellular (cell) and mobile telephones." Lyft Br. 58; Appx2062. Lyft also showed that none of the dependent claims change that analysis as they merely add other "generic computer" techniques in furtherance of the abstract idea. Lyft Br. 56-57.

As is well established, recitation of "already-available computers that are not themselves plausibly asserted to be an advance…amounts to a recitation of what is well-understood, routine and conventional" and does not transform an abstract idea

into a patent eligible invention in satisfaction of *Alice* Step Two. *Customedia Techs.*, 951 F.3d at 1366 (alterations in original) (*citing SAP America, Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1170 (Fed. Cir. 2018)).

RSDI argues that the Board's analysis of Step Two was correct, asserting that Lyft has failed to address the Board's analysis. RSDI Resp. Br. 34-35. To the contrary, Lyft's Principal Brief analyzed Alice Step 2 under the proper legal standard, showing how the claims failed to recite an "'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent eligible application." *Alice Corporation Pty. Ltd. v. CLS Bank Intern.*, 573 U.S. 208, 221 (2014); Lyft Br. 57-61. Thus, Lyft did address the Board's analysis and showed how it was flawed.

To the extent the Board determined the Substitute Claims disclose an inventive concept sufficient to transform the abstract idea into patentable subject matter (which is not clear, given the Board's incorrect reliance on the legally unsupported "Prong Two of Step 2A" of the PTO Guidance), it erred. *See* Appx64-66; Intervenor's Br. 20-30. The claims recite generic computer parts used in conventional and predictable ways. Such conventionality does not amount to an inventive concept.

Abstract claims disclosing generic computer parts in a conventional manner do not transform the abstract idea into patentable subject matter. *See Baggage Airline Guest Servs.*, 351 F. Supp. 3d at 760-61. Likewise, "generalized steps []

performed on a computer using conventional computer activity" are not inventive. *Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253, 1260 (Fed. Cir. 2017).

As Lyft pointed out in its Principal Brief, the Substitute Claims describe broad, generic, and previously existing computer devices with no inventive improvement. *See* Lyft Br. 57-58. The Board interpreted the claims as "recite[ing] technological features that enable communication and coordination between multiple devices that are not co-located and are moving with respect to each other (i.e., a customer's/user's mobile communication device, a vehicle's display, and a driver's mobile communication device and a controller of a vehicle identification system communicating therebetween and generating notifications and indicators based on the vehicle's location and the distance to the user)." Appx65; Appx205. First and foremost, Lyft disagrees that the Substitute Claims recite an inventive technological feature, let alone "technological features that enable communication and coordination between multiple devices that are not co-located and are moving with respect to each other." The Substitute Claims simply do not contain such limitations. Also, the Board's own recitation of the claims describe components such as a mobile communication device, display, and a vehicle identification system controller, all well-known and generic components lacking any inventive improvements. Even RSDI itself admits that the claims merely contain well-known components. RSDI Resp. Br. 35 ("Lyft focuses on the well-known components

18

recited in the claim."). RSDI then argues that the claims derive an inventive concept "from the ordered combination of limitations of the Substitute Claims." RSDI Resp. Br. 35.

However, RSDI and the Director do not explain how the ordered combination of the generic components disclosed in the claims equate to an inventive concept. This is unsurprising because even using the Board's interpretation of the claims, there is nothing inventive about the arrangement of the claim limitations. The limitations within the Substitute Claims appear in a predictable and common-sense order. The specification discloses that a goal of the invention is to "determine[] that the vehicle is within a predetermined distance of a specific location" (Appx245, 2:3-5) and then generate signals to "provide an indicator on a mobile communication device of a user having requested a ride service to allow the user to identify a vehicle prior to boarding." *Id*. at 1:22-25. This goal of the Substitute Claims is not inventive, much less patent eligible. The Substitute Claims disclose determining the vehicle's location, generating and sending signals, and displaying a unique indicator so the rider can identify the vehicle. There is nothing inventive with the specific arrangement of limitations within the Substitute Claims, as they carry out the specification's goal in a conventional manner.

RSDI and the Director's reliance on *Bascom* is inapposite. In *Bascom*, the claimed inventive concept was a web-based filtering tool that "associated individual

accounts with their own filtering scheme and elements while locating the filtering system on an ISP server" as opposed to on a local computer or server. *Bascom Global Internet Services., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016). As the Director's Brief noted, this Court decided that an inventive concept was "found in the non-conventional and non-generic arrangement of known, conventional pieces" which equated to an improved technological process. *Id*. at 1350; *see also* Intervenor's Br. 24. Conversely, the Substitute Claims do not provide a non-generic arrangement of well-known computer components. The crux of RSDI's Substitute Claims is to delay the creation and sending of signals until the vehicle is at a certain location, which are predictable and straightforward limitations merely using computers as a tool. This does not recite an ***improved technological process*** as the claims purportedly did in *Bascom*. These limitations are also found in Lyft's prior art, further indicating their commonplace in the rideshare technology space. *See infra* § III. As such, there is no inventive arrangement of components, or any improvements to existing technological processes, and the Substitute Claims therefore lack an inventive concept.

## II.     The Substitute Claims Contain New Matter and the Board's Decision is not Supported by Substantial Evidence

The Board's finding that the original disclosure provides written-description support for the Substitute Claims is not supported by substantial evidence. As an initial matter, RSDI should not be permitted to rely on the provisional application

for support, and its arguments relying on the provisional application should be disregarded. Additionally, the specification does not provide support for creating an indicator (as opposed to an indicatory signal) when or after the vehicle is within a predetermined distance.

### A.    The '753 Provisional Application Should Be Disregarded Along with RSDI's Arguments

RSDI's Request to Take Judicial Notice of the '753 provisional application ("'753 application") should be denied and RSDI's accompanying arguments should be ignored. As RSDI admits, it did not introduce the '753 application during proceedings before the Board when it had every opportunity to do so. RSDI Resp. Br. 47 n.6. RSDI should not be permitted to circumvent the appellate process through judicial notice. Further, even if the '753 application is considered, it does not support the controller creating the indicator once the vehicle is within a predetermined distance.

As Lyft argued in its opposition to RSDI's request for judicial notice, a "fundamental rule of administrative law" is that a "a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency." *Securities & Exchange Commission v. Chenery Corp.*, 332 U.S. 194, 196 (1947). While the Court may take judicial notice of certain facts, the application of judicial notice is discretionary and should not be used to circumvent the

aforementioned limits on this Court's power to review agency decisions. *See K/S Himpp v. Hear-Wear Techs., LLC*, 751 F.3d 1362, 1367 (Fed. Cir. 2014) ("We decline to exercise our discretion to take judicial notice . . . .") (citing *Murakami v. U.S.*, 398 F.3d 1342, 1354-55 (Fed. Cir. 2005)). RSDI should not be allowed to introduce the provisional application for the first time on appeal when it chose not to do so before the Board. Accordingly, this court should deny RSDI's request for judicial notice and strike RSDI's arguments that rely on the '753 application.[6] *See SmartSky Networks LLC v. Gogo Bus. Aviation, LLC*, No. 23-1058, 2024 WL 358136, at *2 (Fed. Cir. Jan. 31, 2024) (citing *American Standard Inc. v. Pfizer Inc.*, 828 F.2d 734, 746 (Fed. Cir. 1987) (striking references to material not considered by the district court and not properly supplemented)).

Moreover, the '753 application does not provide support for the Substitute Claims because it describes an inapposite embodiment. RSDI points out that the '753 application discloses a "Vehicle Identification System" where code is generated that allows a rider to identify a vehicle. Dkt. 29, Ex. 1 ¶ 1. The '753 application states that the system "consists of three (3) [devices] in order to generate code" and goes on to list the driver's phone, rider's phone, and display that communicates with the driver's phone to display the code. *Id*. ¶ 2. The '753 application then discloses that

---

[6] This applies to RSDI's arguments made in its Appeal and Cross-Appeal briefs that rely on the '753 provisional application.

"once the code is generated from the driver['s] cell phone, it automatically send[s] the code to the display." *Id*. ¶ 3. This is the only embodiment described in the '753 application and is patently different than what is described in the Substitute Claims. The claims merely recite "generating, by creating an indicator," and based on RSDI's own characterization "the Substitute claims require[] that a separate controller that is neither the rider's *nor the driver's cell phone* generates a notification signal." RSDI Resp. Br. 40 (emphasis added). As such, the '753 application describes a completely different embodiment than the Substitute Claims and therefore does not provide support for the Substitute Claims.

### B.     The '049 Application Does not Disclose the Creation of a New Indicator when the Vehicle is Within a Predetermined Distance

Contrary to the Board's findings that the indicator itself is generated in response to the notification, the specification does not disclose that "a new indicator is generated for the new user after the notification signal is generated (i.e., after it has been determined that the vehicle is within a predetermined distance of the user's location)." Appx58, Appx198-199. In reaching its decision, the Board conflated the creation of an indicator with an indicatory signal. The '637 and '199 patents make clear the delineation between the indicator and indicatory signal, as the claims and specification disclose both an indicator and an indicatory signal (or signal representing the indicator). *See*, *e.g.,* Appx245, 2:15-17 ("generating an *indicatory signal* representing an indicator in response to receiving the notification signal")

(emphasis added); Appx276, 8:17-18 ("displaying the *indicator* based on the notification signal on a display associated with the vehicle") (emphasis added). Here, the applicant clearly used different terms to indicate different meanings. *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1119 (Fed. Cir. 2004) ("[W]hen an applicant uses different terms in a claim it is permissible to infer that he intended his choice of different terms to reflect a differentiation in the meaning of those terms.").

With this proper delineation in mind, there is no written description support in the specification for the creation of *an indicator* when the vehicle is within a predetermined distance. The specification repeatedly discloses (*e.g.*, paragraphs 12, 21, 27 and 34-35) instances where an *indicatory signal* (or signal representing the indicator) is created when the vehicle has reached a predetermined distance. *E.g.*, Appx1803, ¶ 12 ("generating an indicatory signal representing an indicator in response to receiving the notification signal."). However, there is zero disclosure concerning the creation of *an indicator*.

The Board and RSDI point to paragraph 30 of the '049 application for written-description support. But, as Lyft previously argued, paragraph 30 discloses a particular scenario where two riders are sharing the same vehicle. In this instance, the first rider is picked up and a new indicator "can be generated for the next rider who is going to share the same vehicle." Appx1809, ¶ 30. In the scenario depicted

24

in paragraph 30, there is no mention of timing the generation of indicators based on vehicle location (such as when the vehicle is within a predetermined distance). Thus, paragraph 30 does not disclose that an indicator is generated when the vehicle is within a predetermined distance and that a notification signal is sent to the driver, as the Substitute Claims require. The Board's reasoning conflates creating an indicator with creating an indicatory signal and combines disparate portions of the specification in reaching its decision. Therefore, the Board's decision that the Substitute Claims have specification support is not supported by substantial evidence.

## III. The Prior Art Discloses Creating an Indicator when the Vehicle is Within a Predetermined Distance and the Board's Decision Otherwise is not Supported by Substantial Evidence

Lyft's prior art combinations render the Substitute Claims obvious. As Lyft noted, the Substitute Claims would have been obvious over either (1) Kalanick and Kemler; (2) Kalanick, Kemler, and Stanfield; (3) Lalancette and Kemler; or (4) Lalancette, Kemler, and Stanfield. Appx61-66; Appx200-204. For the reasons stated below, the prior art discloses creating an indicator when the vehicle is within a predetermined distance and the Board's determination otherwise is not supported by substantial evidence.

A.    **The Board Inconsistently Interpreted Substantially Similar Disclosures of the Kemler Disclosure and those of the Challenged Patents**

The Board and RSDI unfairly interpret Kemler's disclosure in a way that is inconsistent with RSDI's validity arguments for the Substitute Claims. As an example, and as Lyft previously argued, Kemler's description of Figs. 7 and 8 disclose creating an indicator once the vehicle is within a predetermined distance of the rider.

In its discussion of Figs. 7 and 8, Kemler discloses that "[o]nce the vehicle's computing device determines that the vehicle has reached the threshold distance or time, the vehicle may display the unique signal." Appx334, 12:14-16. "Alternatively, to further protect the privacy of the user, once the vehicle reaches the threshold distance or time, the vehicle's computing device may request the unique signal from the one or more server computing devices. In response, the one or more server computing devices may provide the unique signal to the vehicle." *Id*. 12:23-29. Notably, the above description of Kemler discloses that the controller creates and sends the unique ***indicatory signal*** when the vehicle is at a predetermined distance. The Board determined that this disclosure in Kemler did not disclose creating the ***indicator*** itself.

However, when looking at RSDI's '049 application, the Board found nearly identical disclosure in that application to support a finding that creating an indicator

was disclosed. *See supra* § II.B. As discussed above, the Board pieced together disclosure from the '049 application's paragraphs 21, 27 and 34-35 with paragraph 30 in determining the controller may create an indicator when the vehicle is within a predetermined distance. *Id*. But, as Lyft argued, paragraphs 12, 21, 27 and 34-35 of the '049 application at best disclose that an indicatory signal (not an indicator) is generated. *E.g.*, Appx1810, ¶ 21 ("Various embodiments of the presently-disclosed vehicle identification system are adapted to provide a notification signal for activating a driver's mobile communication device to generate a signal representing an indicator."); *see supra* § II.B.

Further, as discussed above, there is no mention, in paragraph 30 or otherwise, of ***an indicator*** being created once the vehicle is within a predetermined distance of the new rider. *See* Appx1809, ¶ 30; *supra* § II.B. Paragraph 30 discloses a unique and specific embodiment where the indicator is created when a second rider shares a vehicle. The remaining paragraphs only disclose when an ***indicatory signal*** is created. Despite this, the Board found that the '049 application supported the Substitute Claims.

At the same time, the Board argued that Kemler's Fig. 10 and related disclosure controlled when the indicator was created, and that the indicator can only be created when the rider requests a ride. *See, e.g.*, Appx62; Appx330, 3:52-59 ("The request [for a vehicle] may be sent to a centralized dispatching system which selects

27

or assigns a vehicle to the requesting user. At the same time, the centralized dispatching system may generate a signal to identify the vehicle to the user."). However, the disclosure referenced by the Board clearly states that it is merely an example embodiment. Appx330, 3:48-49 ("As noted above, the technology may be applicable in ***various circumstances. In one instance*** . . .") (emphasis added). There is nothing in the cited sections of Kemler that require the indicator to be created once the user requests a vehicle, and as mentioned above, Kemler discloses that the indicatory signal may be created and sent when the vehicle reaches a predetermined distance. *See* Appx334, 12:14-29. Thus, the Board improperly interpreted Kemler by limiting its disclosure to a single embodiment. *See In re Wesslau*, 353 F.2d 238, 241 (CCPA 1965) ("It is impermissible within the framework of section 103 to pick and choose from any one reference only so much of it as will support a given position, to the exclusion of other parts necessary to the full appreciation of what such reference fairly suggests to one of ordinary skill in the art."); *see also Bausch & Lomb, Inc. v. Barnes-Hind/Hydrocurve, Inc.*, 796 F.2d 443, 449 (Fed. Cir. 1986).

When Kemler's disclosure and RSDI's '049 application are evaluated consistently, however, either Kemler discloses creating an indicator when the vehicle is within a predetermined distance or the '049 application does not provide support for the Substitute Claims. Either way, the Board's patentability determination of the Substitute Claims cannot stand.

28

### B.    The Board Incorrectly Interprets Stanfield

Notwithstanding Kemler disclosing creating an indicator when the vehicle is within a predetermined distance, Stanfield along with the knowledge of a POSA also discloses these limitations. The Board committed error by discounting Stanfield's disclosure because it purportedly does not address the same problem as the challenged patents. As such, the Board's decision is not supported by substantial evidence. *See Cross Medical Products, Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1323 (Fed. Cir. 2005) ("One of ordinary skill in the art need not see the identical problem addressed in a prior art reference to be motivated to apply its teachings.").

As Lyft and its expert have previously presented, Stanfield discloses the ability to generate and display indicators representing real-time information, and a POSA would have found it obvious to create the indicators only when the vehicle is within a predetermined distance for reasons such as to avoid unnecessary constraints on the system which may occur if the indictor is created before the indicator is actually needed  *See, e.g.*, Appx2101-2102, ¶¶ 53-54 ("In my opinion, a POSA would have considered the creation of an indicator for the first time when a vehicle reaches a certain distance obvious. A POSA would understand that generating an indicator before the indicator is to be displayed may impose constraints on the system."); Appx2130-2131, ¶¶ 38-39; Appx1677, 2:18-21; Appx1679, 6:40-53; Lyft

Br. at 68-69. The Board and RSDI have yet to address the merits of Lyft's arguments which relies on its expert's unrebutted testimony explaining why a POSA would have found it obvious to delay the creation of the indicator until the vehicle is within a predetermined distance.

Additionally, contrary to the Board's findings, Stanfield does address similar problems as the Challenged Patents relating to security. As Lyft's expert stated, a POSA would understand that Stanfield addresses security concerns "by limiting the ability of unauthorized persons from entering the vehicle." Appx2111, ¶ 75; *see also* ¶ 76; Appx2137, ¶ 54; Appx2138 ¶ 55. Thus, the Board's determination is not supported by substantial evidence and Stanfield alone or in combination discloses creating an indicator when the vehicle is within a predetermined distance.

## CONCLUSION

Accordingly, the Board's partial grant of RSDI's motions to amend the '637 and '199 patents should be reversed.

Date: April 2, 2024                          */s/ Eliot D. Williams*

> Eliot D. Williams
> eliot.williams@bakerbotts.com
> Baker Botts L.L.P.
> 700 K Street, N.W.
> Washington, DC 20001-5692
> (202) 639-7700
>
> Jeremy J. Taylor
> jeremy.taylor@bakerbotts.com
> Baker Botts L.L.P.
> 101 California Street, Suite 3200
> San Francisco, CA 94111
>
> Jennifer C. Tempesta
> jennifer.tempesta@bakerbotts.com
> Margaret M. Welsh
> margaret.welsh@bakerbotts.com
> Baker Botts L.L.P.
> 30 Rockefeller Plaza
> New York, NY 10112
>
> *Attorneys for Cross-Appellant Lyft, Inc.*

## **CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS**

1. This filing complies with the type-volume limitation of Federal Circuit Rule 32(a) or Federal Circuit Rule 28.1.

X   The filing contains 6,891 words, excluding the parts of the filing exempted by Federal Rule of Appellate Procedure 32(f) or

__ The filing uses a monospaced typeface and contains_____ lines of text, excluding the parts of the filing exempted by Federal Rule of Appellate Procedure 32(f)

2. This filing complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Circuit Rule 28.1 and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6)

X  The filing has been prepared in a proportionally spaced typeface using Microsoft Office Word 365 in a 14 point Times New Roman font, or

___ The filing has been prepared in a monospaced typeface using in a ___ characters per inch_____ font.

Dated: April 2, 2024                     /s/ Eliot D. Williams
                                         Eliot D. Williams

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on this <u>2nd</u> day of April, 2024, I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Federal Circuit through the Court's CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

<em><u>/s/ Eliot D. Williams</u></em><br>Eliot D. Williams